# EXHIBIT A

THE LAW FIRM OF RAVI BATRA, P.C.
142 Lexington Avenue
New York, NY 10016
Ravi Batra, Esquire (*pro hac vice*)
Michael W. Kennedy, Esquire
(212) 545-1993
(212) 545-0967 (fax)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN TOUCH CONCEPTS, INC., d/b/a ZCOM, | **DOCKET NO.** |
| *Plaintiff,* | **12-CV-00542 (PGS) (TJB)** |
| -against- | **FIRST AMENDED** |
| | **COMPLAINT** |
| (1) CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, (2) TOM VERGHESE, (3) RYAN BROOMES, (4) JORGE VELEZ, (5) ANTHONY FIOCCO, (6) BRUNO PAVLICEK, (7) AJAY BHUMITRA; (8) SHELLY BHUMITRA, (9) POONAM SAWNHEY; and, (10) JOHN/JANE DOE CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS PERSONNEL ## 1-10, so named as their identities have yet to be established, | |
| *Defendants* | |

Plaintiff IN TOUCH CONCEPTS, INC., d/b/a ZCOM ("ITC" and/or "Zcom") by

and through its lead counsel and attorneys of record THE LAW FIRM OF RAVI

BATRA, P.C., as and for its First Amended Complaint against the Defendants (1) Cellco

Partnership d/b/a Verizon Wireless ("VZW"), (2) Tom Verghese ("Verghese"), (3) Ryan

Broomes ("Broomes"), (4) Jorge Velez ("Velez"), (5) Anthony Fiocco ("Fiocco"), (6)

Bruno Pavlicek ("Pavlicek"), (7) Ajay Bhumitra ("Ajay"); (8) Shelly Bhumitra ("Shelly"),

1

(9) Poonam Sawnhey ("Poonam"); and, (10) John/Jane Doe Cellco Partnership d/b/a

Verizon Wireless Personnel ## 1-10, so named as their Identities have yet to be

established, allege the following:[1]

## I.    TABLE OF CONTENTS

1.    The contents of the instant complaint are as follows:

I.    Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    Table of Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.    Overview: Two Separate Plots, Intertwine, and
        Unlawfully Victimize Zcom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.    VZW On Notice That Zcom Contemplated
        Litigation Against It - Zcom Satisfies
        "Pre-Suit" Notice Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VI.    VZW's Prepaid Activation Scheme Generally . . . . . . . . . . . . . . . . 20

        ■    The Crooked Three-Legged Stool:
             Bad Faith, Unfair and Unjust "Push,"
             "Chargebacks" and "Dishonest Investigation . . . . . . . . . . . 21

VII.    Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        A.    The Plaintiff - In Touch Concepts d/b/a Zcom
              ("ITC" or "Zcom") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        B.    The Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

_____

[1]Except those allegations which specifically state "upon information and belief," and as to them plaintiff will likely have evidentiary support after a reasonable opportunity for discovery and further investigation.

2

- Cellco Partnership d/b/a Verizon Wireless ("VZW") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

- Tom Verghese . . . . . . . . . . . . . . . . . . . . . . 28

- Ryan Broomes . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

- Jorge Velez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

- Anthony Fiocco . . . . . . . . . . . . . . . . . . . . . . . . . 31

- Bruno Pavlicek . . . . . . . . . . . . . . . . . . . . . . . . . . 33

- Ajay Bhumitra (Principal of the "Trojan Horse") . . . . . . . . . . . . . 34

- Shelly Bhumitra . . . . . . . . . . . . . . . . . . . . . . . . . 35

- Poonam Sawnhey . . . . . . . . . . . . . . . . . . . . . . . . 36

- John/Jane Does . . . . . . . . . . . . . . . . . . . . . . . . . . 37

VIII.    Non-parties of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

- Verizon Communications, Inc. . . . . . . . . . . . . . . . . 38

  - Inter-locking Verizon and VZW . . . . . . . . . 40

- Vodafone Group Plc . . . . . . . . . . . . . . . . . . . . . . 40

- Ivan Seidenberg . . . . . . . . . . . . . . . . . . . . . . . . . 41

- Lowell McAdam . . . . . . . . . . . . . . . . . . . . . . . . . 42

- Daniel S. Mead (Interlocking Officer of both Verizon Communications and Verizon Wireless) . . . . . . . . . . . . . . . . . . . . . . 43

- Nancy Clark . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

3

- Patrick Devlin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

- Ken Kayal, Esq. . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

- "Shady Shad" . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

- Bell Atlantic Mobile Systems, Inc. . . . . . . . . . . . . . 47

- GTE Wireless Incorporated . . . . . . . . . . . . . . . . . . 48

- PCS Nucleus, L.P. . . . . . . . . . . . . . . . . . . . . . . . . . 49

- JV PartnerCo, LLC . . . . . . . . . . . . . . . . . . . . . . . . . 50

- Non-party Components of the
  Cellco Partnership . . . . . . . . . . . . . . . . . . . . . . . . . 51

- Pino Salonna . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

- John/Jane Does . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

- Non-Party Former Employees of VZW
  Who Were Directed to Participate in the
  Prepaid Activation Scheme: Malenda,
  Coyle, and Allocco . . . . . . . . . . . . . . . . . . . . . . . . 52

IX.   Allegations Common to All Causes of Action . . . . . . . . . . . . . . . . . 53

- "Post-Pay" - Activation "Commission,"
  "Longevity," "Residuals," and "Chargebacks" . . . . . . . . . 55

- How the Prepaid Activation Scam Worked . . . . . . . . . . . . . 57

- The "Spiff" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

- The Original Plan - $26.40 to VZW . . . . . . . . . . . . . . . . . 63

- $39.60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

- "Chargeback" of $40.00 . . . . . . . . . . . . . . . . . . . . . . . . . . 64

4

- ■    VZW Gets $79.60, Nets a Profit of $19.60,
  while Zcom Loses $19.60 . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

- ■    The Revised Plan - $6.40 to VZW,
  After the "Chargebacks" Hit . . . . . . . . . . . . . . . . . . . . . . . . 66

- ■    VZW Gets a Net Profit, and
  Zcom Loses a Net $6.40 . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

- ■    Direct Push . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

- ■    VZW Punishes Zcom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

- ■    VZW Causes False Entries to be Made
  in Zcom's Business Records . . . . . . . . . . . . . . . . . . . . . . . . 72

- ■    Duress & Punishment of Zcom and
  Zcom's Sub Agents by VZW . . . . . . . . . . . . . . . . . . . . . . . 74

- ■    Zcom - The "Boy Scout," Praised by VZW
  Before Being Punished . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

- ■    Layers of Fraud by VZW . . . . . . . . . . . . . . . . . . . . . . . . . 75

- ■    The Bhumitra "Trojan Horse - Plan to
  Victimize Zcom from Within . . . . . . . . . . . . . . . . . . . . . . . 76

- ■    Phony Sales to "Celebrities" by
  VZW's Collaborators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

- ■    Bhumitra "Trojan Horse" Plan . . . . . . . . . . . . . . . . . . . . 77

- ■    "Freeze Out" of Zcom's New Store Growth
  in 2009 by VZW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

- ■    "Trojan Horse" Attacks . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

- ■    "Anonymous Benefactor" . . . . . . . . . . . . . . . . . . . . . . . . . 81

- ■    VZW's "For Cause" Termination of Zcom . . . . . . . . . . . 83

■  The VZW Defendants were
   Not Interested in the Truth  . . . . . . . . . . . . . . . . . . . . . . . . . 96

■  Mitigation by Zcom Thwarted by VZW,
   So As to be Unjustly Enriched in Bad Faith  . . . . . . . . . . . . 97

■  Zcom Tries to Sell, Per Option # 3
   to 3 Prospective Buyers  . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

■  Zcom's Prospective Buyer # 1  . . . . . . . . . . . . . . . . . . . . . . . 99

■  Zcom's Prospective Buyer # 2  . . . . . . . . . . . . . . . . . . . . . . 101

■  Zcom's Efforts to Sell to Prospective Buyer # 3,
   United Telecom, are Severely Hampered by VZW  . . . . . . 102

■  VZW is Exposed After January 31, 2012  . . . . . . . . . . . . . 108

X.   "Smoking-Gun" - Proof of VZW Misconduct -
     Actual Recording of Defendant Jorge Velez,
     of VZW, Pushing Pre-Paid as a "Do or Die"
     to a Zcom Sub Agent  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

        ■  Pre-Pay vs. Post-Pay  . . . . . . . . . . . . . . . . . . . . . . . . 114

XI.  Jurisdiction and Venue  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

XII. Causes of Action  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

     First Cause of Action:  Tortious Interference
     with Contractual Relations Between Zcom and its
     Respective Sub Agents and Customers
     (Against the VZW Defendants)  . . . . . . . . . . . . . . . . . . . . . . 116

        ■  Generation to Generation
           Business Relied Upon  . . . . . . . . . . . . . . . . . . . . . 116

        ■  The Verizon Defendants' E-Mail
           Pre-Paid Push Campaign  . . . . . . . . . . . . . . . . . . . 124

Second Cause of Action:  Fraud and Deceit
(Against the VZW Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

      ■     40% or More "Taken" as "Charge Backs"  . . . . . . 136

Third Cause of Action:  Misrepresentation
(Against the VZW Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Fourth Cause of Action:  Tortious Interference with
Prospective Contractual Relations - "Freeze Out" -
Of Zcom's Probable  New Stores Since 2009 . . . . . . . . . . . . . . . 144

Fifth Cause of Action:  Tortious Interference with
Prospective Contractual Relations - "Freeze In" -
Preventing Zcom from Selling its Business,
Post-Termination, to Pre-Existing VZW Master Agents
Big Enough to Buy Zcom and Pay Zcom a "Fire Sale"
Price (Against the VZW Defendants) . . . . . . . . . . . . . . . . . . . . . . 149

Sixth Cause of Action:  Injurious Falsehood
(Against All Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Seventh Cause of Action:  Unjust Enrichment
(Against the VZW Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

Eighth Cause of Action:  Breach of Contract, By Way
of VZW's Failure to Give Any Pre-Suit Notice to Zcom
Prior to Commencing its Putative "First Filed"
November 2011 Lawsuit Against Zcom (Against VZW): . . . . . . 162

Ninth Cause of Action:  Breach of Contract, By Way of
 VZW Couching a "For Cause" Termination, based
on Knowingly False Allegations, as a "No Cause"
Termination, in Bad Faith (Against VZW)  . . . . . . . . . . . . . . . . . 165

Tenth Cause of Action:  Breach of Contract
by Way of Breaching the Implied Covenant of
Good Faith and Fair Dealing, Imposed by
New York Law - In VZW's Words and Deeds
(Against VZW) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

Eleventh Cause of Action:  Declaratory Judgment,
Seeking Severance of Section 10.2 of the Contract,
Consistent With Section 10.3 of the Contract, as
Drafted by VZW, as Section 10.2 is Against the
Law and Public Policy of the State of New York
(Against VZW) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

## II.   TABLE OF EXHIBITS

2.      The materials exhibited to the instant complaint are as follows:

Exhibit 1:   Printouts from websites maintained by defendant Cellco
Partnership d/b/a Verizon Wireless and its majority parent
Verizon Communications, Inc.;

Exhibit 2:   Portions of filings made by Verizon Wireless with the
Securities and Exchange Commission;

Exhibit 3:   Financial Reports issued by Verizon Communications, Inc.
and Verizon Wireless, pertaining to Verizon Wireless;

Exhibit 4:   <u>Renewed</u> Master Agent Agreement between plaintiff Zcom
and defendant VZW entered October 7, 2008, governed under
New York law;

Exhibit 5:   Correspondence between Zcom and VZW regarding the "for
cause" July 26, 2011 termination of Zcom's agency
agreement effective January 31, 2012;

Exhibit 6:   Affidavit of Charu Sodhi - VZW's Integrity Problems;

Exhibit 7:   E-mail communications between Zcom, prospective
purchasers of Zcom's business and locations and VZW,
wherein VZW blocks sales of Zcom ("Freeze-In");

Exhibit 8:   Letter to VZW seeking indemnification for Reachout lawsuit;

Exhibit 9:   Letter from VZW's lead outside litigation counsel, Philip
Sellinger, Esquire, rejecting indemnification - and reiterating
VZW's "for cause" termination of Zcom on July 26, 2011;

8

Exhibit 10:     Package of evidence received by Zcom from an "Anonymous Benefactor" - exposing the Bhumitra "Trojan Horse" and VZW-Bhumitra collaboration;

Exhibit 11:     Records of prepaid service activated by defendant Shelly Bhumitra's Reachout Wireless in, *inter alia*, fictitious names of Robin Williams, Warren Buffet, and, Russia's Vladamir Putin;

Exhibit 12:     E-mail communications regarding Zcom providing prepaid cellular phones to a recognized charity helping, *inter alia*, autistic children - conclusive proof that "termination cause" is invalid;

Exhibit 13:     E-mail communications regarding Zcom's efforts at fraud detection and maintaining integrity with VZW's acknowledgment of same;

Exhibit 14:     Affidavit of Sandeep "Sunny"Girhotra, principal of a Zcom sub agent, regarding the validity of an incorporated audio recording of defendant Jorge Velez pushing VZW's "shady" pre-pay program on the Zcom sub agent - as "do or die";

Exhibit 15:     E-mail communications from sub agent Sandeep "Sunny"Girhotra regarding the VZW pre-pay push;

Exhibit 16:     E-mail communications from Keith Allocco, then of VZW, regarding the VZW pre-pay push - VZW sets pre-pay goals;

Exhibit 17:     E-mail communications from John Coyle, then of VZW, regarding the VZW pre-pay push;

Exhibit 18:     E-mail communications from Chris Malenda, then of VZW, regarding the VZW pre-pay push;

Exhibit 19:     E-mail communications from VZW's Ryan Broomes, regarding the VZW pre-pay push;

Exhibit 20:     E-mail communications from VZW's Tom Hennesy, regarding, *inter alia*, the VZW pre-pay push;

Exhibit 21:    Proof that Co-Op Money spent by Zcom was within VZW policies and further proof of false "termination cause."

## III.    PRELIMINARY STATEMENT

2.     This action, brought under New York law, as contractually imposed by VZW, the drafter of the contract at issue [*see* Ex. 4], at Section 10.1 thereof, seeks compensatory and punitive damages for the defendants' individual and collective actions which have tortiously interfered with the existing business relations and prospective business relations of plaintiff In Touch Concepts, Inc., d/b/a Zcom ("ITC" and/or "Zcom"). Moreover, the defendants are also liable to Zcom for injurious falsehood in that they maliciously made false statements about Zcom without regard to the economic harm that such falsities would cause Zcom, notwithstanding that a reasonably prudent person would have known, or at least anticipated that economic damage to Zcom would naturally flow therefrom. Furthermore, defendant VZW is liable to Zcom for breach of contract and breach of the implied covenant of good faith and fair dealing. Additionally, Zcom seeks a Declaratory Judgment declaring that Section 10.2 of the Agent Agreement which governed the business relationship between Zcom and VZW, which sought to unlawfully and improperly remove the implied covenant of good faith and fair dealing from the contract, is void, invalid and unenforceable, and accordingly severing same from the Agent Agreement pursuant to Section 10.3 thereof.

3.      For ease of reference herein, defendants Tom Verghese, Ryan Broomes, Jorge Velez, Anthony Fiocco, Bruno Pavlicek, and, John/Jane Doe Cellco Partnership d/b/a Verizon Wireless Personnel ## 1-10, so named as their identities have yet to be established, will collectively be referred to as  the "Individual VZW Defendants." Collectively, Cellco Partnership d/b/a Verizon  Wireless and Individual Verizon Defendants shall be referred to as the "VZW Defendants."

## IV.    OVERVIEW: TWO SEPARATE PLOTS, INTERTWINE, AND UNLAWFULLY VICTIMIZE ZCOM

4.      Zcom is a victim of two plots, independently hatched by Verizon Wireless ("VZW") and the Bhumitra brothers, one from outside and one from inside,  and predicated upon a common breach of New York's mandatory implied covenant of good faith and fair dealing by each defendant, individually and/or collectively, in whole or in part, plus other misconduct, be it  breach of contract or tortious.

5.      All was well between VZW and Zcom until 2008, and the contract was again renewed for a 5-year term, until October 2013.  Then, unfortunately VZW decided to embark on a risky misadventure: "push" its prepaid activations sales in 2008, and given what was, upon information and belief, their fraudulent and corrupt execution of same, it was a failed initiative.

6.      VZW closed their books on same in or about 2011 and selectively terminated some of its "downstream" employees, "Shady Shad," on July 1, 2010, and Tom Verghese, Chris Malenda and John Coyle on or about July 11, 2011.  About two

11

weeks later, on July 26, 2011 VZW wrongfully noticed Zcom with a "for cause" termination, based upon an unfair, *incomplete* and unjust investigation, contemporaneously known by VZW to be incomplete and unfair, and with "causes" that VZW contemporaneously knew did not exist or were the fault of VZW itself.

7.      VZW's misconduct resulted in Zcom being falsely terminated "for cause" by VZW, and in bad faith labeling same as a "no cause" termination, in an effort to deprive Zcom of a means to contest same.   Upon Zcom's objection to same and a stated desire to cure the termination by exposing the falsity of the "causes" stated by VZW with truth and documentary evidence, VZW unfairly foreclosed that process and directed Zcom to "focus" on selling itself, and then in bad faith, secretly and overtly blocked Zcom's efforts over a five (5) month period, up to and including, January 19, 2012, to do so at a "fire sale" price.

8.      Ajay Bhumitra, a self-proclaimed "godfather" of the cellular activation business, and owner of AT&T and Sprint agencies, caused his brother, Shelly Bhumitra, to become Zcom's subagent by requesting a favor of Vikas Dhall, aka Victor Singh ("Victor"), Zcom's CEO, so as to become Ajay's "Trojan Horse," in violation of the duties of loyalty and good faith owed by an agent to its principal.  This was a concerted effort to destroy Zcom from within so Ajay Bhumitra could take over Zcom's 150-store business aided by VZW's Tom Verghese, whom Ajay and Shelly bribed and corrupted to their incidental benefit with VZW reaping intended benefits: defalcation of Zcom's

valuable rights to approximately $750,000.00-a-month in post-pay residuals for the foreseeable future and *inter alia*, Zcom's unique and valuable prized real estate locations with established customer flow generating about $150 Million Dollars a year, with activation and data plan sales of about $75 Million Dollars annually, and a like amount in product and accessories sales.

9.      Hence, the two separate plots, intertwined and victimized Zcom from within and without, as follows:

a.      As to the VZW-related defendants and non-parties of interest, upon information and belief, some of them at a level of VZW's President of the New York Metro Region,  Pat Devlin, or *higher*, deliberated and approved the "push" in 2008 of pre-paid phone activation sales to take it past its "low single digits" of *typical* performance, and "spike it" into the double-digits to achieve a higher combined number of activations, pre-paid and post-pay, an important measure of success in the national cellular carrier industry, made up of VZW, AT&T, Sprint Nextel and T-Mobile USA.

b.      Other VZW-related defendants and non-parties of interest, upon information and belief, at a level of Pat Devlin or *below*,  executed the approved goal of push-based "spike" in pre-paid activation sales by:

i.      creating a fraudulent scheme to take Customer Provided Equipment ("CPE"), upon a VZW-approved upgrade, and have VZW's agent reactivate the CPE as a "free-to-the-customer" back-up "emergency phone" with a new

13

telephone number, by absorbing the cost of "loading up" the CPE with a $15 pre-paid "card," and then a $30 pre-paid  "card" on the 60th day post-activation, with VZW's expensive *non-rollover* air time minutes, and earn $20.00 in a non-"chargebackable" special promotion/incentive, colloquially referred to as a "Spiff," plus $40.00 in commission, subject to "chargeback" if the phone did not have paid air time minutes to last the 180 days, allegedly netting to the VZW agent or subagent $19.60 and a happier customer, who got a free extra cell phone for emergencies. What VZW purposefully did not disclose to Zcom or its sub agents was that if there were no calls placed on the emergency phone, independent of there being minutes loaded up to last the 180 days, VZW would unilaterally "deactivate" it and impose a "chargeback" of the $40.00 commission upon the 150th day.   This willful non-disclosure of a no-activity-within-150 days based deactivation and "chargeback" to Zcom and its subagents by VZW and its employees, below Pat Devlin, caused injury to Zcom's customer good will, Zcom's goodwill with its subagents and a net loss to Zcom of $19.60 per deactivation;

ii.      Upon information and belief, these same level of VZW- defendants, Pat Devlin or lower,  then came up with a "revised plan," now that Zcom and its subagents were aware that there had to be some activity, including, a "test call" upon activation during the first-150 days of activation, that upon merely loading up with $30.00, not $45.00, in VZW non-rollover air time minutes would keep the activated number alive for 180 days, so that the agent could earn the $20.00 "Spiff" and keep the

14

$40.00 in commission, less their discounted cost of the $30.00 in VZW pre-paid air time minutes, with its then-special-elongated life of 180 days for the $30.00 pre-paid "card." Now, if there was a deactivation for any reason, such as sales to fictitious customers by agent or subagent, VZW would get a net profit of $6.40 by netting out the $20.00 "Spiff" and $40.00 in commission, with the discounted price for the $30.00 card plus $40.00 in "chargeback" commission, and Zcom would be left with a loss to its customer goodwill and a loss of $6.40 per deactivation;

    c.  Upon information and belief, by June 2010, VZW, due to heightened fraudulent pre-paid activations, caused by VZW' corrupt execution of the "push" or "spike" approved for pre-paid activations, by employees, including, Tom Verghese, "Shady Shad," John Coyle, Chris Malenda, Ryan Broomes, and inter alia, Jorge Velez, VZW and its employees at the level of Pat Devlin or higher, sent VZW's integrity-investigators Anthony Fiocco and Bruno Pavlicek to first meet with Zcom, as it was VZW's *largest* New York Metro Master Agent, whereupon they learned that Zcom had been victimized by VZW's employees misconduct, Zcom had its own integrity program and had been acting appropriately to monitor its subagents, but, was then unaware of the extent of VZW's misconduct.  VZW fired some of its  employees below the level of Pat Devlin, including, Tom Verghese, "Shady Shad," John Coyle, and Chris Malenda, and then, in collaboration with the Bhumitra brothers, Ajay and Shelly's "Trojan Horse" plot to destroy Zcom from within, aided by their cohort, Poonam Sawnhey, and without by

VZW's bribed-by-Bhumitras Tom Verghese and VZW's Bruno Pavlicek's incomplete
integrity-investigation, falsely took aim at Zcom, as a scapegoat for all that was wrong
with VZW's corrupt and fraudulent execution of its push of pre-paid activations, despite:

    i.    Zcom's stellar growth and VZW-acknowledged performance
for over nearly 20 years;

    ii.    VZW's Pat Devlin, president of New York Metro and above
Tom Verghese and Pino Salonna, telling in or about early 2010 Victor, that he, Devlin,
expected his children to be doing business with Victor's children (generation-to-
generation business was reasonably expected by both VZW and Zcom);

    iii.    Zcom's reasonable reluctance to push pre-paid over post-pay,
when post-pay activations were necessary and more profitable for Zcom's growth and
bottom line;

    iv.    Zcom and its subagents inability to meet the un-naturally
high quotas-per-store set by VZW for each of Zcom's nearly 150 stores, upon threat of
punishment, including, termination;

    v.    Zcom's record of ethical and integrity-based professional
management programs, policies and practices, which was recognized by VZW with many
awards and certifications, which, included, monitoring its subagents pre-paid and post-
pay activations in the normal course of business, and meeting with Bruno Pavlicek and
Anthony Fiocco in or about mid-June 2010 and giving proof of the VZW' dishonest push

of pre-paid activations, including, a recorded voice mail left for Victor by "Shady Shad," VZW's employee, who was fired by VZW on or about July 1, 2010, despite the fact that VZW's field account managers were trained by VZW at VZW facilities to be "a little bit 'shady' like Shady Shad";

          vi.    the September 10, 2010 approval by VZW of Victor's buyout of his then-50% shareholder in Zcom, Alexandra Berstein, at considerable expense, with three (3) years left on the then-current renewed contract with VZW; and

          vii.    VZW's Jorge Velez, still employed by VZW in 2012, documents the lack of good faith and incompleteness of VZW's integrity-investigation by Bruno Pavlicek, as in December 2009, while visiting a Zcom subagent, Sunny, Velez was recorded by Sunny stating, in substance, that the pre-paid activations push is approved by the "big bosses," including, Tom Verghese, and said "its do or die" while admitting VZW's pre-paid push was "a little bit shady."

          d.    VZW, in bad faith, had Bruno Pavlicek conduct a "targeted" interview, without pre-disclosing the charges that VZW was targeting Victor with on June 16, 2011, with Victor's counsel present, whereupon false accusations, fed by, *inter alia*, Shelly Bhumitra, were leveled against Victor without any good faith basis, and a second interview was scheduled for June 22, 2011 so that Victor could look for documentary evidence to address the false charges being leveled in bad faith. The second interview, was cancelled at Victor's direction, as a day earlier, on June 21, 2011, Victor, had

received a package of record evidence from an "Anonymous Benefactor" that contained

proof of dishonesty, disloyalty, and bad faith of Shelly Bhumitra, Zcom's subagent, Ajay

Bhumitra, Poonam Sethi, a Zcom subagent, and the troubling and wrongful **collaboration**

between *inter alia*, Shelly Bhumitra and VZW's Bruno Pavlicek. About a month later,

VZW's Pino Salonna wrongfully issued a "for cause" "Termination Notice," with a

detailed list of false causes, and then in bad faith characterized same as a "no cause"

termination to make its wrongful termination and other misconduct judge-proof.

       e.     It is core piece of evidence that VZW, who drafted its agreement

with Zcom, made it subject to New York law, and then in violation of New York law that

mandates in every contract an implied a covenant of good faith and fair dealing, had a

clause that sought to expressly waive the implied covenant, thereby seeking to make any

and all of VZW-misconduct judge-proof, while having a clause in the contract that if

Zcom acted improperly or without integrity, it could be terminated with immediate effect

- hence, failing the mutuality of obligations needed in a contract. But, there is the

severability clause in the contract, in addition to the court's inherent power to reform a

contract by severing illegal clauses.

## V.   VZW WAS ON ACTUAL NOTICE THAT ZCOM<br>CONTEMPLATED LITIGATION AGAINST IT -<br>ZCOM SATISFIES PRE-SUIT NOTICE REQUIREMENT

    10.    Prior to commencing litigation against VZW, Zcom made written

requests seeking to negotiate with VZW [*see e.g.* Ex. 5, and January 19, 2012 e-mail at

Ex. 7 which, in substance, provides, in pertinent part "see you in Court" (Ex. 7 at 000048 - 000049)].

11.    Prior to commencing litigation against VZW, Zcom notified VZW in writing that litigation was contemplated [*see e.g.* Ex.  8].

12.    Prior to commencing litigation against VZW, Zcom alerted VZW's counsel that litigation was contemplated.

13.    VZW refused to negotiate with Zcom and/or its counsel, and indeed, VZW, via counsel, re-asserted the "causes" for 7/26/2011 termination [*see e.g.* Exhibit 9].

14.    Prior to interposing the within First Amended Complaint, Zcom provided further written notice to VZW and requested that VZW negotiate.

15.    This written notice was sent via FedEx on April 9, 2012 to the Director of Indirect Operations for VZW.

16.    A copy of the written notice was sent by Certified Mail/ Return Receipt Requested to VZW's General Counsel - Northeast Area.

17.    A further copy of the written notice was sent by facsimile and by First Class Mail to VZW's lead litigation counsel.

18.    Zcom complied with the pre-suit notice requirement imposed by Section 14 of the contract by giving same to VZW.

## VI.    VZW'S PREPAID ACTIVATION SCHEME GENERALLY

19.    The plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though they had been set forth in full herein.

20.    VZW developed a scheme to fraudulently inflate their new account activations with little to no cost to themselves, enabling them to enhance its activation figures, while being less than truthful with Zcom and its sub agents and, upon information and belief, with other Master Agents.

21.    Upon information and belief, this fraudulent prepaid activation scheme was collectively devised by VZW along with defendants Verghese, Broomes, Velez, John/Jane Does, whose identities are not yet known, and, non-parties of interest affiliated with VZW and related entities.

22.    Upon information and belief, this fraudulent prepaid activation scheme was collectively approved of by VZW along with defendants Verghese, Broomes, Velez, John/Jane Does, whose identities are not yet known, and, non-parties of interest affiliated with VZW and related entities.

23.    This fraudulent prepaid activation scheme was collectively executed and implemented by VZW along with defendants Verghese, Broomes, Velez, John/Jane Does, whose identities are not yet known, and, upon information and belief, non-parties of interest affiliated with VZW and related entities.

24. Upon information and belief, the VZW Defendants, and, upon information, and belief, non-parties of interest affiliated with VZW and related entities, personally benefitted from the new number activations associated with the prepaid activation scheme.

25. Upon information and belief, a cover-up of the VZW Defendants' prepaid activation scheme was devised by the VZW Defendants and non-parties of interest affiliated with VZW and related entities in or about 2010.

26. Upon information and belief, the cover-up of the VZW Defendants' prepaid activation scheme was executed and implemented by the VZW Defendants and non-parties of interest affiliated with VZW and related entities.

27. <u>The Crooked Three-Legged Stool - Bad Faith, Unfair, and Unjust - "Push," "Chargeback," and "Dishonest Investigation</u>:  the VZW Defendants' scheme was "sold" as the marketing and sale of prepaid VZW branded cellular phone service to end-"user" customers as an "emergency" or "backup" wireless phone number, sort of a "spare tire," but which, upon information and belief, was actually "flat" when needed by the customer.

28. The scheme was a crooked three-legged stool, to wit:

a. one "leg" was the pushing of pre-paid activations bu defendants VZW, Verghese, Velez, Broomes, as well as others, including, *inter alia*, "Shady Shad,"

21

Coyle, Malenda and John/Jane Does, upon Zcom and its sub-agents, without disclosing all of the facts honestly [*see e.g.* Exs. 11-20];

  b. the second leg sought "charge-backs" against Zcom and its sub-agents, despite following VZW Defendants' instructions, provided by VZW, Verghese, Velez, Broomes, as well as others, including, *inter alia*, "Shady Shad," Coyle, Malenda and John/Jane Does [*see e.g.* ¶¶ 459-462, *infra*, describing defendant Velez' recorded conversation with a Zcom sub agent and 4/3/2010 e-mail from Keith Allocco, then a VZW Account Manager, referencing charge backs for non-usage at Ex. 16 at 000099]; and,

  c. upon information and belief, the third leg involved VZW's termination of its own pre-paid scheme, due to its futility, and its resulting need for scapegoats, to wit:  cover-up of their own misconduct via the use of their own internal investigators, including defendants Fiocco and Pavlicek, to conduct a dishonest investigation, to ignore, eliminate and/or secrete existing knowledge and evidence of the VZW Defendants' wrongdoing, minimizing the inclusion of such information in its own investigative reports, fabricating "evidence," such as internal reports, falsely pointing to Zcom, and internally firing VZW employees  [*see e.g.* Exs. 5-6, 9-13].

29.     The VZW Defendants' scheme has punished Zcom for VZW's failures, lack of integrity and contractual and tortious misconduct relative to VZW's own unfair and bad faith push of prepaid phone activations, in a "do or die"[2] fashion, and incredulously listed same, in bad faith, as "causes" for termination of Zcom's contract on July 26, 2011 [*see e.g.* Exs. 5-6, 9].

30.     The VZW defendants have further sought to falsely blame Zcom for invoicing issues related to its own Co-Op advertising program, notwithstanding that Zcom consistently followed VZW's instructions and guidelines, to wit:

      a.     Before January 2009 Co-Op was on accrual basis.

          i.     Option 1:  an advertisement was submitted to VZW for pre-approval.  Once it was approved the advertisement was placed.  The advertisement would be paid for by a sub agent and then submitted to VZW for reimbursement  [*see e.g.* Ex. 21 at 000001 - 000008];

          ii.     Option 2: an order was placed online on VZW's Advertising Checking Bureau ("ACB") website[3] so as to purchase  promotional merchandise from ACB using accrued co-op funds via approved vendors, including, *inter alia*, "Palmer," "Graphics Edge," and  "Cellebrite"  [see e.g. Ex. 21 at 000009 - 000011];

---

[2]"Do or Die" was the mandate of defendant Velez's real time recorded statement pushing the "shady" prepaid activation scheme to a Zcom sub agent (*see e.g.* ¶¶ 459 - 462, *infra*).

[3]ACB was a VZW website that manages advertising pre approvals, Co-Op accruals, Co-Op fund management and lists pre approved vendors for promotional merchandise.

b.     After January 2009, Co-Op was no longer accrued, but was instead paid for up front.  At that time, Zcom received approximately $45,000.00 per month in Co-Op, out of which approximately 70% - 75% was forwarded to Zcom sub agents along with their monthly commission payments.

i.     Option 1: Zcom could get ads pre-approved and do advertising [*see e.g.* Ex. 21 at 000012 - 000022];

ii.     Option 2: Zcom could order through ACB approved vendors using a Zcom credit card [*see e.g.* Ex. 21 at 000023 - 000028].

31.     The VZW Defendants' scheme defrauded and deceived Zcom, causing Zcom to be damaged as a result.

## VII.   PARTIES

32.     The plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though they had been set forth in full herein.

### A.   THE PLAINTIFF

●     *IN TOUCH CONCEPTS d/b/a ZCOM ("ITC" or "ZCOM")*

33.     For all relevant times herein, plaintiff Zcom is a New York Domestic Business Corporation that maintained an agency relationship with defendant Cellco Partnership d/b/a Verizon Wireless ("VZW") wherein Zcom was authorized to sell services on VZW's wireless network, and equipment that works on that network [*see* Ex. 4].

24

34. The agency relationship between Zcom and VZW was longstanding - spanning nearly twenty (20) years.   Zcom performed so well and got so big that it contributed to approximately .029% of VZW's <u>national</u> share[4] and about 25% of VZW's New York Metro market share (*see e.g.* Affidavit of Patrick Devlin dated January 6, 2012 at p. 5).

35. Pursuant to that long standing relationship, beginning with Zcom's predecessor company, Zcom was authorized to engage sub agents who, if approved by VZW, could perform the sale of VZW services and equipment on Zcom's behalf.   Zcom was a "Master Agent" for the sales of VZW services and equipment, while those acting for Zcom were "corporate owned" or independent sub-agents.

### B.   THE DEFENDANTS

- #### *CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS ("VZW")*

36. Defendant Cellco Partnership d/b/a Verizon Wireless ("VZW") is a General Partnership existing under the laws of the State of Delaware with principal offices located in the State of New Jersey and a business presence throughout the United States, including a significant presence in the State of New York [*See e.g.* Exs. 1, 2 and 3].

37. VZW is the wireless business unit of non-party Verizon Communications, Inc. [*See e.g.* Exs. 1, 2 and 3].

---

[4]Upon information and belief, VZW's national share was over $100 Billion Dollars - or to say it another way, 360 Zcom's made up all of VZW's national postpaid sales.

25

38.     VZW holds itself out as the largest provider of wireless communications services in the United States based upon number of customers.  Defendant VZW has made this representation to Zcom as well as in filings with the Securities and Exchange Commission [*See e.g.* Ex. 2 at 000010].

39.     Defendant VZW is a joint venture between Verizon Communications, Inc. and Vodafone Group Plc, and is generally controlled by Verizon Communications, Inc. [*See e.g.* Ex. 2 at 000010*,* 000055].

40.     Verizon Communications, Inc. is the majority owner of the VZW partnership and significantly controls the operations of VZW [*See e.g.* Ex. 2 at 000010*,* 000055].

41.     VZW conducts substantial and continuous business within the State and County of New York, owning many retail stores, and having many agent storefronts marketing and selling VZW branded products and services.

42.     <u>VZW is ". . . controlled by Verizon Communications, Inc."</u>: In filings with the United States federal government, made during the time periods complained of herein, VZW asserted that, *inter alia*, it "is generally controlled by Verizon Communications. . ." [*See e.g.* Ex. 2 at*,* 000055].

43.     VZW's income and profits are recorded by Verizon Communications, Inc. and reported within Verizon Communications, Inc.'s reports to, *inter alia*, consumers and investors [*See e.g.* Ex. 3].

26

44.     Verizon Communications, Inc. owns the Verizon Wireless trademark and licenses it to VZW [*See e.g.* Ex. 2 at 000056].

45.     Since the launch of VZW, Verizon Communications, Inc. has been its 55% beneficial owner.

46.     VZW regularly did and does business in the State of New York.

47.     Much of the conduct complained of occurred within and impaired Zcom within New York.

48.     VZW conducts substantial and continuous business within the State and County of New York, owning many retail stores, and having many agent storefronts marketing and selling VZW branded products and services.

49.     In or about October 2002, VZW reported to the federal government that its management structure provided that "Verizon Communications controls us, and will continue to do so as long as it and its subsidiaries owns at least 20% of our partnership interests" [*See e.g.* Ex. 2 at 000056].

50.     In or about October 2002, VZW then conceded that it was even then "a defendant in a number of cases in various courts involving claims by agents and resellers who allege that we breached our contracts with those agents and resellers, have tortuously interfered with their contractual relationships with others and have engaged in fraud and unfair competition" [*See e.g.* Ex. 2 at 000059]; the instant complaint seeks to expose

defendants' conduct to the judicial disinfectant sunshine, to permit justice and Rule of Law to prevail, despite, upon information and belief, corporate hubris.

51.     Upon information and belief, VZW's performance is also, at times, recorded by Vodafone Group Plc, Inc. and reported within Vodafone's reports to, inter alia, consumers and regulators (*see e.g.* Vodafone Group Plc Form 20-F for fiscal year ended March 31, 2010).

52.     VZW participated in the creation and implementation of the prepaid activation scheme complained of herein, the push, "chargebacks," and its cover up.

53.     VZW benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

54.     Upon information and belief, VZW participated in the fabrication of false allegations against Zcom complained of herein [*see e.g.* Exs. 5-6, 8-20], while preventing the documentation of VZW's upper management misconduct.

55.     VZW orchestrated and implemented the improper, bad faith and unfair termination of the agreement governing the relationship between Zcom and VZW [*see e.g.* Exs. 4-6, 10-20]; it was both a breach of contract, as well as tortious - *inter alia* - fraudulent defalcation of Zcom's $750,000.00 per month "post-pay" "residuals."

- ### *TOM VERGHESE*

56.     At all relevant times defendant Tom Verghese ("Verghese") was employed by VZW as Director of Indirect Distribution for the New York Metro Market.

57.     Prior to his Directorship, Verghese was a District Manager for VZW.

58.     Prior to and during his Directorship, Verghese was a good friend of Shelly Bhumitra.

59.     Prior to and during his Directorship, Verghese was a good friends of Ajay Bhumitra.

60.     Verghese was actively involved in the implementation of the prepaid activation scheme complained of herein.

61.     Verghese approved of the prepaid activation scheme complained of herein.

62.     Verghese benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

63.     Upon information and belief, Verghese was actively involved in the fabrication of false allegations against Zcom complained of herein.

64.     Upon information and belief, as part of their cover up, VZW terminated Verghese, as well as, *inter alia*, "Shady Shad," John Coyle and Chris Malenda.

65.     Upon information and belief, VZW, or a related entity or entities are indemnifying Verghese for his acts complained of herein.

66.     Upon information and belief, VZW, or a related entity or entities are providing a defense to Verghese for his acts complained of herein.

67.     Many of defendant Verghese's activities complained of herein occurred within the State of New York, and caused damage to Zcom within the State of New York.

68.     VZW is liable for the acts and omissions of defendant Verghese, including, based upon the doctrine of *respondeat superior*.

- ***RYAN BROOMES***

69.     At all relevant times defendant Ryan Broomes ("Broomes") was employed by VZW as an account manager.

70.     Broomes actively participated in the implementation of the prepaid activation scheme and its cover up.

71.     Broomes approved of the prepaid activation scheme complained of herein.

72.     Broomes benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

73.     Many of defendant Broomes' activities complained of herein occurred within the State of New York, and caused damage to Zcom within the State of New York.

74.     Upon information and belief, VZW, or a related entity or entities are indemnifying Broomes for his acts complained of herein.

75.     Upon information and belief, VZW, or a related entity or entities are providing a defense to Broomes for his acts complained of herein.

76.     VZW is liable for the acts and omissions of defendant Broomes, including, based upon the doctrine of *respondeat superior*.

- ***JORGE VELEZ***

77.     At all relevant times defendant Jorge Velez ("Velez") was employed by the VZW as an account manager.

78.     Velez actively participated in the implementation of the prepaid activation scheme and its cover up.

79.     Velez approved of the prepaid activation scheme complained of herein.

80.     Velez benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

81.     Defendant Velez's activities complained of herein occurred within the State of New York, and caused damage to Zcom within the State of New York.

82.     Upon information and belief, VZW, or a related entity or entities are indemnifying Velez for his acts complained of herein.

83.     Upon information and belief, VZW, or a related entity or entities are providing a defense to Velez for his acts complained of herein.

84.     VZW is liable for the acts and omissions of defendant Velez, including based upon the doctrine of *respondeat superior*.

- ***ANTHONY FIOCCO***

85.     At all relevant times defendant Anthony Fiocco was ostensibly an internal investigator for VZW.

31

86.     Upon information and belief, Fiocco  was actively involved in and integral to the cover up of the VZW Defendants' creation, involvement and implementation of the prepaid activation scheme.

87.     Upon information and belief, Fiocco was actively involved in the fabrication and dissemination of false allegations against Zcom.

88.     Upon information and belief, Fiocco learned that Zcom was not responsible for bad acts and false charges levied against it, and helped to cover up same, leading to, inter alia, Zcom's unjust termination by VZW.

89.     Many of defendant Fiocco's activities complained of herein occurred within the State of New York, and caused damage to Zcom within the State of New York.

90.     Upon information and belief, VZW, or a related entity or entities are indemnifying Fiocco for his acts complained of herein.

91.     Upon information and belief, VZW, or a related entity or entities are providing a defense to Fiocco for his acts complained of herein.

92.     VZW is liable for the acts and omissions of defendant Fiocco, including based upon the doctrine of *respondeat superior*.

93.     Upon information and belief, any privilege claimed by Fiocco - should it even exist - is subject to, *inter alia*, the crime-fraud exception to same.

## • *BRUNO PAVLICEK*

94.     At all relevant times defendant Bruno Pavlicek  was ostensibly an internal investigator for VZW.

95.     Upon information and belief, Pavlicek  was actively involved in and integral to the cover up of the VZW Defendants' creation, involvement and/or implementation of the prepaid activation scheme.

96.     Upon information and belief, Pavlicek was actively involved in the fabrication and dissemination of false allegations against Zcom.

97.     Upon information and belief, Pavlicek learned that Zcom was not responsible for bad acts and false charges levied against it, and helped to cover up same, leading to, *inter alia*, Zcom's unjust termination by VZW.

98.     Many of defendant Pavlicek's activities complained of herein occurred within the State of New York, and caused damage to Zcom within the State of New York.

99.     Upon information and belief, VZW, or a related entity or entities are indemnifying Pavlicek for his acts complained of herein.

100.     Upon information and belief, VZW, or a related entity or entities are providing a defense to Pavlicek for his acts complained of herein.

101.     VZW is liable for the acts and omissions of defendant Pavlicek, including based upon the doctrine of *respondeat superior*.

33

102. Any privilege claimed by Pavlicek - should it even exist - is subject to, *inter alia*, the crime-fraud exception to same.

● *AJAY BHUMITRA*
(Principal of the "Trojan Horse")

103. At all relevant times herein defendant Ajay Bhumitra ("Ajay") is the self-proclaimed "Godfather" of the wireless activation industry, and is the principal of the Bhumitra "Trojan Horse."

104. Ajay owns a large portfolio of Sprint Nextel and AT&T branded agency locations from where he was able to market wireless products and services in direct competition to Zcom and in competition with VZW.

105. Ajay, acting individually, and, upon information and belief, in concert with the defendants, sought to use a personal relationship developed with defendant Varghese, acting on behalf of VZW to tortiously destroy Zcom's business so that Ajay could take it over at little to no cost.

106. Upon information and belief, Ajay was involved in the fabrication of false allegations against Zcom complained of herein [*see e.g.* Ex. 10].

107. In order to further this scam, defendant Ajay, his brother defendant Shelly Bhumitra, and defendant Poonam Sawnhey provided bribes to defendant Varghese as an incentive to have Varghese direct, or cause, a "freeze out" in 2009 of Zcom's then ongoing year-to-year growth of approximately 30 new VZW-approved store locations and development with VZW.

34

108.    Upon information and belief, Ajay approved and directed Shelly Bhumitra and Poonam Sawhney to collaborate with VZW and, *inter alia*, Bruno Pavlicek, to destroy Zcom's business and contract with VZW.

109.    Ajay Bhumitra is liable for the misconduct of Shelly Bhumitra, Poonam Sawhney, Reachout Wireless and American Candy.

- ***SHELLY BHUMITRA***

110.    At all relevant times herein defendant Shelly Bhumitra ("Shelly") was the principal of Zcom sub agent Reachout Wireless, upon Ajay's request to Zcom to make Shelly as sub agent, and "wi " the Bhumitra Trojan Horse.

111.    Shelly acted as a "Trojan Horse" within Zcom, while ostensibly acting as an Zcom sub agent, he was actually acting on behalf of his brother, defendant Ajay - a Zcom competitor [*see e.g.* Exs. 10-11].

112.    Shelly corrupted an Zcom employee, Raymond Patterson, to steal information which was proprietary to Zcom which was then sent to Shelly and maintained by Shelly on his own computer system [*see e.g.* Ex. 10].

113.    Shelly shared the information stolen from Zcom with, among others, Ajay [*see e.g.* Ex. 10].

114.    Shelly sought to use this information to impair Zcom.

35

115.    In direct breach of the agreements governing his relationship with Zcom, Shelly was actively maintaining Sprint Nextel agency stores - on behalf of Ajay and in direct competition with Zcom.

116.    Shelly, acting individually, and, upon information and belief, in concert with one or more of the defendants, including his brother, defendant Ajay, sought to tortiously destroy Zcom's business so that Ajay could take it over at little to no cost after causing VZW to terminate Zcom in bad faith.

117.    In order to further this additional scheme, defendants Shelly, Ajay and Poonam Sawnhey provided bribes to defendant Varghese as an incentive to have Varghese direct a "freeze out" in 2009 on Zcom's growth and development with VZW.

118.    Additionally, Shelly actively and knowingly participated in VZW's prepaid activation scam in an attempt to harm Zcom and aid defendant Varghese by enabling him to report activation growth amongst the agencies he supervised, including Zcom [*see e.g.* Exs. 10-11, 16-20].

119.    Upon information and belief, Shelly was also involved in the fabrication of false allegations against Zcom complained of herein [*see e.g.* Exs. 5, 10-11], and tortiously collaborated with VZW and, *inter alia*, Bruno Pavlicek.

- *POONAM SAWNHEY*

120.    At all relevant times herein defendant Poonam Sawnhey ("Poonam") was the principal of Zcom sub agent American Candy.

36

121.    Poonam actively and knowingly participated in VZW's prepaid activation scheme in an attempt to harm Zcom and aid defendants VZW and Varghese by enabling him to report activation growth amongst the agents he supervised, including Zcom.

122.    This aid to Vargese also served as a bribe which provided an incentive to have Varghese direct a "freeze out" in 2009 on Zcom's growth and development with VZW.

123.    Upon information and belief, Poonam was also involved in the fabrication of false allegations against Zcom complained of herein [*see e.g.* Exs. 5, 10-11], and collaborated with Shelly Bhumitra, Ajay Bhumitra, and, *inter alia*, VZW and VZW's Verghese, Pavlicek and Fiocco.

- *JOHN/JANE DOES*

124.    Defendants John/Jane Doe Cellco Partnership d/b/a Verizon Wireless Personnel ## 1-10 are so named as their identities have yet to be determined. These fictitious names are used to represent as yet unidentified officers, directors, employees, and agents of defendant VZW who were, upon information and belief, involved in harming Zcom.

125.    VZW is liable for the acts and omissions of these John/Jane Doe defendants, including based upon the doctrine of *respondeat superior*.

## VI.    NON-PARTIES OF INTEREST[5]

126.    The plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though they had been set forth in full herein.

- ***VERIZON COMMUNICATIONS, INC.***

127.    Verizon Communications, Inc. ("Verizon") is a Delaware Corporation registered to do business in New York as a Foreign Business Corporation.  Verizon's principal offices are located in New York State, within the County of New York.

128.    On the website promoting VZW, Verizon has held itself out as

> headquartered in New York, is a global leader in delivering broadband and other wireless and wireline communications services to consumer, business, government and wholesale customers. Verizon Wireless operates America's most reliable wireless network, with more than 107 million total connections nationwide. Verizon also provides converged communications, information and entertainment services over America's most advanced fiber-optic network, and delivers integrated business solutions to customers in more than 150 countries, including all of the Fortune 500. A Dow 30 company with $106.6 billion in 2010 revenues, Verizon

---

[5]When initially commenced in the Supreme Court of the State of New York, now non-parties Verizon Communications Inc., Vodafone Group Plc, Ivan G. Seidenberg, Lowell C. McAdam, Daniel S. Mead, Nancy Clark, Ken Kayal, Esq., Shaid Mohammed, a/k/a "Shady Shad," Bell Atlantic Mobile Systems, Inc., GTE Wireless Incorporated, PCS Nucleus, L.P., JV Partnerco, LLC, John/Jane Doe Verizon Communications Personnel ## 1-10, and, John/Jane Doe Vodafone Group Plc Personnel ## 1-10, were then named as defendants.

As to "Shady Shad" only, he has been dropped from the caption solely because it is believed that he fled the country to parts unknown in Australia.  As he cannot with reasonable diligence be served with process, proceeding against him as a defendant will merely cause further delay.  Notwithstanding same, it is Zcom's contention that VZW remains liable for the acts and omissions of "Shady Shad," and same are still pertinent to these proceedings.

employs a diverse workforce of more than 195,000. For more information, visit www.verizon.com.

[*See* Ex. 1 at 000001 - 000003].

129.    Furthermore, defendant VZW has promoted investment in its corporate activities by directing potential investors to Verizon Communications Inc.'s investor information website [*See* Ex. 1 at 000004 - 000008].

130.    Verizon Communications, Inc. is a majority owner in defendant VZW, owning 55% via its ownership in Bell Atlantic Mobile Systems and GTE Wireless Incorporated [*See e.g.* Exs. 1, 2 and 3].

131.    Verizon Communications, Inc. wields significant influence over the policies and practices of VZW [*See e.g.* Exs. 1, 2 and 3].

132.    Upon information and belief, Verizon Communications, Inc. benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

133.    Verizon Communications, Inc. held defendant VZW out as its own wireless business unit.  [*See e.g.* Ex. 1 at 000004 - 000008] Notably, Verizon Communications, Inc. promoted its "operations" performance pertaining to defendant VZW in terms of total number of connections along with "net adds" - which are the new wireless phone lines added in a given reporting period - net of "deactivations" [*Id.*].

134. <u>Inter-locking Verizon and VZW</u>: furthermore, upon information and belief, Verizon Communications, Inc. Executive Vice President, Daniel S. Mead, <u>also</u> serves as President and Chief Executive Officer of defendant VZW. [*See e.g.* Ex. 1 at 000009 - 000012].

- ***VODAFONE GROUP Plc***

135 Vodafone Group Plc ("Vodafone") is a company organized under the laws of the United Kingdom which, upon information and belief, conducts substantial and continuous business within the United States and in the State of New York. Vodafone's American Depository Shares of stock are listed on the New York County based NASDAQ stock exchange.

136. Upon information and belief, via its interest in PCS Nucleus, L.P. and JV PartnerCo, LLC., Vodafone is a 45% partner and owner of defendant VZW.

137. Since the launch of VZW, Vodafone has been its 45% beneficial owner.

138. Upon information and belief Along with its partner Verizon Communications, Inc., Vodafone exercised control over the acts of VZW complained of herein.

139. Upon information and belief, Vodafone benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

●   *IVAN SEIDENBERG*

140.    At relevant times herein Ivan Seidenberg ("Seidenberg") was employed as Chairman and Chief Executive Officer of Verizon Communications, Inc. [*See e.g.* Ex. 1 at 000004 - 000005, 000016] .

141.    Moreover, upon information and belief, during periods complained of herein, Seidenberg was also Chairman of the Board of Representatives of VZW and had held that position since the launch of VZW in or about April 2000.

142.    Recently, after many of the events complained of herein, upon information and belief, Seidenberg left the CEO position at Verizon Communications, Inc. which was assumed by Lowell McAdam.

143.    Similarly, after many of the events complained of herein, upon information and belief, Seidenberg left the Board of Representatives of VZW and was replaced by Daniel Mead.

144.    Upon information and belief,  Seidenberg maintained a hands-on approach to control over Verizon Communications, Inc. and its various related entities including defendant VZW.

145.    Upon information and belief, Seidenberg was instrumental in the formation of VZW.

146.    Upon information and belief, Seidenberg personally benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

41

147. Upon information and belief, VZW is liable for the acts and omissions of Seidenberg, including based upon the doctrine of *respondeat superior*.

- ***LOWELL McADAM***

148. Upon information and belief, at all relevant times Lowell McAdam ("McAdam") was employed by VZW and Verizon Communications, Inc. in various relevant roles [*See e.g.* Exs. 1 at 000009 - 000010, 000013 - 000015].

149. Upon information and belief, when VZW was first launched in or about April 2000, McAdam was its Executive Vice President and Chief Operating Officer.

150. Upon information and belief, from 2007 until in or about October 2010 McAdam was President and Chief Executive Officer of VZW.

151. Upon information and belief, McAdam has continuously been a part of the VZW Board of Representatives since VZW's launch.

152. Upon information and belief, from October 2010 until in or about August 2011, McAdam served as President and Chief Operating Officer for Verizon Communications, Inc..

153. Upon information and belief, as President and Chief Operating Officer for Verizon Communications, Inc. McAdam had overall active and actual responsibility for the operations of defendant VZW.

154. Upon information and belief, in August 2011 McAdam succeeded Seidenberg as CEO of Verizon Communications, Inc..

155.  Upon information and belief, at both VZW and Verizon Communications, Inc. McAdam maintained a hands-on approach to control over VZW.

156.  Upon information and belief, McAdam personally benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

157.  Upon information and belief, VZW is liable for the acts and omissions of McAdam, including based upon the doctrine of *respondeat superior*.

- *DANIEL S. MEAD*
**(Interlocking Officer of both Verizon Communications and Verizon Wireless)**

158.  Upon information and belief, at all relevant times Daniel S. Mead ("Mead") was employed by defendant VZW and Verizon Communications, Inc. in various roles. [*See e.g.* Ex. 1 at 000009 - 000012].

159.  Upon information and belief, since in or about 2010 Mead has served as Executive Vice President of Verizon Communications, Inc. [*Id.*].

160.  Upon information and belief, while serving as Executive Vice President of Verizon Communications, Inc., Mead _simultaneously_ served as President and CEO of defendant VZW [*Id.*].

161.  Upon information and belief, prior to his service as both Executive Vice President at Verizon and President and CEO of VZW, Mead was Executive Vice President and Chief Operating Officer at defendant VZW, with direct and actual responsibility for VZW's operations and performance throughout the United States.

43

162.    Upon information and belief, at both VZW and Verizon Mead has maintained a hands-on approach to control over VZW.

163.    The allegations in this ¶ have been removed (As Agreed).

164.    Upon information and belief, Mead was involved in the improper, bad faith and unfair termination of the agreement governing the relationship between Zcom and VZW.

165.    Upon information and belief, Mead personally benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

166.    Upon information and belief, VZW is liable for the acts and omissions of Mead, including, based upon the doctrine of *respondeat superior*.

- ***NANCY CLARK***

167.    Upon information and belief, at relevant times Nancy Clark ("Clark") was Vice President – National Operations for defendant VZW, maintaining active and overall actual responsibility for the development and launch of VZW promotions including the prepaid activation scheme complained of herein.

168.    Upon information and belief, thereafter, Clark was promoted to her current position as President – Northeast Area for defendant VZW, where she maintains active and actual responsibility for VZW's operations in the New York Metropolitan area, as well as in New England, the Philadelphia area, Upstate New York, and the regions including and around Washington, D.C., Baltimore and Virginia.

44

169.    The allegations in this ¶ have been removed (As Agreed).

170.    Upon information and belief, Clark personally benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

171.    Upon information and belief, Clark was involved in the improper, bad faith and unfair  termination of the agreement governing the relationship between Zcom and VZW.

172.    Upon information and belief, VZW is liable for the acts and omissions of Clark, including, based upon the doctrine of *respondeat superior*.

- ***PATRICK DEVLIN***

173.    Upon information and belief, at all relevant times Patrick Devlin was President of the New York Metro Region at VZW.

174.    Upon information and belief, Devlin participated in the creation and implementation of the prepaid scheme and its cover up.

175.    Upon information and belief, Devlin approved of the prepaid activation scheme complained of herein.

176.    Upon information and belief, Devlin benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

177.    Upon information and belief, Devlin was involved in the fabrication of false allegations against Zcom complained of herein.

178.    Upon information and belief, Devlin was involved in the improper, bad faith and unfair termination of the agreement governing the relationship between Zcom and VZW.

179.    Many of Devlin's activities complained of herein occurred within the State of New York, and/or caused damage to Zcom within the State of New York.

180.    Upon information and belief, VZW is liable for the acts and omissions of defendant Devlin, including based upon the doctrine of *respondeat superior*.

- ***KEN KAYAL, ESQ.***

181.    Upon information and belief, at all relevant times Ken Kayal, Esq. ("Kayal") was employed by defendant VZW as an attorney.

182.    Upon information and belief, Kayal participated in the implementation of the prepaid scheme and its cover up.

183.    Upon information and belief, Kayal personally benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

184.    Upon information and belief, Kayal was involved in the improper, bad faith and unfair termination of the agreement governing the relationship between Zcom and VZW.

185.    Any privilege claimed by Kayal is subject to, *inter alia*, the crime-fraud exception to same.

46

186.    Upon information and belief, VZW is liable for the acts and omissions of Kayal, including, based upon the doctrine of *respondeat superior*.

●    *"SHADY SHAD"*

187.    At all relevant times defendant Shaid Mohammed, a/k/a "Shady Shad," ("Shady Shad") was employed by VZW as an account manager.

188.    Shady Shad  actively participated in the implementation of the prepaid activation scheme.

189.    Shady Shad  approved of the prepaid activation scheme complained of herein.

190.    Shady Shad benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

191.    Many of Shady Shad's activities complained of herein occurred within the State of New York, and caused damage to Zcom within the State of New York.

192.    VZW is liable for the acts and omissions of Shady Shad, including based upon the doctrine of *respondeat superior*, particularly, when in training VZW field employees, VZW instructed same to be "shady" like "Shady Shad!"

●    *BELL ATLANTIC MOBILE SYSTEMS, INC.*

193.    Upon information and belief, at all relevant times Bell Atlantic Mobile Systems, Inc. ("BAM") was a Delaware corporation registered to do business in New York as a Foreign Business Corporation [*see e.g.* Ex. 2].

47

194. Upon information and belief, BAM is ultimately owned and controlled by Verizon Communications, Inc..

195. Upon information and belief, Verizon Communications, Inc. uses its ownership and control of BAM to exercise part of its controlling interest in defendant VZW.

196. Upon information and belief, Verizon Communications, Inc. uses its ownership and control of BAM to exercise its "general control" over the functions and activities of defendant VZW.

197. Upon information and belief, BAM conducted substantial and continuous business within the State of New York, including through its ownership interest in VZW.

198. Upon information and belief, BAM approved of the prepaid activation scheme complained of herein.

199. Upon information and belief, BAM benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

- ***GTE WIRELESS INCORPORATED***

200. Upon information and belief, at all relevant times GTE Wireless Incorporated ("GTE") was a Delaware corporation ultimately owned and controlled by Verizon Communications, Inc. [*see e.g.* Ex. 2].

201.    Upon information and belief, Verizon Communications, Inc. uses its ownership and control of GTE to exercise part of its controlling interest in defendant VZW.

202.    Upon information and belief, Verizon Communications, Inc. uses its ownership and control of GTE to exercise its "general control" over the functions and activities of defendant VZW.

203.    Upon information and belief, GTE conducted substantial and continuous business within the State of New York, including through its ownership interest in VZW.

204.    Upon information and belief, GTE  approved of the prepaid activation scheme complained of herein.

205.    Upon information and belief, GTE benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

- ***PCS NUCLEUS, L.P.***

206.    Upon information and belief, at all relevant times PCS Nucleus, L.P. ("PCS") was a Delaware Limited Partnership wholly owned and controlled by entities ultimately controlled by Vodafone Group Plc [*see e.g.* Ex. 2].

207.    Upon information and belief, PCS' partners include Vodafone Holdings LLC and Vodafone Americas, Inc..

208.    Upon information and belief, Vodafone Group Plc. uses its ownership and control of PCS to exercise part of its ownership interest in defendant VZW.

49

209. Upon information and belief, PCS conducted substantial and continuous business within the State of New York, including through its ownership interest in defendant VZW.

210. Upon information and belief, PCS approved of the prepaid activation scheme complained of herein.

211. Upon information and belief, PCS benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

- *JV PARTNERCO, LLC*

212. Upon information and belief, at all relevant times JV Partnerco, LLC ("JVP") was a Delaware Limited Liability Company wholly owned and controlled by an entity controlled by Vodafone Group Plc [*see e.g.* Ex. 2].

213. Upon information and belief, JVP's member is Vodafone Americas, Inc..

214. Upon information and belief, Vodafone Group Plc. uses its ownership and control of JVP to exercise part of its ownership interest in defendant VZW.

215. Upon information and belief, JVP conducted substantial and continuous business within the State of New York, including through its ownership interest in VZW.

216. Upon information and belief, JVP approved of the prepaid activation scheme complained of herein.

217. Upon information and belief, JVP benefitted from the prepaid activation scheme complained of herein, to the detriment of Zcom.

- ### *NON-PARTY COMPONENTS OF THE CELLCO PARTNERSHIP*

218.    Additionally, not named as parties herein, as their identities are not fully known, are the individuals and entities who make up the partners who are members of defendant VZW.  Upon information and belief, this includes the owners of Bell Atlantic Mobile Systems, Inc and GTE Wireless Incorporated, as well as the owners of  Vodafone Holdings LLC which partly comprises PCS Nucleus, L.P. and Vodafone Americas Inc., who allegedly also comprise part of PCS Nucleus, L.P. and is apparently the sole member of defendant JV PartnerCo, LLC.

219.    Upon information and belief, the individuals and entities who comprise the component parts of the Cellco Partnership were involved in the creation, orchestration, implementation and/or execution of the prepaid activation scheme complained of herein, which led to significant harm to Zcom, while all of the partners and their parents benefitted.

- ### *PINO SALONNA*

220.    Upon information and belief, at relevant times herein, Pino Salonna was employed by defendant VZW as Director - Indirect Distribution.  Salonna was, *inter alia*, the primary point of contact with VZW regarding what became VZW's unfair and unjust termination of its agency agreement with Zcom.  Salonna endorsed the July 26, 2011 termination letter directed to Zcom.  Subsequently, Salonna refused to negotiate with Zcom, even after receiving written requests for reconsideration and negotiation.

- ### *JOHN/JANE DOE NON-PARTIES*

221.   John/Jane Doe Verizon Communications Personnel ## 1-10 and John/Jane Doe Vodafone Group Plc Personnel ## 1-10 are all so named as their identities have yet to be determined.  These fictitious names are used to represent as yet unidentified officers, directors, employees, and agents of defendants Verizon, Vodafone, BAM, GTE, PCS and JVP who were, upon information and belief,  involved in harming Zcom.

222.   Upon information and belief, VZW is liable for the  acts and omissions of these John/Jane Does, including based upon the doctrine of *respondeat superior*.

- ### *NON-PARTY FORMER EMPLOYEES OF VZW WHO WERE DIRECTED TO PARTICIPATE IN THE PREPAID ACTIVATION SCHEME: MALENDA, COYLE, AND ALLOCCO*

223.   The acts of additional non-parties Chris Malenda ("Malenda") who was employed as an account manager for defendant VZW until his promotion to District Manager; John Coyle ("Coyle"), who was employed as a District Manager for defendant VZW; and, Keith Allocco ("Allocco") who was employed as an account manager for defendant VZW, all on behalf of VZW, are complained of herein.   Many of their acts, all performed on behalf of and at the direction of VZW occurred within the State of New York, and caused damage to Zcom within the State of New York.  Upon information and belief, VZW is liable for the acts and omissions of, *inter alia*, Malenda, Coyle and Allocco, including based upon the doctrine of *respondeat superior*.

## IX. ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

224.    The plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though they had been set forth in full herein.

225.    Until September 2010, Zcom was jointly owned by its current president and CEO Vikas "Victor" Dhall ("Victor") on the one hand, and Alexandra Bershtein ("Alex"), on the other hand; each of whom owned 50% of Zcom's stock.

226.    VZW proclaims itself,  in substance, the "Number 1" provider of wireless communications services in the United States [*see e.g.* Exs. 1-3].

227.    The success of a VZW agent, such as Zcom, is largely determined based upon new account activations, and longevity of postpaid subscription based customers, a/k/a customer-retention and "residual" payments.

228.    Because Zcom, under the guidance of Victor was successful in the marketing and sale of VZW products and services, VZW expanded Zcom's authority under their agency agreement such that Zcom was permitted to enlist sub agents to also market and sell VZW branded products and services - going from 3 stores to about 150 in 2008.

229.    In order for Zcom to enlist a sub agent, VZW had to approve the sub agent and the location that the sub agent is going to operate from.

230.    Under Victor's leadership, Zcom grew such that it owned approximately 30 "corporate owned" stores marketing and selling VZW branded products and services and had an additional approximately 120 sub agents authorized to market and sell VZW branded products and services at Zcom's behest.

231.    All of the Zcom "corporate owned" stores and all of Zcom's sub agents' stores were duly approved of by VZW, as were the locations they operated from.

232.    The defendants were all aware of the existence of Zcom's agency agreements with its sub agents.

233.    Except for defendants Shelly and Poonam, the defendants were all aware that they were not parties to Zcom's agency agreements with its sub agents.

234.    Shelly was aware that he was not a party to Zcom's agency agreements with sub agents that Shelly was not a part of.

235.    Poonam was aware that she was not a party to Zcom's agency agreements with sub agents that Poonam was not a part of.

236.    Zcom was not a franchisee of VZW or any other defendant or entity. Rather, Zcom acted as a Master Agent of VZW pursuant to the terms of the agreements governing their relationship, renewed many times over their "20 + year" relationship.

237.    In 2008 VZW again renewed its master agency agreement with Zcom for a five year term [*see e.g.* Ex. 4].

238.    "Post-Pay" - Activation "Commission," "Longevity," "Residuals," and "Chargebacks:" The agreement governing Zcom's relationship with VZW provides that compensation would fluctuate from time to time, at the sole discretion of VZW.

239.    Generally, VZW paid Zcom a commission for each sale of postpaid subscription based wireless services that Zcom, or any of their sub agents, activated, so long as that number stayed active for a minimum period of time which was set by the defendants ("commission").

240.    Additionally, VZW, would pay Zcom, residual payments on postpaid subscription based wireless telephone accounts opened by a Master Agent, including Zcom, or any of their respective sub agents, so long as such account remained active for a minimum time period as set by VZW ("residuals").

241.    Zcom was receiving approximately $750,000.00 per month in these "residual" payments in 2011, and reasonably expected them to grow over time, and last for the foreseeable future, well beyond the October 2013 contract term, given continued "renewal" of contract.

242.    Zcom expected these "residual" payments to continue until the end of the contract.

243.    Zcom had expectations for repeated renewals of the contract for the foreseeable future based upon conduct by, and on behalf of VZW, including

55

representations made by Patrick Devlin that, in substance, the relationship between Zcom and VZW would be generational [*see e.g.* ¶¶ 483, 741, *infra*].

244.    Should VZW conclude that any payment was made in error to Zcom, including when a customer did not keep his or her account activated for a sufficient period of time, VZW would automatically deduct such monies from future payments due, via a "chargeback."  Any dispute by an agent with a VZW chargeback had to be made within strict time limits unilaterally set by VZW.

245.    When VZW initiated a chargeback, Zcom would, in turn, charge back an equal amount from the sub agent responsible for the chargeback.

246.    VZW created a dispute system pertaining to chargebacks and set strict deadlines in which disputes had to be presented.

247.    As its sub agents were not authorized to interact with VZW directly, Zcom created its own, user friendly, internet based dispute system wherein a sub agent could input a dispute over a chargeback, which Zcom would then forward to VZW.

248.    VZW had final say over whether a chargeback would be reversed, modified, or adhered to.

249.    The agreements governing the relationship between Zcom and VZW provided for fluctuating <u>minimum performance requirements</u> that were transmitted to Zcom by VZW.

250. When Zcom received these minimum performance requirements from VZW it, in turn, transmitted those requirements to its respective sub agents.

251. <u>How the "Prepaid" Activation Scam Worked</u>: As designed and implemented by the VZW Defendants, the scheme involved the activation of cellular telephones ostensibly for use with prepaid VZW branded wireless services.

252. Upon information and belief, this fraudulent prepaid activation scheme was collectively devised and approved of by the VZW defendants non-parties of interest affiliated with VZW and related entities.

253. Upon information and belief, VZW Defendants were involved in the execution and/or implementation of the prepaid activation scheme.

254. Upon information and belief, all of the VZW Defendants benefitted from the prepaid activation scheme.

255. Upon information and belief, non-parties of interest affiliated with VZW and related entities benefitted from the VZW prepaid activation scheme, to the detriment of Zcom.

256. Zcom was damaged by the prepaid activation scheme thrust upon it by VZW (*see e.g.* recorded statements of defendant Velez, transcribed herein at ¶ 462, *infra*).

257. VZW acted as the source to Zcom and its sub agents for information, instruction and direction about the VZW Defendants' prepaid activation scheme.

258.    The instructions and directions that VZW submitted to Zcom and its sub
agents regarding the prepaid activation scheme were proffered on behalf of all of the
VZW Defendants, except Fiocco and Pavlicek.

259.    Upon information and belief, the instructions and directions that VZW
submitted to Zcom and its sub agents regarding the prepaid activation scheme were also
proffered on behalf of non-parties of interest affiliated with VZW and related entities.

260.    In accordance with the VZW Defendants' scheme, the cellular
instruments targeted for activation were: (a) owned by customers who had intended to
discard them upon upgrading to newer equipment; (b) already discarded by customers
who had upgraded to newer equipment; or, (c) provided by VZW, pre-loaded with an
amount of "air time" "minutes" - with a short "shelf-life" before expiration, as determined
by the VZW Defendants.

261.    The VZW Defendants referred to the phones that customers intended to
discard - or did discard - upon an upgrade as "Customer Provided Equipment" or "CPE."

262.    Evidence of the VZW Defendants' heavy promotion of CPE for pre-paid
activation directed  to Zcom includes e-mail communications[6] originating from the

---

[6]There were confidentiality provisions within the agreements governing Zcom's business
relationship with VZW.   Out of an abundance of caution, in another matter commenced by VZW
against Zcom in the United States District Court for the District of New Jersey, Zcom sought
judicial guidance as certain documents that may have been covered by same.  VZW objected to
the need for any protection and as a result, by Letter Order dated March 5, 2012,  the Court
directed that such materials are not subject to sealing by the Court (*Cellco Partnership v. In
Touch Concepts*, 11-cv-06493 (PGS) (TJB) (Docket # 34)).  Zcom welcomes these documents in
the public record.

defendants, via non-party Keith Allocco[7] who was then an account manager at VZW,

directed to Zcom, emphasizing the "push," to wit:

        a.     June 25, 2009: highlights locations with an upgrade ratio

higher than 2.5 to 1.  Wants these locations to aggressively go after the CPE opportunity;

        b.     July 06, 2009: location goal sheet for CPE sales.  Explains

that stores not hitting their goals will lose data commissions plus 50% of their advertising

monies, referred to as "Co-Op;"

        c.     July 23, 2009: directing Zcom to have its sub agents push,

*inter alia*, CPE and Pre-Pay during every transaction; and,

        d.     November 12, 2009: directing Zcom to have its sub agents

push CPE activations with customer's old devices.

Copies of these e-mails are appended hereto as <u>Exhibit 16</u>.

    263.   This heavy promotion of CPE usage continued until in or about April - May

2010 when VZW began promoting VZW branded cellular phones "bundled" with prepaid

air time minutes.

    264.   VZW's heavy "push" of prepaid began in or about November 2009 -

although there was promotion of same which predated that.

---

[7]Keith left VZW in or about September 2010 and joined Zcom in or about October 2010, at which time Zcom did not comprehend VZW's prepaid scheme.  Indeed, the scheme was "discovered" by Zcom, only <u>after</u> August 2011 - in attorney-client consultations, without any waiver of the privilege associated with same.

265. Zcom was instructed by VZW that they must push the prepaid plans on customers by telling customers, in substance, that:

      a.    they could have an "emergency" phone for pennies a day;

      b.    they would "credit" their "activation fee" of $25.00;

      c.    an existing phone would be activated as a "pre-pay" account where the customer does not have to sign any contract; and,

      d.    they were running a promotion wherein the agent would "give" the customer $45.00 worth of air time minutes to use.

266. Pursuant to the scheme and plan as devised by VZW, the customer was specifically not informed that the prepaid air time minutes were at the most expensive rates charged, most commonly twenty-five cents per minute.

267. Pursuant to the scheme and plan as devised by VZW, the customer was not informed that the prepaid air time minutes that were supposedly being "given" to them would expire in 30 days.

268. The "Spiff": A promotional additional incentive used by VZW to push any product or service; a "Spiff" could be used for pre-pay, post-pay, or a particular phone or product VZW was pushing.

269. Pursuant to the original scheme and plan as devised by VZW, Zcom was informed by VZW that they would receive a commission of $40.00 on each prepaid

activation, along with an incentive, colloquially known as a "spiff" of $20.00 for each activation.

270. Pursuant to the scheme and plan as devised by VZW, the sub agents of Zcom were directly informed by VZW that there was a $40.00 commission on each prepaid activation, along with a $20.00 'spiff' for each prepaid activation.

271. Pursuant to the scheme and plan as devised by VZW, Zcom was informed by VZW that Zcom was to start the prepaid accounts by crediting them with $15.00 and that after the first thirty days the accounts were to be replenished with $30.00 on behalf of the customer.

272. Pursuant to the scheme and plan as devised by VZW, the sub agents of Zcom were directly informed by VZW that they were to start the prepaid accounts by crediting them with $15.00 and that after the first thirty days the accounts were to be replenished by the agent with $30.00 on behalf of the customer.

273. Pursuant to the scheme and plan as devised by VZW, Zcom was informed by VZW that following these replenishment instructions was all that was required in order to ensure that the prepaid phone remained active for at least 180 days, thus avoiding "chargebacks" of commissions.

274. These representations were false when made, and VZW knew that such representations were false.

275. Pursuant to the scheme and plan as devised by VZW, the sub agents of Zcom were directly informed by VZW that following these replenishment instructions was all that was required in order to ensure that the prepaid phone remained active for at least 180 days, thus avoiding "chargebacks" of commissions.

276. These representations were false when made, and VZW knew that such representations were false.

277. Pursuant to the scheme and plan as devised by VZW, Zcom was <u>not</u> informed by any of the VZW Defendants that "test calls" had to be made from the prepaid phone at the time of activation to prevent premature deactivation by VZW.

278. Pursuant to the scheme and plan as devised by VZW, the sub agents of Zcom were <u>not</u> informed that "test calls" had to be made from the prepaid phone at the time of activation to prevent premature deactivation by VZW.

279. As devised by VZW, yet then unknown to Zcom and its sub agents, the prepaid phone activation scheme had a built-in "self destruct" wherein if the prepaid phone was not used for "test calls" at the time of activation, the account would deactivate within 150 days, 30 days shy of the minimum activation period for commissions.

280. Upon information and belief, as devised by VZW, yet then unknown to Zcom and its sub agents, the prepaid phone activation scheme was designed to permit the VZW Defendants to obtain the benefits of a newly activated phone number, while depriving their agents, including Zcom, of their commissions on said activations.

281.    Upon information and belief, on the day that a new prepaid number was activated VZW's controlling parent, publically traded Verizon Communications, Inc., was able to report same.

282.    The Original Plan - $26.40 to VZW:  as the scheme was devised by VZW, within a day after the initial activation of the prepaid phone, VZW would receive payment from their Master Agents, including Zcom, of approximately $13.20, which was a discounted rate charged to Master Agents like Zcom for $15.00 worth of prepaid air time.

283.    As the scheme was devised by VZW, within 45 days after the initial activation of the prepaid phone, VZW would receive another payment from their Master Agents, including Zcom, of approximately $26.40, which was a discounted rate charged to Master Agents like Zcom for $30.00 worth of prepaid air time.

284.    **$39.60**:  Accordingly, within 45 days, VZW would receive $39.60 from their Master Agents, including Zcom, for each prepaid account activated pursuant to the scheme and plan as devised by VZW.

285.    Thereafter, VZW would pay its Master Agents, including Zcom, the $40.00 commission and $20.00 "spiff" incentive.

286.    Pursuant to the scheme and plan as devised by VZW, any prepaid account that did not have "test calls" made and was not otherwise used by its end user customer was deactivated by VZW prior to 180 days elapsing.

287.  "Chargeback" of $40.00:  Pursuant to the scheme and plan as devised by VZW, any prepaid account that did not stay active for at least 180 days was subject to a "chargeback" to VZW of the full $40.00 commission.

288.  Pursuant to the scheme and plan as devised by VZW, Zcom and its sub agents were instructed by VZW Defendants to market the prepaid phones as "emergency" phones.

289.  Pursuant to the scheme and plan as devised by VZW, the phones were to be marketed and promoted as for use if there was an urgency requiring same.

290.  Upon information and belief, VZW had the prepaid phones activated, in furtherance of their scheme, as different than general prepaid activations, as these instruments were marketed for emergency use and not daily use (as in general prepaid phone sales pre-VZW "push" of, inter alia, "CPE").

291.  Pursuant to the scheme and plan as devised by VZW, "test calls" were frequently not made by Zcom and its sub agents, as there were no instructions from any of the VZW Defendants requiring them to do so.

292.  Pursuant to the scheme and plan as devised by VZW, unless a customer asked for "test calls" to be made to ensure the newly activated prepaid instrument was operational, there was no use of the phone unless and until the end user customer ultimately used it.

293.    Pursuant to the scheme and plan as devised by VZW, because no "test calls" were made, if the end user customer did not use the phone - as was expected since they were marketed as "emergency" phones - the phone would be unilaterally deactivated by VZW during the 180 day "chargeback" period.

294.    Pursuant to the scheme and plan as devised by VZW, VZW would then "charge back" the $40.00 commission from its Master Agents, including Zcom.

295.    <u>VZW Gets $79.60, Nets a Profit of $19.60, while Zcom Loses $19.60</u>: Pursuant to the original scheme and plan as devised by VZW, VZW would receive $79.60 from Zcom ($39.60 in air time minutes + $40.00 "charged back" = $79.60).

296.    Notwithstanding that VZW initially paid out $60.00 in commission and "spiff," after the $39.60 payment for air time minutes which usually expired before they were ever used, and the "charge back" of the $40.00 commission, pursuant to the scheme and plan as devised by the VZW Defendants, VZW initially realized not less than $19.60 net profit per each prepaid activation done by Zcom and its sub agents, while Zcom and its sub agents realized at least a net loss of $19.60 per pre-paid phone deactivated by VZW.

297.    This was a huge profit of $19.60 for VZW for each prepaid activation using, *i.e.* Customer Provided Equipment ("CPE"), with wireless "service" that frequently would never be used.

298.   <u>The Revised Plan - $6.40 to VZW, After the "Chargebacks" Hit</u>:  Beginning in or about January 2010, VZW slightly amended the instructions to Zcom and its sub agents (before the "chargebacks" had hit Zcom and its sub agents under the original plan).

299.   Under the revised plan, the initial activation of the prepaid instrument by the selling agent was to be done with $30.00 worth of air time minutes rather than $15.00 worth of minutes - at a cost to Zcom and/or its sub agents of $26.40.

300.   <u>VZW Gets a Net Profit, and Zcom Loses a Net $6.40</u>:  Under these revised instructions, VZW initially still realized not less than a net $6.40 per each prepaid activation done by Zcom and/or its sub agents - as the $40.00 "charge back' would still occur ($26.40 + $40.00 charge back vs. $60.00 paid out in "spiff" and commission).

301.   This too was a large profit of $6.40 for VZW for each prepaid activation using, *i.e.* Customer Provided Equipment ("CPE"), with wireless "service" that frequently would never be used.

302.   Upon information and belief, the monies received by VZW from Zcom as a result of the VZW prepaid activation scheme were disbursed by VZW amongst itself and its ownership, ultimately to Verizon Communications, Inc. and Vodafone Group Plc.

303.   Upon information and belief, the ill gotten gains of the VZW prepaid activation scheme were shared amongst VZW Defendants, and their controlling and related entities and persons, be it salary increases, bonuses, enhanced value of stock options, or other material benefits, including promotion in title.

66

304.    Pursuant to the scheme and plan as devised by VZW, VZW directed Zcom to heavily promote prepaid VZW branded services to their customers, notwithstanding that Zcom did not really benefit[8] from the sale of prepaid services - and neither did the customers - who got stuck with a "flat" "spare tire:" the phone would be deactivated by VZW unless the customer loaded it up with more price-gouging, rapidly expiring, non-"roll-over" minutes sold by VZW.

305.    Pursuant to the scheme and plan as devised by VZW, VZW directed Zcom, and its sub agents, to advance the scheme by requiring them to promote the activation of cellular phones that their customers intended to discard (*i.e.* CPE), with prepaid services that the customers did not really want, or need, and would not be able to use when needed given VZW's unilaterally self-imposed deactivations!

306.    Pursuant to the scheme and plan as devised by VZW, VZW directed Zcom's sub agents to advance its scheme by directing them to activate cellular instruments which had already been discarded by customers who had upgraded to newer equipment with prepaid services, even in fictitious names.

307.    Pursuant to the scheme and plan as devised by VZW, VZW falsely incentivized Zcom and its sub agents to participate in its scheme by offering various enticements, including, a $20.00 "Spiff" along with commissions that VZW never really intended to pay, but out of which effort VZW got a free newly "activated" number plus a

---

[8]Zcom did not benefit from prepaid activations in comparison to postpaid activations, for only prepaid counted towards, *inter alia*, customer-satisfaction driven "residuals."

windfall of $19.60 or $6.40 per activation, under the plan, until December 2009 and revised plan, since January 2010, respectively.

308.    Pursuant to the scheme and plan as devised by VZW, because many of such activations were for cellular instruments that were never going to be used, based upon how VZW directed ITC and its sub agents to market these prepaid activations, *inter alia*, as "emergency phones."

309.    Hence, the accounts did not remain active long enough to meet VZW's self-created time frames, wholly <u>inconsistent</u> with VZW's marketing of same, for Zcom, and its sub agents, to be able to keep their commissions.

310.    Based upon the scheme initiated and implemented by VZW, in or about April 2010 VZW began heavily "charging back" commissions paid out to Master Agents, including Zcom, on prepaid activations done in December 2009 - because the accounts, as designed by  VZW, did not remain active long enough.

311.    VZW's sequential fraudulent scheme:

(1)     created an incentive program for pre-paid activations and aggressively pushed it, including a $20.00 "Spiff" and $40.00 commission;

(2)     required Zcom and its sub-agents to load up cellular instruments with <u>high-priced, non "roll-over"</u> VZW minutes for which VZW got paid upon activation of the prepaid phone number, thereby letting VZW "recoup" monies it had as yet <u>not</u> paid to Zcom as "Spiff" or commission for same;

68

(3)     had a set of rules that caused a "charge back" to occur as VZW recouped most of the money it paid out - as the VZW Defendants' architecture for the prepaid phone activation system caused the instruments to become inactive if "test calls" were not made by the agent marketing the prepaid service - yet the agents were not told this - thereby causing a "charge back," and an unhappy Zcom customer who discovered that the "emergency" "CPE" unit was inactive when needed due to VZW's unilateral deactivation (loss of Zcom customer-goodwill);

(4)     Upon information and belief, VZW failure to disclose to its Master Agents, including Zcom, VZW's "real" chargeback rules for prepaid push in 2009 caused much objection by VZW agents, causing VZW upper management to revisit its policies and practices, seek to redress VZW's and VZW-inspired lack of integrity, and VZW covered-up its own misconduct by initiating a false integrity "investigation," collecting evidence of their own misconduct but not including all of it in its reports and never sharing those VZW integrity reports with Zcom, so that Zcom could partially remedy the injury caused by VZW defendants; and then covering-up their tracks by firing some of their "downstream" employees, such as Verghese, John Coyle, Chris Malenda and "Shady Shad," and tortiously injuring Zcom for VZW's own misconduct.

312.    Zcom as an entity did not willfully or voluntarily participate in the VZW Defendants' scheme, as Zcom did not understand or comprehend VZW's pre-paid fraudulent scheme until much later, after-the-fact.

313.   <u>Direct Push</u>: because Zcom did not participate in the VZW Defendants'
scheme, VZW Defendants initiated <u>direct</u> contact with Zcom's sub agents, in knowing
violation of the privity that Zcom had with these sub-agents.

314.   This improper and tortious direct contact was executed on behalf of the
VZW Defendants via Individual VZW Defendants Tom Verghese, Ryan Broomes, Jorge
Velez and, *inter alia*, non-parties "Shady Shad," Chris Malenda, John Coyle and Keith
Allocco - who were all then working for VZW.

315.   These Individual VZW Defendants and related personnel, directed Zcom's
sub agents to participate in the prepaid activation promotion - which was really a bold
fraudulent scam to artificially inflate numbers of new account activations for the benefit
of VZW.

316.   In furtherance of the VZW's prepaid activation scheme, VZW's directives
to the sub agents of Zcom included instructions to promote the activation of cellular
phones that their customers intended to discard (CPE) with prepaid services that the
customers did not really want, or need.

317.   In furtherance of VZW's prepaid activation scheme, VZW directed sub
agents of Zcom to promote the activation of cellular with prepaid services marketed as for
use in an emergency; however, unbeknownst to customers, Zcom, or its sub agents, when
actually needed - in an emergent situation, such prepaid services would probably be
inactive because of a "deactivation" by VZW.

70

318.    In furtherance of VZW's prepaid activation scheme, VZW directed sub agents of Zcom to promote the activation of cellular phones that their customers intended to discard with prepaid services that, unbeknownst to the customers, were <u>too expensive</u> to keep active because of VZW's high-priced, non "roll-over" minutes.

319.    <u>VZW Punishes Zcom</u>:  In furtherance of VZW's prepaid activation scheme, VZW threatened that sub agents of Zcom that did not increase their prepaid service activations would be punished, including, potential loss of:  their commissions for sale of data transmission plans plus 50% of their "Co-Op" advertising monies, and, *inter alia*, their ability to market and sell VZW branded products and services, *i.e.* terminate/ close the business.

320.    In furtherance of VZW's prepaid activation scheme, VZW threatened to take away the livelihoods of Zcom and its sub agents if they did not comply with VZW's tortious demands, which in turn led to threatened reduced revenues for Zcom and impaired relations between Zcom and its own sub agents and Zcom customers, critical for post-paid "residuals."

321.    In furtherance of VZW's prepaid activation scheme, VZW Defendants promised the sub agents of Zcom that if they met VZW-set sales benchmarks, conveyed by VZW, which included prepaid activations, they would be rewarded via commissions to Zcom, which would flow to the sub agents, along with other incentives.

322. In furtherance of the VZW's prepaid activation scheme, while promoting their fraud, VZW imposed "chargebacks" on much of the compensation that had been made to Zcom and thus to Zcom's sub agents, based upon VZW's self created "150 day," not "180 day" post-event deactivation "chargeback" - with VZW deactivating the accounts.

323. <u>VZW Causes False Entries to be Made in Zcom's Business Records</u>: Upon information and belief, in furtherance of VZW's prepaid activation scheme, via their execution and/or implementation of the scheme, VZW, in violation of the New York State Penal Law, <u>caused</u> false entries to corrupt the internal records of Zcom, which victimized Zcom in New York.

324. In pertinent part, pursuant to New York State Penal Law § 175.05, a person is guilty of falsifying business records in the second degree when, with intent to defraud, he:

1. Makes or causes a false entry in the business records of an enterprise; or

4. Prevents the making of a true entry or causes the omission thereof in the business records of an enterprise.

325. The fictitious and fraudulent activations made by the sub agents of Zcom, at the command of VZW, including false celebrity account holders names, were all "caused" to be recorded in the business records of Zcom's sub agents or corporate owned stores,

72

and transmitted to Zcom headquarters, in New York State, for placement and maintenance in its New York based records, upon which Zcom relied.

326.    Zcom relied on the legitimacy of these records.

327.    However, when Zcom suspected fraud, it notified VZW; ironically, it was VZW that was the root cause of the fraud and the false entries.

328.    VZW's fraudulent prepaid account activation scheme was calculated to materially benefit VZW, to the detriment of Zcom - and it did so.

329.    VZW's fraudulent prepaid account activation scheme has unjustly and unfairly blemished Zcom's credibility and reputation in the telecommunications business community.

330.    VZW's fraudulent prepaid account activation scheme has severely impaired Zcom's corporate financial condition.

331.    VZW never intended to pay much of the commissions on the prepaid activations they forced Zcom and its sub agents to make with, *e.g.* "CPE."

332.    Zcom did not then know that VZW was having direct contact with its sub agents, *e.g.* Jorge Velez did not tell Zcom prior to going to Zcom's sub agent, nor after speaking with the sub agent.

333.    Unethical and fraudulent activity was prohibited by the agreements which governed the relationships between Zcom and its sub agents, just as they were prohibited between VZW and Zcom by contract and torts, statutory and common law.

334.   Duress & Punishment of Zcom and Zcom's Sub Agents by VZW:   In
furtherance of VZW's prepaid activation scheme, VZW directed Zcom's sub agents to
violate their agreement with Zcom under threat of punishment from VZW, which could
include a "shut down" of their businesses.

335.   In furtherance of VZW's prepaid activation scheme, VZW actively sought
to punish Zcom via its sub agents, as is revealed in an e-mail from John Coyle, then a
District Manager for defendant VZW, to Zcom, on May 19, 2009, wherein Coyle
indicates that the defendants sought to implement a plan to financially hurt stores that are
underperforming [*see* Ex. 17 at 000001].

336.   Moreover, other e-mails, including ones from Keith Allocco to Zcom on
June 8, 2009 indicated that stores not meeting goals set by VZW, and conveyed through
Zcom, would be penalized [*see* Ex. 16 at 000003 - 000004 ].

337.   Zcom internally detected what appeared to be fictitious prepaid account
activations and expeditiously reported same to VZW.

338.   Zcom - The "Boy Scout," Praised by VZW Before Being Punished: by
e-mail dated November 29, 2009, Zcom informed VZW that they were implementing a
comprehensive anti-prepaid fraud program with a protocol for identifying and preventing
such fraud and with repercussions for sub agents participating in same [*see* Ex. 13].

74

339.   <u>Layers of fraud by VZW:</u>   VZW outwardly <u>commended</u> Zcom for its fraud detection and instructed them to continue to deter prepaid activation fraud; however, at the same time, in furtherance of VZW's prepaid activation scheme, VZW was surreptitiously in direct contact with Zcom's sub agents <u>coercing</u> them to commit the very prepaid activation fraud that Zcom was trying to thwart!

340.   By e-mail of May 2, 2010 Keith Allocco was informed that VZW was giving conflicting messages to Zcom sub agents as Zcom managers were trying to drive <u>postpaid</u> data plans, which were better for Zcom and its sub agents, while VZW, in furtherance of VZW's prepaid activation scheme, was directing Zcom sub agents to focus on prepay and increase prepaid [*see* Ex. 16 at 000100].

341.   Prior to 2009, Zcom had been steadily growing such that it added approximately 30 new storefronts ("doors") opening in one year.

342.   Because Zcom was growing at a rapid pace, to the benefit of VZW and Zcom, Zcom formed its own market development department as a means of streamlining the process of meeting VZW's new door requirements - absent the illegal "freeze out" of Zcom by VZW's Verghese.

343.   Through the use of personnel dedicated to identifying locations that could appropriately benefit from a VZW-Zcom branded door, for purposes of Zcom's expansion, Zcom's growth remained steady.

344.    Zcom was positioned to become a "national agent" for VZW in 2009 -
which would entitle Zcom to be paid by VZW as much as 4 times the commissions,
residuals, market development funds ("MDF"), Co-Op Advertising monies, etc..., with
nationwide jurisdiction for Zcom store openings.

345.    In order for Zcom to open a new store to market and sell VZW branded
products and services, whether to be operated by a related business entity, or an
independent sub agent, VZW had to approve same.

346.    Beginning in or about 2009, defendant Verghese, on behalf of VZW, sought
to harm Zcom by unjustly freezing out its growth of new stores - intending to benefit
VZW's bottom line, and incidentally benefitting Ajay, Shelly and Poonam.

347.    The Bhumitra "Trojan Horse: Plan to Victimize Zcom from Within: certain
of Zcom's sub agents became enamored with the scam and developed close relationships
with employees of VZW, including defendant Verghese, while ostensibly benefitting
through increased commissions and realizing their secret "Trojan Horse" plan.

348.    Phony Sales to "Celebrities" by VZW's Collaborators:  for instance,
defendants Shelly Bhumitra ("Shelly"), principal of then Zcom sub agent Reachout
Wireless, Inc.,  and Poonam Sawnhey, a/k/a Poonam Sethi ("Poonam"), principal of then
Zcom sub agent American Candy, Inc., in order to ingratiate themselves to VZW
Defendants, including Verghese, they readily increased their numbers of prepaid

76

activations by employing fictitious customers, including use of the names of celebrities, including: Robin Williams, Julia Roberts, the late Steve Jobs, Warren Buffet and Russian leader Vladimir Putin [*see e.g.* Ex. 11].

349.    Shelly took advantage of his relationship with Verghese, which ultimately permitted Shelly's true colors to be exposed.

350.    Shelly's brother, defendant Ajay Bhumitra ("Ajay"), is also heavily involved in the wireless communications business, having extensive agency relationships with Sprint Nextel and AT&T, competitors of VZW.

351.    Bhumitra "Trojan Horse" Plan:  Upon information and belief, Shelly became a Zcom sub agent in order to misuse Zcom's agreement with VZW as a means of seeking to destroy Zcom from within, for the geometric growth of Ajay's portfolio of business interests.  Simply put, if Zcom failed, that would give Ajay an opportunity to take over Zcom's empire of VZW branded prized locations at little or no cost, and become a VZW agent in addition to his Sprint Nextel and AT&T agencies.  Either way, as planned, it was "win win" for Ajay and Shelly.

352.    The massive fraudulent activations initiated by Shelly and Poonam, upon information and belief, benefitted all of the defendants, including Verghese personally, as he was able to claim internal credit for marked growth.

353.    Upon information and belief, these marked growth goals were set at high policy maker levels of VZW and related entities.[9]

354.    Shelly used his relationship with Verghese and bribes paid to Verghese in order to have Verghese, in his capacity of an employee of VZW, hurt Zcom.

355.    Prior to Shelly's corrupting of Verghese, Zcom had been growing, sometimes at a rate of approximately 30 new stores a year, and in 2009 recorded approximately 150 "doors," *i.e.* 150 store locations around parts of the United States, all of which were authorized by VZW to market and sell VZW branded products and services.

356.    "Freeze Out" by VZW of Zcom's New Store Growth in 2009:  After Shelly's bribing of Verghese, on behalf of VZW, Verghese stopped approving new Zcom stores and Zcom sub agents, notwithstanding that the locations and Zcom's prospective sub agents all met with VZW's requirements - this permitted VZW not to pay Zcom at the "Big 6" level of compensation, etc... - saving money for VZW.

357.    VZW's Verghese tortiously interfered with Zcom's prospective business relationships by freezing out Zcom's store growth and impairing its ability to grow its pre-existing sub agents and newly found sub agents, all of whom met with VZW's

---

[9]These policy maker levels include then Chairman of the Board (Seidenberg), members of the Board of Directors of Verizon Communications, Inc and Board of Representatives of VZW (Seidenberg, McAdam, Mead), Corporate Officers, *e.g.* Chief Executive Officer (McAdam for Verizon; Mead for VZW), President ( McAdam for Verizon; Mead for VZW), General Counsel, Regulatory Compliance Officers, Regional Presidents such as VZW Northeast Area President Clark and  Devlin, President of the VZW New York Metro Region.

requirements - this Freeze Out, instigated by VZW's Verghese, on behalf of VZW, continued up to and including VZW's issuance of a wrongful termination notice to Zcom on July 26, 2011.

358.    Upon information and belief, the defendants tortiously interfered with Zcom's prospective business relationships by freezing Zcom's growth and impairing its ability to open up new storefronts at locations that met with VZW's preexisting requirements.

359.    Upon information and belief, the freezing of Zcom's growth was done by Verghese on behalf of VZW, with incidental benefit to the Bhumitra brothers and Poonam.

360.    Verghese incidentally and intentionally caused the freezing of Zcom's store growth, on behalf of VZW, because he was bribed and otherwise corrupted by Shelly, Poomam and Ajay.

361.    Verghese benefitted from the freezing of Zcom's growth by the continued active participation in VZW's prepaid scam by Shelly and Poonam, as Zcom sub agents, without Zcom's knowledge.

362.    VZW benefitted with Zcom's freeze out, as VZW didn't have to pay Zcom like a "National Agent" or "a Big 6," where "residuals" and commissions are almost four times (400%) what was paid to Zcom, and Market Development Funds ("MDF") used to

promote the creation of new "doors" meetingVZW's guidelines are four or five times the normal amount, a huge savings for VZW.

363. Upon information and belief, in 2009 and 2010, VZW never really had any intention of actually paying all of the commissions and incentives promised for the "pushed" prepaid account activations.

364. While VZW did initially pay commissions on these activations, because many of the accounts were either fraudulent, or not being used, the accounts did not stay active long enough to warrant a commission based upon VZW's self-established guidelines - all to VZW's benefit - due to "chargebacks."

365. Upon information and belief, after the accounts became inactive - as they were designed by VZW to do from the outset - VZW then issued "chargebacks" to Zcom, taking back commissions that were paid. Zcom in turn had to "chargeback" its respective sub agents who activated the accounts - leaving only a loss of $19.60 or $6.40, for Zcom and its sub agents, for their activations of prepaid VZW branded wireless products and services - exactly as VZW designed their scheme to work.

366. On April 3, 2010 Keith Allocco, then of VZW, sent an e-mail to Zcom, at the direction of his superiors in the VZW hierarchy, seeking to explain away charge backs that were being imposed on December 2009 prepaid activations made at VZW's direction [see e.g. Ex. 16 at 000099].

367. Included in the sub agents charged back were Shelly's Reachout Wireless and Poonam's American Candy.

368. "Trojan Horse" Attacks: After VZW wrongfully terminated Zcom on July 26, 2011, Shelly and Poonam, through their corporate entities, commenced a putative "class action" lawsuit against Zcom falsely claiming, in substance, that Zcom had: (a) fostered the fraudulent prepaid scam - rather than VZW; and, (b) wrongly withheld commissions - when VZW enjoyed imposing unilateral chargebacks. That related matter, *Reachout Wireless, Inc., et. al., v. In Touch, et. al.*, New York County Supreme Court Index # 652587/2011 (Ramos, J.) ("Reachout lawsuit") is pending, to Zcom's expense, injury and detriment.

369. Zcom has been damaged by having to combat the meritless Reachout lawsuit which finds its genesis in VZW's misconduct, and VZW's employees collaborating with Ajay, Shelly and/or Poonam and their related entities, including, Reachout and American Candy.

370. Anonymous Benefactor: On June 21, 2011, a day before a second meeting was scheduled with VZW's Bruno Pavlicek, Victor received a package from an anonymous source containing, *inter alia*, records and materials that Shelly caused to be stolen from Zcom, including records maintained on Zcom's computer system, along with evidence of Shelly and Ajay competing with Zcom, and Shelly communicating and

81

collaborating with VZW's Pavlicek [*see e.g.* Ex. 10]. Victor had his attorney call VZW to cancel and reschedule the June 12, 2011 meeting.

371. Included in that package was evidence that Pavlicek was communicating and collaborating with Shelly Bhumitra, despite Shelly's fictitious celebrity pre-paid activations.

372. Upon information and belief, VZW decided to terminate its own pre-paid scheme, due to its futility, it needed scapegoats - the third piece/leg of VZW's fraudulent pre-paid scheme: falsely cover-up their lack of integrity and instigate a false "investigation" so as to collect whatever knowledge of the VZW Defendants' own misconduct existing and minimize its inclusion in VZW's investigative reports, and then cover it up with internal firing of VZW employees and a false scapegoat: Zcom. VZW quietly terminated many VZW employees, such as Verghese, Coyle, Malenda and "Shady Shad." VZW also issued a "for cause" termination of Zcom, based in large part on VZW's own pre-paid scam, in direct violation of the implied covenant of good faith and fair dealing.

373. Upon information and belief, VZW claimed to "investigate" the fraudulent activation of prepaid accounts; however, this "investigation" was merely for show as a means of covering up its own creation and implementation of the prepaid scheme.

374. Upon information and belief, after Zcom refused to falsely admit to wrongdoing for which it was not responsible, VZW, with VZW Defendants Pavlicek and Fiocco acting as the ostensible "investigators," fabricated "evidence" to pass blame onto Zcom as a means of "whitewashing" the VZW Defendants' own wrongdoing - all the way to the genesis of the prepaid scam, push and "chargebacks"!

375. VZW made Zcom its scapegoat, in bad faith and unjustly.

376. VZW falsely accused Zcom of creating the fraudulent prepaid activation scheme that was actually a "white collar" sophisticated scam - a product of VZW, which Zcom had sought to combat, without comprehending the scheme, as Zcom made money with post-pay instead.

377. Upon information and belief, VZW Defendants initiated what they referred to as an internal "investigation" of the widespread fraudulent activation of prepaid VZW branded services and VZW management policies and practices; however, this "investigation" was nothing more than a cover-up with a predetermined result: make VZW look good, fire a few "downstream" VZW employees, and sacrifice all others without regard to the good faith and fair dealing covenant.

378. VZW's "For Cause" Termination of Zcom: When Zcom would not "cave in" to pressures from VZW, VZW then "invented" bad acts that it sought to fraudulently attribute to Zcom, falsely claiming not only that Zcom had initiated the prepaid activation scam, but:

a.      falsely asserted that Zcom had intentionally paid for defendant

Verghese to go on a trip to Belgium and Germany, notwithstanding that the defendants

were, upon information and belief, well aware that the trip in question was organized by

Shelly, and that all travel arrangements and billing were done through Shelly's travel

agent.  Moreover, that Zcom would reward Verghese, the man who prematurely stunted

Zcom's growth and vitality in 2009 with VZW profiting thereby was itself absurd.  Upon

information and belief, these false claims were based upon knowingly false statements

made by Shelly to VZW;

b.      falsely asserted that Zcom had issued a mortgage to former VZW

employee Coyle, valued at between $20,000.00 to $30,000.00, when no such mortgage or

loan had ever been made, nothing of the type was ever publically recorded, and the records

of all bank accounts associated with Zcom and its principals confirm that no such

transaction ever occurred; Indeed, defendant Bruno Pavlicek, without any evidence, asked

Victor about same.  Upon information and belief, such false charge was made due to

Pavlicek's collaboration with, *inter alia*, Shelly;

c.      falsely asserted that Zcom improperly gifted $1,000.00, by check, to

former VZW employee Chris Malenda, notwithstanding that the monies were a wedding

gift for 4 invited guests to Malenda's wedding (2 of whom actually went and 2 who

RSVP-ed and whose place settings were paid for but did not show up), and the wedding

cost approximately  $230.00 per person, in "hard" and "soft" costs, such that the only

84

"gift" would have been $20.00 per person given, as the remainder went to cover the costs of the event consumed by the guests attending;[10]

       d.     falsely asserted that Zcom fraudulently sought to obtain commissions for distribution of VZW branded pre-paid cellular phones which were to be given away to customers as part of an incentive promotion promulgated by VZW, notwithstanding that Zcom provided documentary proof that it had, in fact, <u>provided all of these cellular instruments to New York based non-profit organization(s) for use, as needed, by, *inter alia*, autistic kids who were residents of a non-profit facility</u>.  Appended hereto as <u>Exhibit 12</u> is a series of e-mail communications thanking Zcom for the donation - and then reporting the unexpected deactivation of the accounts by VZW;

       e.     VZW falsely asserted that Zcom submitted falsified invoices to VZW to obtain reimbursement from a Co-Op advertising account, notwithstanding that Zcom wholly complied with VZW's requirements, to wit:

---

[10] For instance, under the New York Legislative Law,

> gifts from a . . . person with a personal relationship with the public official, including invitations to attend personal or family social events, when the circumstances establish that it is the . . . personal relationship that is the primary motivating factor. . .

are excluded from those "gifts" prohibited to be exchanged with an elected official.  *See* Legislative Law § 1-c (j)(vii).  *See also e.g.* Public Officers Law § 73(b).

Moreover, another analogous circumstance is a charitable function wherein an attendee may deduct their costs as a charitable deduction on their tax return - <u>less</u> the actual "per plate" cost.  *See e.g.* IRS Publication 526.

85

     a.    Before January 2009 Co-Op was on accrual basis.

     i.    Option 1: an advertisement was submitted to VZW for pre-approval. Once it was approved the advertisement was placed. The advertisement would be paid for by a sub agent and then submitted to VZW for reimbursement [*see e.g.* Ex. 21 at 000001 - 000008];

     ii.    Option 2: an order was placed online on VZW's Advertising Checking Bureau ("ACB") website so as to purchase promotional merchandise from ACB using accrued co-op funds via approved vendors, including, *inter alia*, "Palmer," "Graphics Edge," and "Cellebrite" [*see e.g.* Ex. 21 at 000009 -000011];

     b.    After January 2009, Co-Op was no longer accrued, but was instead paid for up front. At that time, Zcom received approximately $45,000.00 per month in Co-Op, out of which approximately 70% - 75% was forwarded to Zcom sub agents along with their monthly commission payments.

     i.    Option 1: Zcom could get ads pre-approved and do advertising [*see e.g.* Ex. 21 at 000012 - 000022];

     ii.    Option 2: Zcom could order through ACB approved vendors using a Zcom credit card [*see e.g.* Ex. 21 at 000023 -000028].

379.    The VZW Defendants' scheme defrauded and deceived Zcom, causing Zcom to be damaged as a result.

380. At some time soon after June 15, 2010, Fiocco and Pavlicek came to Zcom's headquarters ostensibly in furtherance of their "investigation."

381. Victor directed Zcom employees to cooperate with Fiocco, Pavlicek and VZW.

382. It was Zcom policy to cooperate with VZW's investigation.

383. Victor even encouraged a former employee, Charu Sodhi, who was visiting Zcom, to voluntarily speak with Fiocco and Pavlicek in order to assist them [*See* Ex. 6].

384. Pavlicek then told Charu Sodhi, that, in substance, VZW had "received a file that there is a tremendous amount of prepaid activity in New York, so we are contacting all of the New York agents to find out what is going on."

385. Pavlicek further claimed, in substance, that since Zcom was VZW's biggest agent in New York they were starting their investigation with Zcom.

386. Pavlicek inquired if the prepaid activations were legitimate to which he was informed by Charu Sodhi that the massive prepaid activations were being done at the direction of VZW itself.

387. Amongst other things, while at Zcom headquarters, Pavlicek was:

     a.    shown e-mails sent from VZW to Zcom pressuring Zcom to aggressively market and sell prepaid VZW products and services;

     b.    given a digital copy of a voice mail message left for Victor by "Shady Shad" regarding getting paid for prepaid activations;

        c.      shown e-mails distributed amongst Zcom sub agents prohibiting unethical prepaid activations;

        d.      shown e-mails to individual sub agents, including defendant Poonam Sawnhey of American Candy, Inc. wherein Zcom specifically questioned prepaid activations; and,

        e.      shown those portions of Zcom's website which included Zcom's "Integrity & Compliance Guidelines," which in large part consisted of a "DO NOT DO" list.

388.    Pavlicek was candidly informed that Zcom had absolutely <u>no</u> logical or <u>financial</u> reason to promote "prepaid" activations as it was a <u>money loser</u> as compared to "post-pay."

389.    Notwithstanding Zcom was not involved in any fraud, in an effort to assist VZW in rooting out any fraud, Pavlicek, who appeared to be unaccustomed to the wireless business and terminology, was instructed in ways that VZW agents could commit fraud in order to make more money, fulfill VZW-imposed minimum activation requirements, or both.  In substance, Pavlicek was informed of:

        a.      "Ghost Lines:" wherein an agent could add $9.99 lines to preexisting "post paid" subscription based customer accounts, without informing the customer; and,

        b.      "Churn:" wherein if a customer was not concerned with keeping a preexisting wireless phone number, the agent could cancel the account and open a brand

new account in a different name, with a different social security number or tax identification number. Churn could be beneficial to an unscrupulous agent because the creation of a new account brings added benefits with it, including credit towards contractual requirements, enhanced commissions and continued residual payments.

390. When Pavlicek and Fiocco first came to Zcom's headquarters, these "investigators" appeared to be wholly unfamiliar with wireless activation business terminology. For instance, they claimed not to know terms including: "post pay," "ghost lines," and "residuals." Moreover, they also held themselves out as unfamiliar with VZW agent contractual requirements.

391. After leaving the employ of Zcom, Charu Sodhi considered becoming a VZW Master Agent and contacted VZW's Director of Indirect Operations, Pino Salonna ("Salonna") to discuss same.

392. Salonna was the first point of contact because Charu Sodhi, having worked at Zcom, had knowledge that Verghese was corrupt and she sought to avoid interacting with him.

393. Notwithstanding efforts to avoid Verghese, in or about September 2010 Salonna directed Charu Sodhi that she must deal with Verghese in order to be considered for an activation agency.

394. In compliance with Salonna's instructions, in or about September 2010 Charu Sodhi called Verghese and left a message on his voice mail pertaining to obtaining a VZW activation agency.

395. Verghese returned Charu Sodhi call and directed her to personally meet with him in New York City, <u>away</u> from Verghese's own VZW office.

396. Approximately two days later, Verghese called Charu Sodhi from an unknown/blocked telephone number and directed her to meet with him in New York City that upcoming weekend.

397. Verghese specifically stated to Charu Sodhi, in substance, that "you know that you have to take care of me in this situation."

398. Because of Verghese's corrupt reputation within the cellular activation community, Charu Sodhi knew that Verghese was soliciting a bribe, which she had no intention of paying.

399. Knowing that Verghese was committing acts of misconduct, Charu Sodhi employee asked, in substance, "how much do you want?" to which Verghese replied "50K."

400. Thereafter, Charu Sodhi left the United States on a pre-planned trip, and remained away until approximately mid-January 2011.

401.    In February 2011, Charu Sodhi, who, at Zcom's request, was assisting VZW's ostensible "investigation," met with Pavlicek in a Morristown, New Jersey office in an effort to complain about defendant Verghese.

402.    Pavlicek obtained a 4 paged written statement from Charu Sodhi, which he did <u>not</u> provide her a copy of.  Amongst other things, the statement informed Pavlicek and VZW that:

        a.    Verghese had solicited a $50,000.00 bribe;

        b.    Verghese was known to be very close to defendant Ajay Bhumitra, notwithstanding that Ajay Bhumitra was the principal of wireless activation businesses that were supposedly in direct competition with VZW;

        c.    Verghese's girlfriend, "Kavi," was employed by Ajay Bhumitra's company but the check for her pay was being issued to VZW agent Wireless Voice in Westchester County because "Kavi" had an H-1 visa and could thus only receive payment from her sponsoring employer - Wireless Voice;

        d.    VZW should be concerned about leakage of confidential information because Verghese was leaking confidential VZW information to Ajay Bhumitra; and,

        e.    Verghese was known to be taking bribes from VZW agents other than Zcom, either to sustain their businesses or to obtain new VZW agency agreements.

403.    Notwithstanding that Zcom cooperated fully with VZW, and went above and beyond to assist Fiocco and Pavlicek, upon information and belief, these "investigators" nevertheless fabricated tales about Zcom, wholly inconsistent with what they were informed, and unreasonably claimed that Zcom was involved in fraudulent conduct.  This was VZW's conduct, in violation of the implied covenant of good faith and fair dealing.

404.    On or about July 26, 2011 VZW, issued a letter terminating Zcom's agency agreement with VZW effective January 31, 2012 [*see* Ex. 5 at 000001 - 000003].

405.    VZW was not interested in the truth, and via VZW's Director of Indirect Operations Pino Salonna ("Salonna"), they made that clear - in writing [*see e.g.* Pino Salonna letter of August 24, 2011, Ex. 5 at 000005 - 000006; Pino Salonna e-mail of September 16, 2011, Ex. 5 at 000010].

406.    Because of actions taken defendants, Zcom's authority to market and sell VZW branded products and services terminated on January 31, 2012.

407.     Because of actions taken by defendants, the authority to market and sell VZW branded products and services that was held by Zcom's sub agents terminated on January 31, 2012.

408.    VZW terminated Zcom because Zcom would not cooperate in the VZW's prepaid activation scheme, and VZW profited from the wrongful termination by, *inter alia*, no longer paying Zcom approximately $750,000 per month in post-pay "residuals," and,

*inter alia*, having all of Zcom's choice locations available to VZW, at its discretion, to keep or "gift" to any agent of its sole choice - without paying Zcom for defalcating its business assets.

409. In their letter terminating Zcom's Master Agency, VZW provided what their own internally generated, fabricated or false claims of bad acts by Zcom as "cause" for the termination [Ex. 5 at 000001 - 000003].

410. VZW wrongfully terminated Zcom for "cause" and in what was a nefarious attempt to thwart Zcom from contesting such wrongful termination and to make it "Judge-proof," VZW falsely claimed that the "for cause" termination, based upon a fabricated and false predicate, was "without cause."

411. Upon information and belief, by setting forth the false and fabricated allegations against Zcom in their termination letter, the VZW Defendants, by VZW, further evidenced their failure to act in good faith toward Zcom.

412. Upon information and belief, by setting forth the false and fabricated allegations against Zcom in their termination letter, the VZW Defendants, by VZW, further evidenced their unfair dealing with and toward Zcom.

413. Upon information and belief, the VZW Defendants misrepresented their true reasons for terminating Zcom's agency agreement in order to prevent their own misconduct from being disclosed.

414.    Upon information and belief, VZW misrepresented the true reasons for terminating their agency agreement with Zcom in order to prevent their own misconduct from being disclosed.

415.    VZW drafted the agreement which governed the relationship between Zcom and VZW.

416.    The terms of the agreement governing the relationship between Zcom and VZW, as drafted by VZW, provide that the agreement shall be governed by the laws of the State of New York.

417.    The public policy of the State of New York law <u>mandates</u> that all contracts include an implied covenant of good faith and fair dealing.

418.    Consistent with the public policy of the State of New York, New York law mandates that all contracts include an implied covenant of good faith and fair dealing.

419.    The agreement that governed the relationship between Zcom and VZW must be read to include an implied covenant of good faith and fair dealing.

420.    VZW was obligated to act in good faith with Zcom.

421.    VZW was obligated to act fairly with Zcom.

422.    Notwithstanding the policy and law of the State of New York, which, as drafted by VZW, governs the agreement between Zcom and VZW, VZW inserted a provision in the agreement which sought to waive VZW's <u>un-waivable</u> obligation to act in good faith and fairly towards Zcom, to wit:  Section 10.2.

94

423.   VZW inserted Section 10.2 into the agreement governing its relationship with Zcom because it never intended to act in good faith with Zcom.

424.   VZW inserted Section 10.2 into the agreement governing its relationship with Zcom because it never intended to act fairly toward Zcom.

425.   The obligation of a party to a contract to act in good faith with other parties to the contract cannot be waived in New York.

426.   The obligation of a party to a contract to act fairly with other parties to the contract cannot be waived in New York.

427.   The obligation of a party to a contract to act in good faith with other parties to the contract cannot be bargained away in New York.

428.   The obligation of a party to a contract to act fairly with other parties to the contract cannot be bargained away in New York.

429.   The termination of Zcom was, upon information and belief, an effort to cover-up misconduct by the VZW Defendants, individually and collectively, which was not in good faith.

430.   The termination of Zcom was, upon information and belief, an effort to cover-up misconduct by the VZW Defendants, individually and collectively, which was unfair.

431.    The termination of Zcom was, upon information and belief, an effort to misleadingly pass blame for misconduct by VZW Defendants, individually and collectively, which was not in good faith.

432.    The termination of Zcom was, upon information and belief, an effort to misleadingly pass blame for misconduct by VZW Defendants, individually and collectively, which was unfair.

433.    <u>The VZW Defendants were Not Interested in the Truth</u>: when Zcom sought to have the VZW Defendants reconsider, <u>on the facts</u>, including by letter dated August 18, 2011 [*see* Ex. 5 at 000004], the VZW Defendants, by letter dated August 24, 2011, made clear that they were not interested in the truth [*see* Ex. 5 at 000005 - 000006].

434.    Upon information and belief, the termination of Zcom was made in bad faith and without justification, as a product of the VZW Defendants' attempts to cover-up their own internal misconduct.

435.    Upon information and belief, the termination of Zcom was made unfairly as a product of the Verizon Defendants' attempts to cover-up their own internal misconduct.

436.    The termination of Zcom was a result of the defendants' tortious interference with Zcom's existing business relationships with its own sub agents.

437.    As a result of the defendants' tortious interference with Zcom's relationships with its sub agents, Zcom has been irreparably damaged such that:

        a.      Zcom's value was depleted by the VZW Defendants;

b.     Zcom sub agents failed because once Zcom's agreement with

VZW became ineffective on January 31, 2012, Zcom's sub agents were no longer

permitted to market and sell VZW branded products and services under Zcom's Master

Agreement - which, in turn, caused Zcom to lose its revenue stream and secure future

profits built up through the years with satisfied Zcom customers and with proven

"residuals", in the approximate amount of $750,000.00 per month received from VZW;

c.     employees of Zcom and its sub agents lost their jobs as a result of the

defendants misconduct - approximately 400 people working under the Zcom label lost

their jobs.

438.   Mitigation by Zcom Thwarted by VZW, so as to be Unjustly Enriched in

Bad Faith : Zcom sought to mitigate its damages and by e-mail dated August 30, 2011,

Zcom proposed three options[11] for the future of Zcom, or its sale to others [*See* Ex. 5 at

000007 - 000009].   By e-mail of September 16, 2011 VZW made clear that the sale of

Zcom was the only option they would consider, but even then only on their own terms [*see*

Ex. 5 at 000010].

439.   The VZW Defendants directed Zcom to sell off its 'corporate owned" and

sub agency locations and made that the only post-termination letter option for Zcom: focus

on "Option 3".

_____

[11]These three options included: (i) include "best practices" in corporate governance of
Zcom; (ii) merge with another VZW Master Agent; or, (iii) sell to another VZW Master Agent.

440.   Zcom tried, in good faith, to comply with the VZW Defendants' instructions.

441.   Zcom approached VZW Defendants, via VZW, with prospective buyers, each of whom already had a pre-existing "authorized agent" business relationship with VZW, and accordingly were already approved to market and sell VZW branded products and services.

442.   All of Zcom's corporate owned stores were in locations already approved by VZW.

443.   All of Zcom's sub agents had already been approved by VZW.

444.   All of Zcom's sub agents' stores were in locations already approved by VZW.

445.   Zcom only sought to sell to business entities that had already been approved by VZW.

446.   Zcom only sought to sell to business entities that had already been authorized by VZW to market and sell VZW branded products and services.

447.   Zcom Tries to Sell, Per Option # 3, to 3 Prospective Buyers:  E-mail traffic from and to Zcom regarding its interactions with prospective buyers evidence Zcom's good faith attempt to sell to a pre-approved purchaser, and the defendants' tortuous interference with same, to wit [see Ex. 7]:

98

448. <u>Zcom's Prospective Buyer # 1</u>: Attempts to sell to "prospective buyer # 1" and VZW's defendants' tortuous interference with same, is evidenced by e-mails to wit [*see* Ex. 7 at 000001 - 000014]:

a. an e-mail of September 7, 2011 from Zcom to "prospective buyer # 1," who had a long standing pre-approved business relationship with VZW, and is permitted to operate VZW branded stores, confirms that meetings were occurring in a good faith attempt by Zcom to sell to a pre-approved buyer [Ex. 7 at 000001];

b. Thereafter, on or about October 8, 2011, "prospective buyer # 1" informed Zcom that VZW was showing Zcom's locations and facilities to other agents for what appeared to be a take over of the entirety of Zcom without paying any consideration to Zcom. Zcom followed this up with an e-mail of that date [Ex. 7 at 000003];

c. an e-mail from "prospective buyer # 1" on October 10, 2011 to VZW sought "preliminary approval" for "prospective buyer # 1" to take over as a Master Agent for Zcom [Ex. 7 at 000004];

d. by e-mail dated October 12, 2011, VZW then asserted that it would have to "independently evaluate" each store - notwithstanding that all of Zcom's locations had been pre-approved by the defendants - and "prospective buyer # 1" was already approved by and doing business with VZW. Moreover, VZW then refused to permit <u>any</u> buyer of Zcom to buy <u>any</u> sub agent locations, thereby unjustly threatening the livelihood of all sub agents and their employees, notwithstanding that Zcom had been endeavoring to

protect same, destroying Zcom's Fair market value, all to VZW's profit, including not

having to pay about $750,000 per month in post-pay "residuals" to Zcom [Ex. 7 at

000005];

       e.    On October 14, 2011, Zcom wrote, via e-mail, to VZW, indicating

that Zcom personnel had been <u>informed that VZW was seeking to steal all of Zcom's</u>

<u>locations by distributing its stores to "National Agents" of VZW</u>.  Moreover, Zcom

emphasized that the defendants were <u>seeking to "dismember ITC"</u> - as every Zcom

location - including all of its sub agents - had already been vetted and approved by the

defendants - yet VZW demanded that Zcom could only "sell" but in the same breath was

refusing to permit same.  Moreover, VZW had hired a real estate firm to "show" Zcom's

own stores and those of its sub agents in an attempt to "steal" 65 of Zcom's Long Island

based "doors" [Ex. 7 at 000007 - 000009];

       f.    by e-mail of November 4, 2011, Zcom provided VZW with a listing

the "doors" which would be part of a deal with "prospective buyer # 1" [Ex. 7 at 000010 -

000013]; and,

       g.    by e-mail dated November 10, 2011, VZW reiterated that all of

Zcom's pre-approved locations would still have to be, in essence, re-approved, prior to any

sale of Zcom being considered by the defendants.  By e-mail of that same day, Zcom

sought to discuss same with VZW via telephone [Ex. 7 at 000014].

449.    The VZW Defendants thwarted any deal between Zcom and "prospective buyer # 1."

450.    <u>Zcom's Prospective Buyer # 2</u>:    Attempts to sell to "prospective buyer # 2" and VZW's defendants' tortuous interference with same, is evidenced by e-mails [*see e.g.* Ex. 7 at 000015 - 000032], to wit:

a.    On October 28, 2011 Zcom e-mailed "prospective buyer # 2," who has a long standing pre-approved business relationship with VZW, and is permitted to operate VZW branded stores, about the prospective availability of Zcom's stores;

b.    On November 4, 2011 "prospective buyer # 2" e-mailed Zcom seeking information about the availability of Zcom's stores.  That same day further e-mails between Zcom and "prospective buyer # 2" were transmitted seeking to arrange an in-person meeting [*see e.g.* Ex. 7 at 000015 - 000018];

c.    by November 17, 2011 e-mail, "prospective buyer # 2" confirmed a meeting at its offices for November 18, 2011 [Ex. 7 at 000019].  On November 18, 2011 further e-mails were transmitted regarding that same meeting.  Thereafter on November 18, 2011, Zcom transmitted a list of stores to "prospective buyer # 2," who responded that a call had been placed to a contact regarding same [*see e.g.* Ex. 7 at 000021 - 000023];

d.    On November 22, 2011 Zcom e-mailed  "prospective buyer # 2" in an attempt to learn if VZW had provided any response.  "Prospective buyer # 2" responded

101

that VZW had not respond; however, "prospective buyer # 2" still sought a plan regarding stores [Ex. 7 at 000025];

      e.     on November 22, 2011 Zcom again e-mailed "prospective buyer # 2" regarding input from VZW, and on November 23, 2011 "prospective buyer # 2" advised that it still awaited an answer from VZW [*see e.g.* Ex. 7 at 000026 - 000027];

      f.     On November 29, 2011 "prospective buyer # 2" e-mailed Zcom advising that VZW had to approve any deal that Zcom and "prospective buyer # 2" might make - only after the terms of the deal were complete [*see e.g.* Ex. 7 at 000028];

      g.     on December 13, 2011 "prospective buyer # 2" e-mailed Zcom and indicated that Zcom stores were going to be coming to "prospective buyer # 2" and proposed another meeting for that coming Friday. In follow-up e-mails Zcom and "prospective buyer # 2" on December 13, 2011 and December 14, 2011, plans for a meeting were finalized [*see e.g.* Ex. 7 at 000029 - 000032].

     451.     The VZW Defendants thwarted any deal between Zcom and "prospective buyer # 2."

     452.     <u>Zcom's Efforts to Sell to Prospective Buyer # 3, United Telecom, are Severely Hampered by VZW</u>: Attempts to sell to United Telecom ("UT"), and VZW's defendants' tortuous interference with same, is evidenced by e-mails [*see e.g.* Ex. 7 at 000033 - 000050] to wit:

a.    On December 15, 2011, UT e-mailed VZW reiterating prior communications between them and indicating that the proposal for UT to purchase Zcom was being made jointly by that prospective buyer and Zcom.  UT further indicated that the details of the deal were near finalized and were in the best interests of the prospective buyer, Zcom and VZW.   UT referenced sub agent locations - advising that they only sought to purchase Zcom's pre-approved sub agents "that have a proven track record over the years."  In the event that VZW would not permit the sub agents to be sold as sub agents of UT, UT made clear that they would then purchase the sub agent businesses and make them a part of UT - who would operate them as part of their corporation that was, and remains, actively marketing and selling VZW branded products and services [*see e.g.* Ex. 7 at 000033 - 000035];

b.    On December 22, 2011, VZW responded to UT's December 15, 2011 e-mail by disingenuously claiming that VZW, UT and Zcom were "going around in circles" and misleadingly claiming that UT and Zcom had not provided requested information, when in fact they had.  Rather, instead of handling the matter in good faith, VZW tried to use semantics to muddy up the deal.  While Zcom had made clear to VZW that it had the authority of sub agents to sell to UT, VZW knew this, yet claimed otherwise.  Furthermore, while VZW advised that they were not seeking to expand through the addition of sub agent locations - nobody ever proposed adding new sub agents.  To the contrary, UT was willing to use preexisting sub agents of Zcom that had already been

103

approved by VZW, at locations already pre-approved by VZW - OR was willing to buy

sub agent locations and operate them through its own corporate entity.  Either way, the

proposal was within the guidelines that VZW communicated to Zcom [*see e.g.* Ex. 7 at

000036 - 000037];

       c.    On January 4, 2012 Zcom responded to VZW's e-mail of December

22, 2011 so as to again make clear to VZW that

> continuing with our duty to mitigate damages, we are in
> complete agreement to have [UT] take over [Zcom] owned
> stores ASAP and convert them to their own corp stores before
> 1/31/12.   I am also helping [principal of UT], as desired by
> him, to negotiate with many of [Zcom's] sub agents relevant
> to the stores/doors he is interested in acquiring by 1/31/12.

Furthermore, Zcom also attached a list of the Zcom stores and sub agent locations that

"prospective buyer # 3" sought to purchase [*see e.g.* Ex. 7 at 000038 - 000039];

       d.    VZW replied to Zcom's  January 4, 2012 e-mail, a week later, on

January 11, 2012.  Notwithstanding that VZW knew that Zcom was approving a transfer

of its agency with its sub agents to UT, and that Zcom had arranged for all leases for the

relevant sub agent and Zcom locations to be transferred to UT, UT would be purchasing

the sub agent locations, VZW, again arguing semantics, urged that Zcom was not clear

enough in prior e-mails about its authority to consummate the deal - notwithstanding that

VZW knew full well that Zcom spoke for the entirety of the Zcom family and that Zcom

had obtained authority to act on behalf of the sub agents long before [*see e.g.* Ex. 7 at

000040 - 000041];

e.       On January 16, 2012, Zcom responded to VZW's January 11, 2012

e-mail. Zcom again sought to make clear that by "helping" the principal of UT, Zcom

> has acquired a written confirmation as well as leases from all
> the sub's listed on the attachment, thus giving full authority to
> [Zcom] to sell the sub agent's location to [UT].  Further
> [Zcom] had facilitated the process for these locations and
> their leases to be transferred to [UT] immediately.  Please
> consider this email as a written confirmation from [Zcom] for
> [Zcom]  owned stores as well as some sub agent doors as
> specified in the attachment

[*see e.g.* Ex. 7 at 000042 - 000043];

f.       On January 17, 2012 VZW sent an e-mail indicating that out of 71

locations that were part of the deal between Zcom and UT, they were only approving the

transfer of 10 Zcom corporate affiliates on Long Island - and rejecting 17 Zcom corporate

affiliates and ignoring the remaining 54 sub agent locations whom Zcom obtained

authority to transfer to UT.  In the worst of faith, notwithstanding that Zcom had full

authority to act on behalf of its sub agents that were part of the prospective deal, VZW

disingenuously claimed that they were not even considered because Zcom had not

provided any "statement or proof" of its ability to convey those locations.  Of course,

VZW wholly ignored the "plain as day" language in Zcom's January 16, 2012 e-mail,

where Zcom indicated that VZW should consider that communication as written

confirmation of Zcom's authority.  That the sub agents had agreed to sell and be acquired

by UT as part of its corporate owned entity was also of no moment to VZW.  Thus, to be

absolutely clear, Zcom had authority to convey all 54 sub agent locations identified in

attachments which were provided to VZW - and which VZW had acknowledged receipt

[*see e.g.* Ex. 7 at 000044 - 000045];

       g.    In response to VZW's January 17, 2012 e-mail, UT sent their own

e-mail, validly expressing significant confusion. UT sought clarification as to what was

happening with regards with the remaining 17 Zcom corporate affiliates, as UT had

already secured their leases. Moreover, UT further confirmed that VZW was toying with

semantics pertaining to the sale of sub agent locations - as UT made clear that they had

> obtained, from all the sub agents listed, <u>written consent</u> to purchase their location from them. We have also received all the leases as well as detailed numbers of expenses and sales for each location. If it is a case of symantics (*sic*), simply [UT] has received authorization to speak to the subs from Zcom and have in place a purchase agreement with each of the listed locations pending Verizon Wireless' approval.
>
> These locations will be [UT] owned locations and operated in the same manner as any other [UT] location

[*see e.g.* Ex. 7 at 000046 - 000047];

       h.    steaming mad from all the hoops that VZW has had Zcom jump

through, just to mitigate the harm that they themselves caused, Victor also replied to VZW

by e-mail on January 17, 2012, indicating that:

> Your 10-corporate store approval email is duly acknowledged. Out of 71 stores, with full authority, for transfer to [UT], you have rejected corporate stores and all sub-agent stores to the tune of 61 stores. This behavior by you on behalf of VZW is reprehensible and added proof of why even Option 3 has been a wild goose chase imposed upon [Zcom] by you in bad faith. You have made us waste our time

106

> and resources hoping against hope that someone high up
> would 'do the right thing.' How wrong of us to have had that
> hope. Your conduct is unacceptable and nothing short of theft
> of our business and lives

[Ex. 7 at 000050]. Accordingly, to date any deal between Zcom and UT has also been

unfairly muddied by VZW, in the worst of faith;

       i.     Thereafter, on January 19, 2012, VZW responded to Zcom, again,

*inter alia*, twisting the story regarding Zcom's authority to sell the very sub agent locations

that it had already obtained authority to sell [Ex. 7 at 000049];

       j.     On January 19, 2012, Victor replied to VZW, making clear that

VZW's actions were in bad faith, to wit:

> [i]t is painful and sad for me to realize that the games VZW
> has been playing is because you guys have decided to cut up
> lTC, and then give it away to your favored agents. Since every
> one of lTC's stores is pre-approved and part of VZW's
> distribution system, it is laughable that you wanted, in bad
> faith, the right to re-approve their move to a pre-approved
> VZW agent-buyer.
>
> Your word games are welcome proof of your misconduct,
> individually and on behalf of your employer. Since you have
> made mitigation efforts worthless, I am unburdened thereby.
> The buyer was willing to become the owner of a preexisting
> distribution system. You have chosen to prevent that;
> obviously, you guys have cut your own secret deals with
> others for whom you wish to "steal' my hard work's efforts
> and ITC's existence. Shame on you; and see you in court.

[Ex. 7 at 000048 - 000049] (emphasis added).

453.    The VZW Defendants thwarted significant portions of the deal between Zcom and UT.

454.    The VZW Defendants' malice towards Zcom is evidenced by their awarding of agreements directly to prospective purchasers and their agents after thwarting deals between Zcom and those same entities.

455.    The VZW Defendants tortiously interfered with Zcom's prospective business relationships as notwithstanding that the defendants directed Zcom to sell its agencies and locations, each prospective sale was rejected by VZW Defendants - without any justifiable basis.

456.    The VZW Defendants have sought to tortiously enrich themselves, unjustly, by wrongly taking Zcom's business, agents and locations, with no compensation, much less fair compensation, paid to Zcom.

457.    VZW is Exposed After January 31, 2012:  The proof of VZW's bad faith, unfair dealing and criminal disregard of the VZW defendants' civil obligations owed to Zcom is, *inter alia*, that after the January 31, 2012 termination took effect, VZW then granted former Zcom sub agents direct probationary licenses to market and sell VZW branded products and services.  These were the very locations that VZW did not allow Zcom to even sell in a "fire sale," after the January 31, 2012 termination of Zcom, in an effort to allow them to continue in business by being taken over by an existing VZW Master Agent.

108

## VIII. "SMOKING-GUN" PROOF OF VZW MISCONDUCT - ACTUAL RECORDING OF DEFENDANT JORGE VELEZ, OF VZW, PUSHING PRE-PAID AS A "DO OR DIE" ON DECEMBER 4, 2009

458.    The plaintiff repeats and realleges each and every allegation in the preceding

paragraphs as though they had been set forth in full herein.

459.    Sub agents of Zcom participated with the VZW Defendants' scheme because

of the pressure to do so put on them by the defendants, without any authority of Zcom.

460.    For instance, on or about December 4, 2009, acting on behalf of the VZW

Defendants, Individual VZW Defendant Velez informed Zcom sub agent Sandeep

"Sunny" Girhotra ("Sunny") that prepaid activations, albeit "shady" were approved and

that if the activations weren't made people would lose their jobs.

461.    Defendant Velez further reported that his "general" was Defendant Verghese

and that Verghese, and higher ups were demanding more prepaid numbers.

462.    This communication was recorded by Sunny and a digital recording of same

is available for review, and incorporated herein by reference.  An affidavit from Sunny is

appended hereto and made a part hereof [Ex. 14].  A transcript of the communication

follows with the letters "JV" representing the statements of defendant Velez, and "SG"

representing Sunny:

> JV:     [unintelligible] my big stores are not doing absolutely
>          nothing, and, and, of course, obviously I'm not
>          blaming the stores, I'm blaming the economy, the
>          traffic.

109

SG:    Right.  Right, right.  So that means Tom Verghese,
       John Coyle. . .

JV:    [unintelligible].

SG:    are okay with that.  Like, they know it.  It will be like,
       it will be shady, a little bit shady, not 100% shady but a
       little bit shady.

JV:    Yes it is sir.  And, listen, I don't sugarcoat shit
       because, you know,  I'm an honest person, I like to do
       things honest myself.  But, right now, Tom is asking
       for numbers.

SG:    Gotcha.

JV:    How we get the numbers, he doesn't want to know.
       All he wants to see numbers.  And the only way we can
       do things like this is by promoting C, customer
       provided equipment, we call it C P E and tacking on
       that $15.00 that way our [unintelligible].

SG:    So.

JV:    So listen, if you, if you do, if you do five, say here in
       Bohemia for the whole fuckin' month [unintelligible]
       ten numbers [unintelligible] well then of course you
       guys are gonna do business.  You guys are also gonna
       sell prepay the right way also but, it's just the way we
       got, we're trying to do something for the next couple
       of days to show some kind of growth, because right
       now we're not.  We had a horrible October, horrific
       November, and December's not doing so well.  And,
       and, and honestly it's everybody's job is on the line if
       we don't perform well in December.  You know my
       job is on the line, Coyle's job is on the line, and
       obviously, obviously our big general Tom is on the line
       as well.

SG:    Gotcha, gotcha.

JV:     But, it's do or die sir, so you know [unintelligible].

SG:     No, no, no, definitely, for $15.00, let's say we like, for argument sake, just talking to you, let's say we do like 25 new lines with the prepay

JV:     Yeah.

SG:     In my store.  Argument sake only five people continue to carry the prepaid and twenty people does not even increase the minutes. . .

JV:     Right.

SG:     So we get, we get, five commissions for sure, like [unintelligible] if the money [unintelligible]   Just like advertising I can say, oh you know I can say my [beeping in background - unintelligible speaking] saving your  jobs [unintelligible] I can say.

JV:     Absolutely sir.

SG:     I can stand about 2 - 3 hundred dollars extra a month you know.

JV:     And before, and before I talk to Ahmed, before I speak to Tina, I first talk to you, because I want to get your feedback, your, your suggestions.

SG:     No, no, I was there with Tina and, and Andy and everybody, and I did mention then, you know you told me that In Touch was getting a very good deal for their Samsung Smooth.

JV:     Yeah [unintelligible] they sent e-mail on it [unintelligible] I asked her to send information to you guys but she hasn't sent shit.   It's, it's already the 4th of the month.

111

SG:     Yeah, they have not sent anything.  Thank you to you
        because we are ready now. I spoke to Dan and we
        already are, like, um, you know, basically, I discuss
        with [inaudible/ unintelligible - background voice]
        basically I, I discuss [unintelligible] with either you or
        Dan, how to sell those $25.00 prepaid, you know how
        to put like a new sign, free phone on the counter, and
        you know, even by giving them the free phone, if we
        charge them just the $30.00 for the minutes.

JV:     Right, absolutely.

SG:     We can cover, because you said that the phone will be
        $25.00 and it comes with a $30.00 card.

JV:     Right.  That's correct.

SG:     If it comes with a $30.00 card and I sell the phone for
        just $30.00 it means I'm covering the cost of, um, my
        phone and increasing the gross ad.

JV:     [unintelligible] right.

SG:     Simple as that.  So, I'm definitely on it, you know, I'm
        just waiting for them to get the phone, but this is a
        good idea.  Now, now you give me green signal.

JV:     Right.  Listen, even, even, even my idea is costing you
        nothing because remember we're using, we're using
        the same customer's phone.

SG:     Customer's own phone. Right.

JV:     Just we're doing a lot of upgrades why not take
        advantage of the upgrade that's already coming in
        instead of waiting for  [unintelligible] or whatever.
        What happened to [unintelligible].  It's not Tuesday.
        We can't wait till Tuesday.  We got Friday, today,
        Saturday, weekend, Sunday, we can, honestly, it's a do
        or die, it's a do or die situation for us.  My ass is on the

112

> line. Coyle's ass is on the line. Tom's ass is on the
> line. We, my bosses' bosses want to see numbers.
> How we get it they don't care at this point.

SG:    Gotcha sir.

JV:    Alright, buddy, so. . .

SG:    No problem. I'll go again on the weekend, or Monday
maybe to my stores and I'll again continue
[unintelligible].

JV:    No problem sir. Listen, I appreciate your time.

SG:    No problem. Thank you. Thank you Jorge. Bye.

Notably, on December 8, 2009 that same sub agent contacted Zcom via e-mail expressing

concern about the prepaid activation plan endorsed by the defendants because the prepaid

phone would become inactive during the charge back period [Ex. 15].

463.    Based upon the compensation guidelines for Zcom, as conveyed by VZW,

the sales of prepaid services were generally a <u>loss</u> for Zcom.

464.    VZW paid Zcom a one-time commission for the activation of a new prepaid

number, so long as the number remained active for at least a set period of time as

determined solely by the VZW Defendants and reported by VZW.

465.    VZW did not pay "residuals" to Zcom on prepaid accounts activated by

Zcom and its sub agents.

466.    The main beneficiaries of the VZW branded prepaid activations program are the VZW Defendants, and related persons and entities themselves.

467.    Zcom received ZERO credit towards its own minimum performance requirements with VZW for prepaid activations.

468.    Pre-Pay vs. Post-Pay: only post-pay subscription based accounts count toward Zcom's "minimum activations" and for "residuals."

## IX.    JURISDICTION AND VENUE

469.    The plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though they had been set forth in full herein.

470.    This lawsuit was initially commenced in the New York State Supreme Court, in and for the County of New York by the filing of a summons and verified complaint on December 28, 2011, and the purchase of Index # 653635/2011.

471.    Verizon Communications, Inc. is functionally the controlling majority partner in defendant VZW, accordingly Verizon's principal office is located in New York County, venue was and remains proper in New York County pursuant to C.P.L.R. § 503(d).

472.    Defendant Ajay Bhumitra resides in New York County, accordingly, venue was and remains proper in New York County pursuant to C.P.L.R. § 503(a).

114

473.    By Notice of Removal dated January 3, 2012, and filed with the New York State Supreme Court on January 4, 2012, VZW, along with related defendants - and <u>then</u> named defendants[12] removed the entirety of the case from New York State Supreme Court to the Southern District of New York, ostensibly pursuant to 28 U.S.C. §§ 1332, 1367, 1441, 1446 and 1453, asserting, inter alia, that Zcom's lawsuit was removable pursuant to the Class Action Fairness Act ("CAFA").

474.    By Order dated and entered on January 24, 2012, Hon. P. Kevin Castel, United States District Judge for the Southern District of New York, transferred this matter, due to a first filed suit by VZW in New Jersey federal court,  to the District of New Jersey pursuant to 28 U.S.C. § 1404, .  Venue currently rests in the District of New Jersey pursuant to that transfer Order.

475.    Zcom reserves all rights including, *inter alia,* the right to seek re-transfer back to an appropriate Court and venue in the State of New York.

476.    By submitting this amended complaint Zcom is not consenting to venue in the District of New Jersey or waiving any future motions to adjust same.

---

[12]Verizon Communications Inc., Vodafone Group Plc, Ivan G. Seidenberg, Lowell C. McAdam, Daniel S. Mead, Nancy Clark, Ken Kayal, Esq, Bell Atlantic Mobile Systems, Inc., GTE Wireless Incorporated, PCS Nucleus, L.P. and JV Partnerco, LLC.

## X.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS BETWEEN
### ZCOM AND ITS RESPECTIVE SUB AGENTS AND CUSTOMERS
### (AGAINST THE VZW DEFENDANTS)

477.    The plaintiff repeats and realleges each and every allegation in the preceding

paragraphs as though they had been set forth in full herein.

478.    Notwithstanding Zcom's profitability for the defendants, once Verghese

became involved with Zcom's account on behalf of the defendants, he steadfastly refused,

in bad faith and unfairly, to approve any further development or growth of Zcom, upon

information and belief, a move approved by the VZW Defendants' policy makers - in bad

faith.

479.    The defendants unjustifiably hampered Zcom's growth.

480.    The defendants inequitably hampered Zcom's growth.

481.    Upon information and belief, the defendants funneled the business that

Zcom would have obtained via additional doors to other master agents, particularly large

national agents ("Big 6").

482.    In September 2010, with the approval of the defendants, via VZW, Victor

purchased Alex's shares of Zcom.

483.    <u>Generation to Generation Business Relied Upon</u>: at or about the time that

Victor purchased Alex's shares, Patrick Devlin, on behalf of VZW, informed Victor that

116

he anticipated that Victor's children on behalf of Zcom would be doing business with Devlin's own children on behalf of VZW.

484. The VZW Defendants knew that Victor was investing a tremendous amount of his own money, as well as significant sweat equity, into purchasing the entirety of Zcom, and seeking to further grow same.

485. The VZW Defendants, via VZW, approved of Victor's purchase of Alex's shares in Zcom and on September 10, 2010 the transaction between Victor and Alex closed. Critically, this was done after the June 2010 meeting at Zcom's main office in Long Island, New York, between VZW's Fiocco and Pavlicek and Zcom's Victor and, *inter alia*, former employee Charu Sodhi.

486. VZW paid Zcom commissions and residuals on wireless services that were activated though Zcom or any VZW authorized sub agent acting for Zcom.

487. Pursuant to the agreements governing the relationship between Zcom and VZW, the VZW Defendants, including VZW, do not have any business relationship with Zcom's sub agents.

488. VZW's agreements are with Zcom, and Zcom, in turn, has agreements with its sub agents.

489. Zcom's sub agents were not parties to any agreements between Zcom and VZW.

490.    VZW was not a party to any agreement between Zcom and any of its sub agents.

491.    The Defendants were all aware of the existence of the agency agreements between Zcom and its sub agents.

492.    The defendants were all aware that they were not parties to the agency agreement between Zcom and its respective sub agents.

493.    The sub agents of Zcom were not parties to the master agency agreement between Zcom and VZW.

494.    The defendants, including VZW, had no control over the agreements governing the relationship between Zcom and its sub agents.

495.    The VZW Defendants, including VZW, and their employees and agents, were not to have direct contact with Zcom's sub agents.  Rather, any business dealings pertaining to Zcom's sub agents was to be directed to and conducted through Zcom.

496.    The VZW Defendants offered VZW branded prepaid wireless communications plans which provide customers an opportunity to access wireless communication without committing to a long term service plan or contract  ("prepaid service").

497.    Prepaid service is generally paid for by customers in advance of usage.

498.    Because VZW promoted prepaid service without the need for service plan or contract, people with poor credit were able to access prepaid services so long as they could pay for the services in advance.

499.    Starting in or about 2008, as the economy took a downward turn, upon information and belief, the VZW Defendants heavily promoted the activation and sale of VZW branded prepaid service.

500.    Upon information and belief, the VZW Defendants' push of VZW branded prepaid service was a means of quicky and easily increasing its new number activations, and VZW did so between 2008 and 2010 - a three year period.

501.    Upon information and belief, by adding prepaid activations to the total number of activations of VZW branded wireless service, the VZW was able to claim a greater number of activations on new cellular lines, instruments and numbers in their head-to-head competition with competitors AT&T, T-Mobile USA and Sprint Nextel.

502.    VZW also benefitted from prepaid based upon their own costs associated with such accounts as it costs VZW significantly more money to process, activate, monitor and pay residuals on a new postpaid wireless subscription account, then it does for a prepaid account.

503.    Upon information and belief, the average cost to VZW for a prepaid activation is approximately $10.00.

504.    Upon information and belief, the average cost to VZW for a postpaid subscription based activation is approximately $150, plus VZW's obligation to pay monthly "residuals."

505.    Upon information and belief, the average life of a prepaid VZW branded account is generally between approximately 30 - 45 days.

506.    Upon information and belief, the average life of a postpaid subscription based VZW branded account is approximately two years or more.

507.    Upon information and belief, by pushing prepaid services, VZW was able to make more money, faster and with less out of pocket costs via prepaid activations when compared to postpaid subscription type accounts, and VZW's obligation to pay "residuals."

508.    VZW began to pressure Zcom to increase the sale and marketing of prepaid VZW branded wireless accounts.

509.    Upon information and belief, VZW developed a scheme to inflate the amount of VZW branded prepaid wireless accounts without the need for actually acquiring additional customers.

510.    Upon information and belief, the scheme, as developed by VZW, entailed activating older discarded wireless equipment with a prepaid cellular phone number, even with fictitious names, and, *inter alia*, improper direct contact between VZW and Zcom's sub agents.

511.     Sometimes the name used to establish the bogus prepaid account would be thay of a celebrity, such as Julia Roberts and Robin Williams, famous business leaders like Warren Buffet and Steve Jobs, and world leaders like Vladimir Putin [*see e.g.* Ex. 11].

512.     Upon information and belief, based upon VZW's representations the sub agent activating the account would then use its own funds to prepay a minimal amount of money on the account.  The sub agent would still ostensibly profit off the transaction as the one time commission they received was greater than the amount of money they put on a new prepaid account.

513.     The VZW Defendants heavily emphasized to Zcom and its sub agents that the prepaid "push" was a means of easily obtaining commissions.

514.     The scheme worked because Zcom and its sub agents were falsely led to believe that the one time commission ostensibly paid by VZW was higher than the out of pocket cost to Zcom and its sub agents, and because Zcom and its sub agents were told by VZW and its employees to sell or be punished by VZW.

515.     VZW never really intended to pay all of the commissions on the fraudulent prepaid transactions performed at their own direction and insistence.

516.     VZW did not inform Zcom and its sub agents that the prepaid instruments would deactivate prior to the 180 day minimum time period to avoid "charge backs" of commissions, if "test calls" were not made at the time that the prepaid phone was initially activated, and if the phone was not used by the end user.

121

517.    At VZW's direction, the prepaid phones were promoted to the end user customer for use in emergencies and <u>not</u> for regular usage.

518.    Because the phones were promoted for emergency use, customers were not expected to use most, if not any of the air time minutes put on the phone at VZW's direction and insistence.

519.    Because the phones were not intended to be used regularly, many of them were deactivated by VZW before the 180 day "chargeback" period expired.

520.    Upon information and belief, VZW designed the prepaid program anticipating that many instruments would be deactivated, and thus they could claim the new activation as a "new number" - yet deprive their Master Agents, including Zcom, of their commission - notwithstanding it was the agents doing all of the work - at the defendants' specific direction and insistence.

521.    Upon information and belief, the VZW Defendants also encouraged the mass fraudulent activation of previously discarded wireless equipment as prepaid instruments, even using false information, including fictitious customer names [*see e.g.* Ex. 11].

522.    Zcom as an entity would <u>not</u> willingly participate in, what was, upon information and belief, a misleading scheme proposed, orchestrated, implemented, executed and/or conducted by the VZW Defendants.

523.    Under Victor's leadership, Zcom detected and notified VZW of suspected prepaid activation fraud.

524.    On or about July 28, 2009, Zcom expressed concern with the defendants prepaid program to then VZW employee John Coyle.

525.    Beginning on or about July 28, 2009, Zcom developed and implemented a comprehensive training program for all its employees and agents to prevent account activation fraud [*see e.g.* Ex. 13 at 000011 - 000012].

526.    Zcom also developed protocol for identifying of suspicious activations and the repercussion for violating Zcom account activation policy.

527.    Upon information and belief, VZW openly encouraged Zcom to develop its anti-fraud program, while surreptitiously having its own employees and agents, including; Varghese, Velez, Shady Shad, Broomes, Coyle and Malenda directly communicate with sub agents of Zcom and pressured them into participating in the VZW Defendants' scheme.

528.    Without Zcom's involvement or approval, upon information and belief, VZW directed Zcom's sub-agents to create fraudulent pre-paid accounts for mobile phones discarded by customers in connection with hardware upgrades transacted at their respective stores, in wholesale breach of Zcom's ethics policy, at VZW's direction and insistence, the phones would then be activated under the names of fictitious customers.

529.    The VZW Defendants' E-Mail Pre-Paid Push Campaign:  by e-mails of
September 24, 2009, VZW's Chris Malenda demanded that Zcom increase the VZW
branded pre-paid wireless service sales ten fold per day [Ex. 18 at 000001 - 000002].

530.    By e-mail of December 15, 2009 Malenda then demanded that prepay be
driven even harder such that there be 12 prepaid activations per store [Ex. 18 at 000003 -
000004].

531.    The defendants' forceful push of the sale and marketing of prepaid VZW
branded products and services is further evidenced by additional e-mail traffic from the
defendants to Zcom, to wit:

a.      August 13, 2009:  inquiring why pre-paid was not a focus at some
stores.  Comments that VZW addressed the fears of stores who feared charge backs on the
pre-paid phones and directs that Zcom have its agents push pre-paid [Ex. 16 at 000018 -
000023];

b.      October 1, 2009: instructing Zcom to have its agents leverage prepaid
activations [Ex. 16 at 000024 - 000026];

c.      November 23, 2009: directing Zcom to ensure that its stores were
promoting VZW branded products including prepaid [Ex. 16 at 000036 - 000044];

d.      December 1, 2009: goals for prepaid sales, per Zcom location, were
forwarded to Zcom [Ex. 16 at 000045 - 000048];

e.      December 4, 2009: seeking assurances that Zcom had sent out prepay promotions to its sub agents [Ex. 17 at 000008 - 000011];

f.      December 4, 2009: new opportunity to earn additional funds through activating a specific prepaid phone [*Id.*];

g.      January 06, 2010: ensure that every location continues to push prepaid as was done in December 2009 [Ex. 16 at 000080 - 000085];  and,

h.      January 28, 2010: directs Zcom to contact specific sub agents to determine why they have not made at least 10 prepaid activations.  Directs Zcom to have these locations focus on prepaid [Ex. 16 at 000098].

532.    Moreover, e-mail communications amongst the defendants themselves, further reveals the defendants heavy push of prepaid VZW branded products and services, to wit:

a.      December 1, 2009: e-mail from defendant Varghese to Keith Allocco revealing that VZW is worried about low pre-pay numbers [*see e.g.* Ex. 13 at 000013] ; and,

b.      December 1, 2009: e-mail from John Coyle to Keith Allocco reporting that VZW will be initiating an "extremely aggressive" pre-pay activation plan for December.  Anticipating a minimum of 10 pre-pay sales per door for December 2009 [*see e.g.* Ex. 17 at 000004 - 000007].

125

533.    Defendants Shelly and Poonam willingly participated in the VZW Defendants' scheme, for their own benefit.

534.    These principal's of Zcom sub agents, acting in a manner unsanctioned by Zcom and outside the scope and in breach of the agreements which governed their relationship with Zcom, actively engaged in prepaid activation fraud by activating numerous cellular instruments in the deceptive manner described herein, with phantom subscribers.

535.    Upon information and belief, Verghese was acting with VZW's approval.

536.    Shelly and Poonam were acting with the approval of defendant Verghese.

537.    Beginning on or about December 10, 2009, without the approval or consent of Zcom, VZW sent defendant Broomes to personally meet with Zcom sub agents to coerce them into further participation in the prepaid scheme.  Thereafter, Broomes evidenced his own visits to Zcom's sub agents via an e-mail sent to Zcom that same day [*see* Ex. 19].

538.    The VZW Defendants, knowing that they had absolute control over the VZW branded service marketed and sold by Zcom, and all of its sub agents, employed duress and coercion to compel Zcom sub agents  to employ the VZW Defendants' fraudulent scheme.

539.    Many of Zcom's sub-agents were intimidated into complying with the VZW Defendants' fraudulent pre-paid scam, leading to severe damages to Zcom.

540. Zcom sub agents, at the VZW Defendants' direction, falsified new account activations and customer identification by generating "new" pre-paid accounts with fictitious customer names.

541. Those false names became part of Zcom's business records, which Zcom relied upon to their detriment because they did not know the records were false when entered.

542. The VZW Defendants' imposition of their fraudulent scheme and plan upon Zcom's family of sub agents, independent of Zcom, caused and directed the sub agents to breach their own agreements with Zcom.

543. The VZW Defendants' scheme enabled the VZW Defendants to inflate their new account activations.

544. Upon information and belief, the VZW Defendants' scheme enabled employees of the VZW Defendants, including, *inter alia*, Varghese, Velez, and Shady Shad to obtain performance bonuses for achieving account activation growth benchmarks.

545. Upon information and belief, the VZW Defendants engineered their scheme such that the prepaid activations were expected to be short-lived.

546. On or about April 3, 2010, VZW began initiating charge backs from Zcom pertaining to December 2009 prepaid sales that the VZW Defendants had forced upon Zcom's sub-agents.

547.    Legitimate charge backs are required to be paid as a result of certain triggering events set solely at VZW's discretion.

548.    Zcom was required to pay a charge back to VZW if an account holder disconnected their prepaid phone before 180 days elapsed from the time of activation.

549.    The pre-paid accounts activated at VZW's direction and insistence would frequently be deactivated by VZW such that they would not remain active for the minimum time frame set by the VZW Defendants.

550.    Upon the premature deactivation the VZW Defendants, via VZW, would then charge back all commissions paid to Zcom and through Zcom to Zcom's sub agents.

551.    Accordingly, the VZW Defendants could take "credit" for new activations without having to pay any commission to Zcom for activations that VZW forced upon Zcom and its sub agents.

552.    Zcom, however, lost money, to wit: VZW charged back Zcom's own meager commission and much of the prepaid commissions paid to sub-agents, notwithstanding that the sub agents had followed VZW's instructions as VZW insisted, and Zcom's customer goodwill was damaged.

553.    The VZW Defendants falsely accused Zcom of creating the fraudulent prepaid activation scheme that was actually a product of the VZW Defendants, which Zcom had sought to combat.

554.   Upon information and belief, the VZW Defendants claimed to "investigate" the fraudulent activation of  prepaid accounts; however, such "investigation" was merely a means of covering up their own creation, orchestration, implementation and/or execution of the prepaid scheme, firing a few "downstream" employees and scapegoating Zcom in bad faith and unfairly.

555.   Upon information and belief, after Zcom refused to falsely admit to wrongdoing for which it was not responsible, the VZW Defendants, with Pavlicek and Fiocco acting as the ostensible "investigators" fabricated "evidence" to pass blame onto Zcom as a means of "whitewashing" the VZW Defendants' own wrongdoing, while "cleaning house" at VZW by firing VZW employees.

556.   Zcom nevertheless persisted in its truthful denial of bad acts; however, even at their highest levels the VZW Defendants were not interested in the truth as was made clear by VZW's Pino Salonna - in writing [*see e.g.* Ex. 5 at 000005 - 000006, 000010].

557.   On or about July 26, 2011 VZW, via Pino Salonna - who, upon information and belief, knew that the misconduct alleged against Zcom was false and fabricated - sought to terminate Zcom's agency agreement with VZW effective January 31, 2012 for specific "causes" stated [*see* Ex. 5 at 000001 - 000003].

558.   VZW, via Salonna, falsely cloaked such termination as "without cause," but then proceeded to repeat their internally generate false "causes" of bad acts by Zcom - knowing that Zcom was innocent [*Id.*].

129

559.    When Zcom sought to have the VZW Defendants reconsider, on the facts, VZW, by Salonna, again made clear that the VZW Defendants were not interested in the truth [*see e.g.* Ex. 5 at 000005 - 000006, 000010] - particularly when Salonna issued the termination, upon information and belief, knowing that the claims against Zcom were false, and that VZW Defendants and their own employees, acting at VZW's direction, were responsible for the prepaid activation fraud.

560.    In addition, the package of evidence received by Victor on June 21, 2011 from the "anonymous benefactor," a day before a second scheduled meeting with Bruno Pavlicek, exposed communications and collaboration between Pavlicek, Shelly and Poonam that, upon information and belief, led to further fabrications by VZW about Zcom [*see e.g.* Ex. 10].

561.    Zcom had contractual agreements with all of its sub agents.

562.    The VZW Defendants knew that Zcom had contractual agreements with its sub agents.

563.    The VZW Defendants knew that they were not parties to the agreements governing the relationship between Zcom and its sub agents.

564.    The VZW Defendants' coercion of Zcom's sub agents induced them to violate the terms of their agreements with Zcom.

565.    The VZW Defendants' misrepresentations directed to Zcom's sub agents induced them to violate the terms of their agreements with Zcom.

130

566. Zcom has been significantly damaged as a result of the VZW Defendants' tortious interference with its contractual relations with its sub agents.

567. The VZW Defendants' tortious interference with the contractual relationships between Zcom and its respective sub agents is the proximate cause of damages sustained by Zcom.

568. $150 Million Dollars a Year: Zcom, with Verghese's "Freeze Out" of Zcom's growth, was doing approximately $75 million dollars per year in activations, plans and accessory sales business, plus with a related company, a like amount of product sales.

569. The misrepresentation, deceit and cover up employed by the VZW Defendants evinces a high degree of moral turpitude, and demonstrates wanton dishonesty as to imply a criminal indifference to the VZW Defendants' own civil obligations owed to Zcom.

570. By reason of the foregoing, Zcom has been damaged by the VZW defendants in an amount to be determined at trial, together with interest at the maximum rate allowed by law, and punitive damages for the VZW Defendants' wrongful conduct which evinced a high degree of moral turpitude so as to demonstrate wanton dishonesty implying a criminal indifference to their own civil obligations.

## SECOND CAUSE OF ACTION
## FRAUD AND DECEIT
## (AGAINST THE VZW DEFENDANTS)

571.    The plaintiff repeats and realleges each and every allegation in the preceding

paragraphs as though they had been set forth in full herein.

572.    The VZW Defendants developed a scheme to fraudulently inflate their

new account activations with little to no cost to themselves, enabling them to enhance their

activation figures.

573.    As designed and implemented by the VZW Defendants, the scheme involved

the activation of cellular telephones ostensibly for use with prepaid VZW branded wireless

services.   However, in accordance with the VZW Defendants' scheme, these cellular

instruments were either: (a) owned by customers who had intended to discard them upon

upgrading to newer equipment; or, (b) already discarded by customers who had upgraded

to newer equipment.

574.    The VZW Defendants directed Zcom, and its sub agents, to heavily

promote prepaid VZW branded services to their customers, notwithstanding that Zcom did

not really benefit from the marketing and sale of prepaid services.

575.    The VZW Defendants directed Zcom, and it sub agents, to promote their

scheme by directing them to promote the activation of cellular phones that their customers

intended to discard with prepaid services that the customers did not really want, or need.

132

576.  The VZW Defendants directed Zcom, and its sub agents, to promote their scheme by directing them to activate cellular instruments which had been discarded by customers who had upgraded to newer equipment with prepaid services in fictitious names.

577.  Because many of such activations were for cellular instruments that were never going to be used, either because the customer didn't want the service, or the customer was fictitious, the accounts were deactivated by VZW in advance of the VZW Defendants' self-created time frames for Zcom, and its sub agents, to be able to keep their commissions.

578.  The VZW Defendants initiated  direct contact with sub agents of Zcom and directed them to participate in the prepaid activation promotion - which was really a scheme to artificially inflate numbers of new account activations for VZW.

579.  The VZW Defendants' directives to the sub agents of Zcom included instructions to promote the activation of cellular phones that their customers intended to discard with prepaid services that the customers did not really want, or need.

580.  The VZW Defendants directives to the sub agents of Zcom also included instructions to activate cellular phones that their customers had, in fact, discarded upon upgrading to newer equipment, with prepaid accounts in fictitious names.

581.    The VZW Defendants threatened that sub agents of Zcom that did not increase their prepaid service activations would be <u>punished</u>, including potential loss of their authority to market and sell VZW branded products and services.  Zcom was also so threatened by VZW.

582.    The VZW Defendants threatened to take the livelihoods of Zcom, and its respective sub agents, if they did not comply with the VZW Defendants' demands.

583.    The VZW Defendants promised the sub agents of Zcom  that if they met sales benchmarks, set by the VZW Defendants and conveyed by VZW, which included prepaid activations, they would be rewarded via commission to Zcom, and its sub agents, along with other incentives.

584.    Unbeknownst to Zcom, the VZW Defendants never really intended to pay much of the promised commissions.

585.    Unbeknownst to the sub agents of Zcom, the VZW Defendants never really intended to pay much of the promised commissions.

586.    In an attempt to further encourage participation in their scheme, the VZW Defendants initially paid commissions on the prepaid activations made at their demand and insistence and pursuant to their instructions.

587.    Unbeknownst to Zcom, the VZW Defendants intended to chargeback many of these commissions.

588.     Unbeknownst to the sub agents of Zcom, the defendants intended to chargeback many of these commissions.

589.     Pursuant to the prepaid activation program marketing instructions developed by the VZW Defendants and conveyed via VZW, many of the prepaid accounts were sold as "emergency" phones such that their end user customers never had a reason to use them.

590.     When prepaid "emergency phones" were activated by Zcom and/or via its sub agents, the VZW Defendants were able to claim a "new number" activation.

591.     Because the prepaid "emergency phones" were marketed for "emergency" use, upon information and belief, many customers had no reason to use the phones because they were not confronted with emergency situations.

592.     Because many of the prepaid "emergency phones" were not used after activation, VZW unilaterally deactivated them in advance of the 180 day chargeback period instituted by the VZW Defendants.

593.     Because these accounts were unilaterally deactivated by VZW in advance of the charge back period, whatever commissions were paid to Zcom for itself and its subagents were then charged back by VZW, to the benefit of the VZW Defendants and direct loss to Zcom and its sub agents, along with damage to Zcom's goodwill with its customer base.

594.    Because many of the prepaid accounts established as directed by the VZW Defendants, they did not stay active long enough to warrant a commission based upon the VZW Defendants self-established guidelines.

595.    After the accounts became inactive - as they were destined to do from the outset - VZW issued "chargebacks" to Zcom taking back commissions that were paid.

596.    Zcom in turn had to "charge back" their respective sub agents who activated the accounts.

597.    VZW had final say over whether a chargeback would be reversed, modified, or adhered to.

598.    The VZW Defendants engineered their scheme such that the prepaid activations were expected to be short-lived.

599.    On or about April 3, 2010, VZW began initiating charge backs from Zcom pertaining to December 2009 pre-paid sales that the VZW Defendants had forced upon Zcom's sub-agents.

600.    40% or More "Taken" as "Charge Backs:"   upon information and belief, approximately 40% of the commissions paid on prepaid activations - done at the VZW Defendants' instruction and insistence, and on coercive threat, were subject to "chargebacks."

601.    Upon information and belief, accordingly, the VZW Defendants would take "credit" for new activations, often without having to pay any commission to the Master

136

Agents, like Zcom, and its sub agents, notwithstanding that it was the VZW Defendants who forced engagement in their scheme.

602.    Upon information and belief, the VZW Defendants knew they could artificially inflate account activations without any real obligations on their part by requiring Master Agents, Zcom, and their respective sub agents, to activate prepaid accounts that were frequently destined to be unilaterally deactivated by VZW prior to the minimum 180 days to ensure commission payment.

603.    Upon information and belief, many of these pre-paid accounts fraudulently activated at VZW's direction and insistence would not remain active for the minimum time frame set by the VZW Defendants.

604.    Upon the premature deactivation - done by VZW - VZW then chargedback commissions paid to Zcom and its sub agents.

605.    Zcom and its sub agents lost approximately 40% of its prepaid commissions to deactivations by VZW notwithstanding that Zcom's sub agents followed VZW's activation instructions, conveyed by the VZW Defendants.

606.    The VZW Defendants suppressed the true facts in order to induce Zcom and its sub agents, to activate prepaid accounts, at VZW's insistence and direction.

607.    The VZW Defendants suppressed the true facts  suppressed the true facts in order to induce Zcom and its sub agents, to activate prepaid accounts that were, in actuality, in furtherance of VZW's scheme to inflate its activation figures.

608.   The VZW Defendants suppressed the true facts failed to disclose the true facts in order to deceive Zcom and its respective sub agents.

609.   The VZW Defendants did deceive Zcom and its respective sub agents.

610.   Zcom and its respective sub agents lost the bulk of their prepaid commissions paid as a result of sub agents following the VZW Defendants' instructions.

611.   Zcom has been significantly damaged as a result of the VZW Defendants fraud and deceit.

612.   Upon information and belief, the VZW Defendants' fraud and deceit is the proximate cause of the damages sustained by Zcom.

613.   Upon information and belief, the misrepresentation, deceit and cover up employed by the VZW Defendants evinces a high degree of moral turpitude, and demonstrates wanton dishonesty as to imply a criminal indifference to the VZW Defendants' own civil obligations owed to Zcom.

614.   By reason of the foregoing Zcom has been damaged by the VZW Defendants in an amount to be determined at trial, together with interest at the maximum rate allowed by law, and punitive damages for the VZW Defendants' wrongful conduct which evinced a high degree of moral turpitude so as to demonstrate wanton dishonesty implying a criminal indifference to their own civil obligations.

## THIRD CAUSE OF ACTION
## MISREPRESENTATION
## (AGAINST THE VZW DEFENDANTS)

615.    The plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though they had been set forth in full herein.

616.    Upon information and belief, the VZW Defendants were conducting a scheme to inflate activation figures.

617.    Upon information and belief, the VZW Defendants' directions to Zcom and its respective sub agents were in furtherance of their scheme.

618.    Upon information and belief, the VZW Defendants coerced Zcom and its sub agents into participation in their prepaid account activation program which was, in actuality a scheme to artificially inflate VZW's activation figures.

619.    Upon information and belief, the VZW Defendants promised Zcom and its respective sub agents that they would be paid commissions and other incentives for prepaid accounts activated in accordance with the VZW Defendants' instructions.

620.    At the time that the VZW Defendants made these promises to Zcom and its sub agents, upon information and belief, the VZW Defendants had no intention of honoring them.

621.    Upon information and belief, these false promises were made to induce Zcom and its sub agents to aggressively market and sell prepaid VZW branded products and services.

139

622.   Upon information and belief, these false promises were made to induce Zcom and its respective sub agents to aggressively market and sell prepaid VZW branded products and services in accordance with the instructions provided by the VZW Defendants.

623.   Upon information and belief, these false promises were made to induce Zcom and its sub agents to aggressively market and sell prepaid VZW branded products and services notwithstanding that the sale of such services was never particularly beneficial to Zcom.

624.   Upon information and belief, in an effort to prolong the participation of Zcom and its sub agents in the VZW Defendants' scheme to aggressively market and sell prepaid VZW branded products and services as a means of fraudulently inflating their activation figures, VZW paid commissions to Zcom knowing that they would be distributed to sub agents.

625.   Upon information and belief, at the time that they made these commission payments, VZW on behalf of the VZW Defendants, intended to impose charge backs on many of them.

626.   Upon information and belief, because the VZW Defendants knew that they would be unilaterally taking the commissions back, their actually disbursing them was a ploy to encourage Zcom and its sub agents to continue participation in what was the VZW Defendants' prepaid activations scheme.

140

627.   Zcom was <u>not</u> informed that "test calls" were necessary at the time that a prepaid account was activated in order to prevent premature deactivation and chargebacks.

628.   These were all material facts that were, upon information and belief, known to the VZW Defendants but not known to Zcom and its respective sub agents.

629.   Zcom and its respective sub agents relied upon the representations of the VZW Defendants, made via VZW.

630.   Zcom and its respective sub agents aggressively marketed and sold prepaid VZW branded products and services in accordance with instructions provided by the VZW Defendants as a direct result of the promises and assurances that the VZW Defendants made.

631.   Had they known that the VZW Defendants' aggressive prepaid marketing program was a scheme, Zcom and its sub agents would not have participated at all.

632.   Zcom and its sub agents acted on the facts as they appeared, based upon the VZW Defendants' representations.

633.   Zcom did not know that the VZW Defendants were conducting a scheme to artificially inflate activation figures.

634.   Zcom and its respective sub agents, did not know that the commissions which were paid were issued only to induce further participation in the prepaid marketing scheme, and that upon information and belief, the VZW Defendants intended to charge

back the commissions paid after they no longer required the participation of Zcom and its sub agents.

635. Zcom and its sub agents, did not know that the VZW Defendants, upon information and belief, did not intend to actually pay their promised commissions.

636. Zcom and its sub agents did not know that the VZW Defendants, upon information and belief, intended to charge back commissions which were paid.

637. The suppression of these material facts by the VZW Defendants evidences false representation.

638. The suppression of these material facts by the VZW Defendants is the equivalent of false representation.

639. All of the matters in which the VZW Defendants concealed the facts were material to the VZW Defendants' scheme involving the marketing and sale of prepaid VZW branded products and services.

640. All of the matters in which the VZW Defendants concealed the facts were material to the agreements which govern the relationships between Zcom and its sub agents.

641. Upon information and belief, the VZW Defendants knew they were concealing material facts.

642. Upon information and belief, the VZW Defendants knew they were misrepresenting material facts.

643.    Upon information and belief, the VZW Defendants withheld and concealed material facts in order to induce Zcom and its sub agents to act upon the facts as they appeared.

644.    Zcom has been significantly damaged as a result of the VZW Defendants misrepresentations.

645.    Upon information and belief, the VZW Defendants' misrepresentations are the proximate cause of the damages sustained by Zcom.

646.    Upon information and belief, the misrepresentation, deceit and cover up employed by the VZW Defendants evinces a high degree of moral turpitude, and demonstrates wanton dishonesty as to imply a criminal indifference to the defendants' own civil obligations owed to Zcom.

647.    By reason of the foregoing Zcom has been damaged by the VZW Defendants in an amount to be determined at trial, together with interest at the maximum rate allowed by law, and punitive damages for the defendants' wrongful conduct which evinced a high degree of moral turpitude so as to demonstrate wanton dishonesty implying a criminal indifference to their own civil obligations.

# FOURTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH
### PROSPECTIVE CONTRACTUAL RELATIONS
### "FREEZE OUT": VZW'S VERGHESE PREVENTS ZCOM
### FROM OPENING NEW STORES SINCE 2009
### (AGAINST ALL DEFENDANTS)

648.    The plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though they had been set forth in full herein.

649.    What became Zcom opened its first store in approximately 1991 and steadily expanded each year - until 2009; sometimes 30 new storefronts opening per year.

650.    Zcom's business model provided for strong growth through rapid expansion into many cities and many states across the country.

651.    Zcom sought to become a national agent for VZW, and join the "Big 6," but in any event simply sought to grow.

652.    Zcom was attracting prospective sub agents because it had established its name as one of the most recognized and respected brands among VZW authorized agents in every market they entered across the United States.

653.    Beginning in or about 2009, VZW, through defendant Verghese, unjustly froze Zcom's growth, refusing to approve any further development or expansion of Zcom.

654.    Upon information and belief, in order to ingratiate themselves to VZW defendants, including Verghese, Shelly Bhumitra, principal of Zcom sub agent Reachout Wireless, Inc. and Poonam Sawnhey, a/k/a Poonam Sethi, principal of Zcom sub agent

144

American Candy, Inc., readily increased their numbers of prepaid activations by employing fictitious customers [*see e.g.* Ex. 11].

655. Upon information and belief, VZW and defendant Verghese benefitted from Shelly and Poonam's use of fictitious customer identification, as they were able to claim significant activation growth.

656. Upon information and belief, Defendant Verghese obtained performance bonuses and incentives in part because of the activations attributed to Shelly and Poonam.

657. Poonam became a "Trojan Horse" within Zcom as she began acting along with Shelly, on behalf of Ajay.

658. On behalf of Ajay, Shelly sought to destroy Zcom from within.

659. Poonam joined Shelly in his quest to destroy Zcom from within.

660. Any failure of Zcom was a benefit to Ajay.

661. If Zcom failed, its own markets would open up - giving Ajay an opportunity to seek to obtain an agency with VZW from his friend Verghese and take over where Zcom had been.

662. Even if Ajay was unable to obtain what were Zcom's locations, or contracts, he would still "socially" benefit as one of his most significant competitors would be eliminated.

663.    Shelly used his relationship with Verghese and paid bribes paid to Verghese in order to have Verghese, in his capacity of an employee of the defendants, hurt Zcom with direct benefits to VZW and incidental benefit to Ajay.

664.    Upon information and belief, Verghese, while working for and on behalf of VZW, accepted the bribes paid by Shelly, Poonam and Ajay.

665.    Upon information and belief, VZW knew that their employees accepted bribes given their lax enforcement of corporate policies, and permitting "practices" to be unfair or corrupt.

666.    In exchange for the bribes paid by Shelly, Poonam and Ajay, Verghese, on behalf of VZW, stopped approving new Zcom stores and sub agents, notwithstanding that the locations and prospective agents all met with VZW's requirements.

667.    Zcom always had prospective sub agents, and existing sub agents looking to expand, who sought to do further business with Zcom.

668.    All of the existing sub agents seeking to expand had already been approved by VZW and had proven their ability to market and sell VZW branded products and services in accordance with VZW's requirements.

669.    The prospective sub agents met VZW's requirements for sub agents and were all prepared to market and sell VZW branded products and services as part of the Zcom family.

670.    The defendants all tortiously interfered with Zcom's prospective business relationships by freezing Zcom's growth and impairing its ability to grow its pre-existing sub agents and newly found sub agents, all of whom met with VZW's requirements.

671.    The defendants tortiously interfered with Zcom's prospective business relationships by freezing Zcom's growth and impairing its ability to open up new storefronts at locations that met with the defendants' preexisting requirements.

672.    The freezing of Zcom's growth was done by Verghese, on behalf of VZW, and continued by VZW until Zcom was terminated effective January 31, 2012.

673.    Upon information and belief, the policies and practices that were employed by the VZW Defendants to freeze Zcom's growth were developed, *inter alia*, by VZW.

674.    Upon information and belief, the policies and practices that were employed by the VZW Defendants to freeze Zcom's growth were implemented, *inter alia*, by VZW.

675.    Upon information and belief, the policies and practices that were employed by the VZW Defendants to freeze Zcom's growth were approved of by, *inter alia*, by VZW.

676.    Upon information and belief, the policies and practices that were employed by the VZW Defendants to freeze Zcom's growth were executed by, *inter alia*, VZW and Verghese, with the approval of VZW.

677.    Upon information and belief, the defendants intended to harm Zcom.

678. Upon information and belief, the defendants used unlawful means, including bribe receiving, to harm Zcom.

679. The defendants caused economic injury to Zcom.

680. By the defendants unjustifiably interfering with Zcom's growth, prospective sub agents were diverted to other master agents.

681. As a result of the defendants' misconduct, Zcom suffered near-zero growth in terms of numbers of storefronts after 2009.

682. As a result of the defendants' misconduct, Zcom lost significant profits as they were not opening new doors which had always led to increased profitability.

683. The defendants' tortious interference with Zcom's prospective contractual relationships with prospective sub agents is the proximate cause of damages sustained by Zcom.

684. The misrepresentation, deceit and cover up employed by, upon information and belief, the defendants evinces a high degree of moral turpitude, and demonstrates wanton dishonesty as to imply a criminal indifference to the defendants' own civil obligations owed to Zcom.

685. By reason of the foregoing, Zcom has been damaged by the defendants and the defendants are liable to Zcom in the amount of not less than Two Billion Dollars ($2,000,000,000.00) together with interest at the maximum rate allowed by law, and punitive damages of $8,000,000,000.00 for the defendants' wrongful conduct which

148

evinced a high degree of moral turpitude so as to demonstrate wanton dishonesty implying

a criminal indifference to their own civil obligations.

## FIFTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH
## PROSPECTIVE CONTRACTUAL RELATIONS
## "FREEZE IN" - PREVENTING ZCOM FROM SELLING
## ITS BUSINESS, POST-TERMINATION, TO PRE-EXISTING
## VZW MASTER AGENTS BIG ENOUGH TO BUY ZCOM
## AND PAY ZCOM A "FIRE SALE" PRICE
## (AGAINST THE VZW DEFENDANTS)

686.    The plaintiff repeats and realleges each and every allegation in the preceding

paragraphs as though they had been set forth in full herein.

687.    On or about August 18, 2011, Zcom reached out to VZW to explore the

possibility of redressing the termination letter and moving forward with the agency

relationship.

688.    VZW refused to reconsider or to negotiate.

689.    VZW directed Zcom to sell off its sub agencies and locations.

690.    Zcom tried, in good faith, to comply with these instructions.

691.    Zcom approached VZW with prospective buyers, each of whom already had

a preexisting business relationship with VZW, and accordingly were already approved.

692.    All of Zcom's corporate owned stores were in locations already approved by

VZW.

693. Zcom had prospective purchasers with the necessary relationships and structures in place to manage stores and sub-agents marketing and selling VZW branded products and services.

694. All of Zcom's sub agents had already been approved by VZW.

695. All of Zcom's sub agents stores were in locations already approved by VZW.

696. Zcom only sought to sell to business entities that had been pre-approved by VZW.

697. Notwithstanding that each prospective purchaser and location was already approved by VZW, nearly every overture by Zcom to sell was summarily rejected by VZW in bad faith and unfairly.

698. The VZW Defendants blocked any sale by Zcom to prospective buyers # 1 and # 2.

699. While Zcom was attempting to sell its business, at VZW's direction - and in a good faith attempt to mitigate its damages, VZW was surreptitiously "showing" Zcom corporate and sub agent locations to larger agents via a real estate broker.

700. VZW repeatedly put "road blocks" in the way of Zcom being able to fairly sell off its business operations to already vetted buyers who were ready, willing and able to seamlessly take over the Zcom operation.

701.    On January 17, 2012, nearly the eve of the termination becoming effective on January 31, 2012, VZW approved the sale of <u>only 10 out of 71</u> locations that UT was prepared to purchase.

702.    All ten of these locations were corporate affiliates of Zcom.

703.    VZW unreasonably refused to approve the sale of 17 other Zcom corporate affiliates.

704.    VZW unreasonably refused to permit any of 54 Zcom sub agents that UT was ready, willing and able to purchase to be included in the deal.

705.    Zcom had confirmed to VZW that it was authorized to enter into an arrangement to sell the 54 sub agent locations; however, VZW inexplicably, unreasonably and falsely claimed that Zcom had not demonstrated same.

706.    VZW thwarted significant portions of the deal between Zcom and UT.

707.    Upon information and belief, the VZW Defendants' malice towards Zcom is evidenced by their after January 31, 2012 awarding of agreements directly to Zcom's sub agents and Zcom's prospective purchasers, after thwarting deals between Zcom and those same entities.

708.    Upon information and belief, the VZW Defendants tortiously interfered with Zcom's prospective business relationships as notwithstanding that VZW directed Zcom to sell its agencies and locations, each prospective sale was unreasonably rejected by VZW Defendants - without any good faith basis.

709.   Upon information and belief, the VZW Defendants have sought to tortiously enrich themselves, unjustly, by wrongly taking Zcom's business, agents and locations, with no compensation, much less fair compensation, paid to Zcom.

710.   Upon information and belief, the defendants tortiously interfered with Zcom's prospective business relationships as notwithstanding that the defendants directed Zcom to sell its agencies and locations, each prospective sale was rejected by the defendants - without any good faith basis.

711.   Upon information and belief, the VZW Defendants tortious interference with Zcom's prospective contractual relationships with prospective sub agents is the proximate cause of Zcom's damages, including being unable to sell any of its sub-agent store locations to any VZW Master Agent.

712.   The misrepresentations, deceit, cover up and obstruction employed by, upon information and belief, the defendants evinces a high degree of moral turpitude, and demonstrates wanton dishonesty as to imply a criminal indifference to the defendants' own civil obligations owed to Zcom.

713.   By reason of the foregoing, Zcom has been damaged by the defendants and the defendants are liable to Zcom in the amount of not less than One Hundred Fifty Million Dollars ($150,000,000.00) together with interest at the maximum rate allowed by law, and punitive damages of $600,000,000.00 for the defendants' wrongful conduct

which evinced a high degree of moral turpitude so as to demonstrate wanton dishonesty implying a criminal indifference to their own civil obligations.

## SIXTH CAUSE OF ACTION
## INJURIOUS FALSEHOOD
## (AGAINST ALL DEFENDANTS)

714.    The plaintiff repeats and reallege each and every allegation in the preceding paragraphs as though they had been set forth in full herein.

715.    Upon information and belief, the VZW Defendants' internal "investigation" was a sham.

716.    Upon information and belief, with the approval of VZW, Individual VZW Defendants fabricated evidence as a means of passing blame for the VZW Defendants' own scheme onto Zcom.

717.    Upon information and belief, the VZW defendants and non-parties of interest affiliated with VZW and/or its parents and subsidiaries, participated in developing the means to  cover up the prepaid account activation scheme.

718.    Upon information and belief, the VZW defendants and non-parties of interest affiliated with VZW and/or its parents and subsidiaries, participated in the plan to fabricate evidence.

719.    Upon information and belief, the VZW defendants and non-parties of interest affiliated with VZW and/or its parents and subsidiaries orchestrated the plan to fabricate evidence.

720. Upon information and belief, the VZW defendants and non-parties of interest affiliated with VZW and/or its parents and subsidiaries approved the fabrication of evidence as a means to cover up bad acts of the VZW Defendants.

721. Upon information and belief, blame was passed to Zcom for bad acts of the VZW Defendants as part of the cover up developed, approved of, and orchestrated by the VZW defendants.

722. Upon information and belief, defendants Fiocco and Pavlicek, acting with the approval and authority of VZW, and its leadership, fabricated evidence against Zcom in order to support a false claim that Zcom developed VZW's own prepaid activation scheme.

723. Upon information and belief, defendants Fiocco and Pavlicek, acting with the approval and authority of VZW, and its leadership, spoliated legitimate evidence favorable to Zcom, by not including it in their reports, in order to support a false claim that Zcom developed the VZW Defendants' own prepaid activation scheme.

724. Upon information and belief, defendants Fiocco and Pavlicek, acting with the approval and authority of VZW, and its leadership, secreted evidence favorable to Zcom in order to support a false claim that Zcom developed the VZW Defendants' own prepaid activation scheme.

725.    Upon information and belief, defendants Fiocco and Pavlicek, acting with the approval and authority of VZW, and its leadership, fabricated evidence against Zcom in order to support a termination of Zcom's agent agreement with VZW.

726.    Upon information and belief, from the inception of the internal "investigation," until the present, the VZW Defendants have undertaken a strategy of prejudicing the reputation and credibility of Zcom among Zcom's sub agents and within the telecommunications community.

727.    VZW has  falsely stated, repeatedly and publicly, that Zcom generated the prepaid activation scam, notwithstanding that, upon information and belief, it was the VZW Defendants who created it and forced it upon Zcom's sub agents through threats and coercion.

728.    VZW has falsely stated that Zcom's sub agents participated in the prepaid activation scheme in direct response to Zcom's specific demand that they do so, notwithstanding that it was the VZW Defendants who directly communicated with Zcom's sub agents causing them to participate in the scheme under duress.

729.    VZW falsely stated, repeatedly and publicly, that  Zcom provided the sub agents with a quota of six to ten pre-paid activations per day notwithstanding it was the VZW Defendants who determined the quota of pre-paid activations and forced it upon Zcom sub agents.

730. VZW falsely stated, repeatedly and publicly, that Zcom threatened the sub agents that if they did not meet the quota, Zcom would terminate their sub-agency or ensure that competing VZW branded stores were opened in close proximity to their stores, notwithstanding it was VZW who threatened Zcom and its sub agents and it was VZW that ultimately did terminate the agency agreement.

731. Since issuing the July 26, 2011 termination notice, upon information and belief, the the VZW Defendants have been "showing" Zcom locations to others as a "gift," to the benefit of VZW and a loss to Zcom.

732. VZW falsely stated, repeatedly and publicly, that Zcom further directed the prepaid scheme by specifically instructing the sub agents not to exceed the quotas set by the VZW Defendants, and when and how to "ramp down" the number of new fictitious activations in and after May 2010, to avoid detection by VZW, notwithstanding that, upon information and belief, it was the VZW Defendants who contacted the sub-agents, without Zcom's knowledge and consent, to implement the prepaid scheme and force it upon the sub agents.

733. VZW falsely stated, repeatedly and publicly, that Zcom wrongly made at least 125 prepaid activations directly from its corporate headquarters, notwithstanding the VZW Defendants know this to be utterly false - as these phones were all donated to charities which were reportedly registered had 501(c)(3) tax exempt status [*see e.g.* Ex. 12].

156

734.    VZW falsely stated, repeatedly and publicly, that Zcom submitted falsified invoices to VZW to obtain reimbursement from a co-op advertising account notwithstanding that Zcom abided by VZW's policies and practices, including, either getting pre-approval, or using VZW pre-approved vendors for promotional items, which vendors were directly paid by VZW [*see e.g.* Ex. 21].

735.    VZW falsely stated, repeatedly and publicly, that Zcom intentionally paid the travel and entertainment expenses of defendant Verghese for a trip to Germany and Belgium, notwithstanding that, upon information and belief, the VZW Defendants know that this trip was coordinated by Shelly Bhumitra, whose travel agent committed a fraud upon Zcom, and Shelly provided free airfare upgrades and free hotel accommodations in Europe where his girlfriend Yolanda resides.

736.    VZW falsely stated, repeatedly and publicly, that Zcom made a wrongful $1,000.00 gift, by check, to defendant Malenda, notwithstanding that the gift was for four Zcom representatives who had *r.s.v.p.*-ed that they would be attending Malenda's wedding (notwithstanding that 2 failed to show up) and the $1,000 was an appropriate  figure to cover the cost of four people at a wedding - particularly given the approximate cost of a wedding in the New York metropolitan area of $230 per guest.  Accordingly, a cost of $920 for 4 plates at a wedding, at best the "gift" was $20 per person - well below what VZW ostensibly permits at $75.00.

737.    VZW falsely stated, repeatedly and publicly, that Zcom gave a mortgage loan to John Coyle in the early to mid-2000's, in an amount between $20,000 and $30,000, to allow Coyle to finance the purchase of a new house, notwithstanding that Zcom and its majority owner, Victor, have never lent Coyle any money, there is no recorded mortgage, and all of Zcom and Victor's bank accounts confirm that there are simply no monies paid to Coyle, ever.  Indeed, defendant Bruno Pavlicek, without any evidence, asked Victor about same.

738.    All of these false statements were made with the VZW Defendants knowing that they were false or with reckless disregard for the truth.

739.    Pino Salonna's letter of August 24, 2011 stated unambiguously that VZW was not interested in the truth!

740.    Upon information and belief, these falsehoods were based upon fabrications of the VZW Defendants themselves.

741.    The VZW Defendants falsehoods have tarnished Zcom's credibility and reputation in the business community, over and above terminating what was an ongoing business doing over $75 million dollars of business per year, as per Pat Devlin, on a generational basis.

742.    The VZW Defendants falsehoods have caused Zcom significant economic harm.

158

743.   VZW's falsehoods created false fuel for Shelly and Poonam to commence a putative class action lawsuit in New York State Supreme Court, based upon these material falsehoods, exposing Zcom to significant legal expenses and lost business opportunities.

744.   VZW's injurious falsehoods of Zcom are the proximate cause of Zcom's damages.

745.   The misrepresentation, deceit and cover up employed by the VZW Defendants - including, upon information and belief, generating the falsehoods and then spreading them as fact - evinces a high degree of moral turpitude, and demonstrates wanton dishonesty as to imply a criminal indifference to the defendants' own civil obligations.

746.   By reason of the foregoing, Zcom has been damaged by the VZW Defendants and the VZW Defendants are liable to Zcom in the amount of not less than One Hundred Fifty Million Dollars ($150,000,000.00)  together with interest at the maximum rate allowed by law, and punitive damages of $600,000,000.00 for the VZW Defendants' wrongful conduct which evinced a high degree of moral turpitude so as to demonstrate wanton dishonesty implying a criminal indifference to their own civil obligations.

## SEVENTH CAUSE OF ACTION
## UNJUST ENRICHMENT
## (AGAINST THE VZW DEFENDANTS)

747.    The plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though they had been set forth in full herein.

748.    Zcom built up a family of corporate owned and sub agent stores with a self sustaining management structure in place.

749.    In building its corporate family Zcom developed a  proven "play book" on how to run an honest and successful telecommunication activation and resale business.

750.    Zcom provided service and support for its customers that was top quality - resulting in repeat business and satisfied customers - and a healthy monthly "residuals" payment.

751.    The high quality of service and support provided by Zcom led to a long list of folks seeking to be employed by or become sub agents of Zcom.

752.    VZW has profited and will continue to profit from the successful operation put in place by Zcom.

753.    VZW continues to keep Zcom's customers and no longer pays Zcom its residuals.

754.    Upon information and belief, the VZW Defendants orchestrated the downfall of Zcom so that they could take Zcom's good will, business relationships, sub agents and customer base without any compensation paid to Zcom.

755.    After January 31, 2012, the VZW Defendants did take Zcom's good will, business relationships, sub agents and customer base without any compensation paid to Zcom.

756.    Upon information and belief, the VZW Defendants' misconduct is the proximate cause of the unjust taking of Zcom's good will, business relationships, sub agents and customer base without any compensation to Zcom.

757.    Upon information and belief, the  VZW Defendants have been unjustly enriched by taking Zcom's good will, business relationships, sub agents and customer base without any compensation to Zcom.

758.    Zcom's good will, business relationships, sub agents and customer base are worth not less than One Hundred Fifty Million Dollars ($150,000,000.00), and the VZW Defendants have damaged Zcom accordingly.

759.    Upon information and belief, the misrepresentation, deceit and cover up employed by the VZW Defendants - including generating the falsehoods and then spreading them as fact - evinces a high degree of moral turpitude, and demonstrates wanton dishonesty as to imply a criminal indifference to the defendants' own civil obligations owed to Zcom.

760.    By reason of the foregoing, Zcom has been damaged by the VZW Defendants and the VZW Defendants are liable to Zcom in the amount of not less than One Hundred Fifty Million Dollars ($150,000,000.00) together with interest at the

maximum rate allowed by law, and punitive damages of $600,000,000.00 for the

defendants' wrongful conduct which evinced a high degree of moral turpitude so as to

demonstrate wanton dishonesty implying a criminal indifference to their own civil

obligations.

### EIGHTH CAUSE OF ACTION
### BREACH OF CONTRACT: BY WAY OF VZW'S FAILURE TO GIVE
### ANY PRE-SUIT NOTICE TO ZCOM PRIOR TO COMMENCING ITS PUTATIVE
### "FIRST FILED" NOVEMBER 2011 LAWSUIT AGAINST ZCOM
### (AGAINST VZW)

761.    The plaintiff repeats and realleges each and every allegation in the preceding

paragraphs as though they had been set forth in full herein.

762.    At all times complained of herein, VZW and Zcom were each parties to an

Agent Agreement which, as amended, permitted Zcom to independently, and through sub

agents, act as an agent of VZW for the purposes of the marketing and sale of VZW

branded products and services.

763.    The Agent Agreement is a contract.

764.    The Agent Agreement was drafted by, or on behalf of, VZW.

765.    Zcom did not draft the Agent Agreement.

766.    Zcom did not have any say as to the phrasing of the Agent Agreement.

767.    Zcom did not have any say as to the content of the Agent Agreement.

768.    The only parties to the Agent Agreement were Zcom and VZW.

769.    VZW benefitted from the Agent Agreement between Zcom and VZW.

162

770.     Section 14, inclusive, of the agent agreement mandates that if a party to the Agent Agreement intends to litigate against the other party, the party seeking to litigate must first provide notice to the other party and an opportunity to negotiate any dispute.

771.     The provision of notice in advance of commencing litigation is material to the Agent Agreement.

772.     In or about November 4, 2011 VZW commenced a court case against Zcom.

773.     Prior to commencing the court case against Zcom, VZW did not provide any notice to Zcom.

774.     Prior to commencing the court case against Zcom, VZW did not provide any opportunity for Zcom to negotiate with VZW.

775.     VZW's commencement of litigation against Zcom without providing any advance notice to Zcom whatsoever, was a material breach of Section 14, inclusive, of the Agent Agreement, as drafted by VZW.

776.     VZW's commencement of litigation against Zcom without providing any opportunity whatsoever for Zcom to negotiate, was a material breach of Section 14, inclusive, of the Agent Agreement, as drafted by VZW.

777.     Zcom has been significantly damaged as a result of VZW's material breach of Section 14, inclusive, of the Agent Agreement, including, *inter alia*, the transfer and referral by Judge Castel.

163

778.    As a result of VZW's material breach of Section 14, inclusive, of the Agent Agreement, Zcom has had to expend extensive funds in efforts to defend same and remedy the breach.

779.    VZW's material breach of Section 14, inclusive, of the Agent Agreement is a proximate cause of damages sustained by Zcom.

780.    VZW resorted to misrepresentation, deceit and cover up in an attempt to disguise their failure to comply with the letter, let alone the spirit, of Section 14, inclusive, of the Agent Agreement.

781.    The misrepresentation, deceit and cover up employed by VZW evinces a high degree of moral turpitude, and demonstrates wanton dishonesty as to imply a criminal indifference to VZW's civil obligations owed to Zcom.

782.    By reason of the foregoing, Zcom has been damaged by VZW and VZW is liable to Zcom in the amount of Five Million Dollars ($5,000,000.00), together with interest at the maximum rate allowed by law, and punitive damages of Twenty Million Dollars ($20,000,000.00), for VZW's wrongful conduct which evinced a high degree of moral turpitude so as to demonstrate wanton dishonesty implying a criminal indifference to their own civil obligations.

## NINTH CAUSE OF ACTION
## BREACH OF CONTRACT, BY WAY OF VZW COUCHING
## A "FOR CAUSE" TERMINATION, BASED ON KNOWINGLY FALSE
## ALLEGATIONS, AS A "NO CAUSE" TERMINATION,
## IN BAD FAITH AND UNREASONABLY
## (AGAINST VZW)

783. The plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though they had been set forth in full herein.

784. Zcom performed its duties and obligations under the Agent Agreement with VZW in full.

785. VZW failed to fully perform its obligations to Zcom under the Agent Agreement.

786. VZW falsely claimed that Zcom was in breach of the Agent Agreement.

787. Zcom was not in breach of the Agent Agreement.

788. VZW was obligated pursuant to Section 8.4.1 of the Agent Agreement to use "reasonable discretion" in assessing alleged conduct of Zcom.

789. VZW's claims about Zcom were not reasonable exercises of discretion.

790. VZW's claims about Zcom were not made in good faith.

791. VZW passing blame to Zcom for misconduct that VZW, along with other VZW Defendants performed and directed, was an abuse of discretion.

792. VZW passing blame to Zcom for misconduct that VZW, along with other VZW Defendants performed and directed, was in bad faith.

165

793.    VZW passing blame to Zcom for misconduct that VZW, along with other VZW Defendants performed and directed, was unfair.

794.    Upon information and belief, VZW fabricated evidence against Zcom, which was an abuse of discretion.

795.    Upon information and belief, VZW fabricated evidence against Zcom, which was in bad faith.

796.    Upon information and belief, VZW fabricated evidence against Zcom, which was unfair.

797.    VZW making misrepresentations about Zcom was an abuse of discretion.

798.    VZW making misrepresentations about Zcom was in bad faith.

799.    VZW making misrepresentations about Zcom was unfair.

800.    VZW failed to provide any opportunity fo Zcom to cure any alleged default.

801.    Since the "discretion" exercised by VZW was not "reasonable," VZW was not entitled to immediately terminate the Agent Agreement in accordance with Section 8.4.1 of the Agent Agreement.

802.    As immediate termination was not authorized, VZW was obligated to provide Zcom with a thirty day cure period pursuant to Section 8.7 of the Agent Agreement for any alleged breach.

803.    VZW terminated its agent agreement with Zcom "for cause."

804. In truth, VZW did not have cause to terminate its Agent Agreement with Zcom.

805. Upon information and belief, because VZW had fabricated the cause it relied upon to terminate its Agent Agreement with Zcom, it exacerbated the breach by falsely claiming that the termination was without cause in a bad faith and unfair effort to deprive Zcom of Judicial redress and defalcate Zcom's business.

806. In its termination letter of July 26, 2011, VZW falsely claimed to be terminating the Agent Agreement without cause, yet much of the letter spells out what VZW asserts is "cause" - notwithstanding that the allegations are false and fabricated by VZW in an effort to cover up VZW's own misconduct and that of the other VZW Defendants.

807. By not exercising "reasonable discretion," VZW materially breached its Agent Agreement with VZW.

808. By terminating its Agent Agreement with Zcom for what were, upon information and belief, fabricated reasons, in an effort to conceal its own bad acts, and those of other VZW Defendants, VZW materially breached its Agent Agreement with VZW.

809. By terminating its Agent Agreement with Zcom for what were, upon information and belief, self-fabricated reasons, in an effort to punish Zcom for not willfully promoting and participating in the prepaid activation scheme, and to prevent

167

exposure of VZW's internal misconduct for the pre-pay scheme, VZW materially breached its Agent Agreement with VZW.

810.    By terminating its Agent Agreement with Zcom, VZW deprived Zcom of the benefits of the agreement.

811.    By terminating its Agent Agreement with Zcom, VZW deprived Zcom of the benefits of the bargain.

812.    By falsely representing that the termination was without cause, in an effort to disguise the fabricated cause falsely created by VZW and the other VZW Defendants, VZW resorted to misrepresentation, deceit and cover up.

813.    VZW materially breached the agent agreement with Zcom.

814.    The misrepresentation, deceit and cover up employed by VZW evinces a high degree of moral turpitude, and demonstrates wanton dishonesty as to imply a criminal indifference to VZW's own civil obligations.

815.    By reason of the foregoing, Zcom has been damaged by VZW and VZW is  liable to Zcom in the amount of not less than Four Hundred Fifty Million Dollars ($450,000,000.00)  together with interest at the maximum rate allowed by law, and punitive damages of One Billion Eight Hundred Million Dollars (1,800,000,000.00), for VZW's wrongful conduct which evinced a high degree of moral turpitude so as to demonstrate wanton dishonesty implying a criminal indifference to their own civil obligations.

## TENTH CAUSE OF ACTION
## BREACH OF CONTRACT BY WAY OF BREACHING
## THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, IMPOSED
## BY NEW YORK LAW - IN VZW'S WORDS AND DEEDS
## (AGAINST VZW)

816.    The plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though they had been set forth in full herein.

817.    The Agent Agreement governing the business relationship between Zcom and VZW was drafted by, or on behalf of, VZW.

818.    Pursuant to Section 10.1 of the Agent Agreement governing the business relationship between Zcom and VZW, as drafted by, or on behalf of, VZW, the Agent Agreement is governed by New York law.

819.    New York law mandates that each contract include an implied covenant of good faith and fair dealing amongst the parties.

820.    As a party to the Agent Agreement, VZW was obligated to act in good faith towards Zcom.

821.    The duty to act in good faith and fairly towards Zcom was imposed upon VZW, and consequently all of its employees, agents and those under its control, by entering into a contract governed by New York law.

822.    VZW chose the governing law as the contract was drafted by, or at the direction of VZW.

169

823.    In an effort to obviate its need to act in good faith and fairly towards Zcom, VZW drafted an illegal putative waiver of the covenant of good faith and fair dealing into Section 10.2 of the Agent Agreement.

824.    VZW benefitted from the Agent Agreement between Zcom and VZW.

825.    VZW owed Zcom a duty to act in good faith.

826.    VZW owed Zcom a duty to deal fairly.

827.    VZW did not act in good faith towards Zcom.

828.    VZW did not deal fairly with Zcom.

829.    VZW's inclusion of the putative waiver language at Section 10.2 of the Agent Agreement was itself bad faith and unfair dealing, as good faith and fair dealing cannot be waived.

830.    All of the misconduct of VZW individually and in concert with the other VZW Defendants was in bad faith and unfair to Zcom.

831.    Upon information and belief, VZW seeking to have Zcom participate in the VZW Defendants' prepaid activation scheme was in bad faith and unfair.

832.    VZW coercing Zcom sub agents to participate in the VZW Defendants' prepaid activation scheme was in bad faith and unfair.

833. By misleading Zcom and its sub agents into the false belief that they would be compensated for prepaid activations done in accordance with instructions conveyed by, *inter alia*, the Individual VZW Defendants, VZW acted in bad faith and unfairly towards Zcom.

834. By charging back commissions paid to Zcom for activations of prepaid accounts made in accordance with instructions conveyed by, *inter alia*, the Individual VZW Defendants, VZW acted in bad faith and unfairly towards Zcom.

835. By depriving Zcom of compensation it earned by following instructions conveyed by, *inter alia*, the Individual VZW Defendants, VZW acted in bad faith and unfairly towards Zcom.

836. By seeking to pass blame onto Zcom for the bad acts of VZW and other VZW Defendants, VZW acted in bad faith and unfairly with Zcom.

837. VZW acted in bad faith and unfairly with Zcom by, upon information and belief, fabricating evidence to create the false impression that Zcom was the architect of the VZW Defendants' prepaid activation scheme.

838. VZW acted in bad faith and unfairly with Zcom by, upon information and belief, publically disseminating false information about Zcom, including to others in the telecommunications activation business and other wireless industries.

839. VZW's termination of its Agent Agreement with Zcom was in bad faith and unfair.

840.    VZW's taking of Zcom's family of corporate and sub agent stores, without compensation, was in bad faith and unfair.

841.    VZW's blocking of Zcom's ability to sell its business operations to entities already in business with VZW, after the July 26, 2011 termination notice, was in bad faith and unfair.

842.    As a direct and proximate result of VZW's bad faith conduct, Zcom was deprived of the benefits of the Agent Agreement, and the business enterprise it had painstakingly created over 20 years which employed 400 people.

843.    As a direct and proximate result of VZW's unfair conduct, Zcom was deprived of the benefits of the Agent Agreement.

844.    The misrepresentation, deceit and cover up employed by VZW evinces a high degree of moral turpitude, and demonstrates wanton dishonesty as to imply a criminal indifference to VZW's own civil obligations.

845.    By reason of the foregoing, Zcom has been damaged by VZW and VZW is liable to Zcom in the amount of not less than Four Hundred Fifty Million Dollars ($450,000,000.00) together with interest at the maximum rate allowed by law, and punitive damages of One Billion Eight Hundred Million Dollars (1,800,000,000.00), for VZW's wrongful conduct which evinced a high degree of moral turpitude so as to demonstrate wanton dishonesty implying a criminal indifference to their own civil obligations.

# ELEVENTH CAUSE OF ACTION
## DECLARATORY JUDGMENT,
### SEEKING SEVERANCE OF SECTION 10.2 OF THE CONTRACT, CONSISTENT WITH SECTION 10.3 OF THE CONTRACT, AS DRAFTED BY VZW, AS SECTION 10.2 IS AGAINST THE LAW AND PUBLIC POLICY OF THE STATE OF NEW YORK (AGAINST VZW)

846.    The plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though they had been set forth in full herein.

847.    The Agent Agreement governing the business relationship between Zcom and VZW was drafted by, or on behalf of, VZW.

848.    Pursuant to Section 10.1 of the Agent Agreement governing the business relationship between Zcom and VZW, as drafted by, or on behalf of, VZW, the Agent Agreement is governed by New York law.

849.    VZW chose the governing law as the contract was drafted by, or at the direction of VZW.

850.    New York law mandates that each contract be read to include an implied covenant of good faith and fair dealing amongst the parties.

851.    As a party to the Agent Agreement, VZW was obligated to act in good faith towards Zcom.

852.    The duty to act in good faith and fairly towards Zcom was imposed upon VZW, and consequently all of its employees, agents and those under its control, by entering into a contract governed by New York law.

853.   In an effort to obviate its need to act in good faith and fairly towards Zcom, VZW drafted a putative waiver of the covenant of good faith and fair dealing into Section 10.2 of the Agent Agreement.

854.   An absolute waiver of the covenant of good faith and fair dealing would essentially make VZW's breach of contract and/or tortious misconduct "judge proof" - hence, illegal as against public policy and law.

855.   The public policy of the State of New York prohibits waivers of the covenant of good faith and fair dealing by mandating its inclusion by implication in every contract.

856.   VZW's inclusion of the putative waiver language at Section 10.2 of the Agent Agreement was itself bad faith and unfair dealing.

857.   Section 10.3 of the Agent Agreement provides for severability of provisions of the contract which are invalid and/or unenforceable.

858.   Section 10.2 of the Agent Agreement is invalid.

859.   Section 10.2 of the Agent Agreement is void.

860.   Section 10.2 of the Agent Agreement is unenforceable.

861.   Zcom seeks a judgment declaring that Section 10.2 of the Agent Agreement is invalid, void and unenforceable.

862.   Zcom seeks a declaratory judgment that Section 10.2 of the Agent Agreement is severed therefrom consistent with Section 10.3.

174

**WHEREFORE**, Zcom respectfully requests judgment:

a. for compensatory damages as delineated herein, together with interest at the maximum rate allowed by law;

b. punitive damages for the defendants' wrongful conduct which evinced a high degree of moral turpitude so as to demonstrate wanton dishonesty implying a criminal indifference to their own civil obligations, as delineated herein; and,

c. Declaratory Judgment striking Section 10.2 of the Agent Agreement, along with all court costs, disbursements, and attorneys fees expended in the prosecution of this action, along with such other and further relief as the Court deems just, proper and equitable

DATED:   New York, New York
            May 4, 2012

THE LAW FIRM OF RAVI BATRA, P.C.
*Attorneys of Record for Plaintiff*

Ravi Batra, Esquire
Michael W. Kennedy, Esquire
142 Lexington Avenue
New York NY 10016
212-545-1993

InTouchConcepts\050412FirstAmendedComplaint

175

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IN TOUCH CONCEPTS, INC., d/b/a ZCOM,

*Plaintiff,*

-against-

CELLCO PARTNERSHIP
d/b/a VERIZON WIRELESS, *et. al.,*

*Defendants*

**DOCKET NO.
12-CV-00542 (PGS) (TJB)**


**PLAINTIFF'S VERIFICATION**

STATE OF NEW YORK   )
                    )  SS:
COUNTY OF NEW YORK)

VIKAS DHALL, a/k/a I.P. SINGH, being duly sworn, says:

I am the President and Chief Executive Officer of In Touch Concepts, Inc., d/b/a ZCom, the plaintiff in the action herein; I have read the foregoing **First Amended Complaint,** know the contents thereof and the same are true to my knowledge except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true.

These proceedings were commenced in the Supreme Court of the State of New York, New York County, and are only pending in Federal Court because of removal by certain of the defendants, including, but not limited to Cellco Partnership d/b/a Verizon Wireless, ostensibly pursuant to the "Class Action Fairness Act."

While removal initially caused this case to be sent to the Southern District of New York, counsel for the same defendants who sought removal wrote to Hon. P. Kevin Castel, the District Judge before whom the matter was assigned in the Southern District of New York seeking transfer to the District of New Jersey.  No formal transfer motion was made.  Judge Castel, in open Court, directed that these proceedings then be transferred to the District of New Jersey based upon what the Court referred to as the "first filed doctrine."

It was always our intention to have these proceedings heard in New York State Supreme Court, and accordingly that is where we commenced this case.  It was never our intention to have this case heard in Federal Court, and it is only before the Federal

Page 1 of 2

Judiciary and venued in the District of New Jersey, because of actions taken by the jointly represented removing defendants.

By amending the complaint in the District of New Jersey, via this, our First Amended Complaint, we most respectfully do not consent to venue in this District, and believe that the matter should not have been transferred. More specifically, we believe that prior proceedings which were commenced in the District of New Jersey were done in anticipation of litigation by In Touch Concepts, Inc., and were filed without pre-suit notice that was mandated by Section 14, inclusive, of the October 7, 2008 contract between In Touch Concepts, Inc. and Cellco Partnership. Accordingly, we believe that those proceedings ought be dismissed and thereafter this matter returned to Federal Court in New York.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
VIKAS DHALL, a/k/a I.P SINGH
PRESIDENT & CHIEF EXECUTIVE OFFICER
IN TOUCH CONCEPTS, INC., d/b/a Zcom

Sworn to before me this _____ day of
May, 2012

_____
Notary Public, State of New York

Notary Public
State of New York
Todd B. Sherman
Registration #02SH6167491
Qualified in Bronx County
Commission Expires 6 / 4 / 20 15

Page 2 of 2

## DOCKET NO. 12-CV-00542 (PGS) (TJB)

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

———

## IN TOUCH CONCEPTS, INC.
d/b/a ZCOM,

-against-

(1) CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, (2) TOM VERGHESE, (3) RYAN BROOMES, (4) JORGE VELEZ, (5) ANTHONY FIOCCO, (6) BRUNO PAVLICEK, (7) AJAY BHUMITRA; (8) SHELLY BHUMITRA, (9) POONAM SAWNHEY; and, (10) JOHN/JANE DOE CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS PERSONNEL ## 1-10, so named as their identities have yet to be established,

*Defendants*

# FIRST AMENDED COMPLAINT

THE LAW FIRM OF RAVI BATRA, P.C.
The Batra Building
142 Lexington Avenue
New York, NY 10016
(212)545-1993

InTouchConcepts 050412FirstAmendedComplaint