# EXHIBIT C

THE LAW FIRM OF RAVI BATRA, P.C.
The Batra Building
142 Lexington Avenue
New York, NY 10016
Michael W. Kennedy, Esquire
Ravi Batra, Esquire (*pro hac vice*)
(212) 545-1993
(212) 545-0967 (fax)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS,<br><br>*Plaintiff,*<br><br>v.<br><br>IN TOUCH CONCEPTS, INC. d/b/a ZCOM WIRELESS,<br><br>*Defendant.* | CASE No. 11 Civ. 6493 (PGS) (TJB) |

# DEFENDANT'S BRIEF IN SUPPORT OF
# MOTION TO DISMISS AND TO SEAL MATERIALS

*On the brief*:

Ravi Batra, Esquire (*pro hac vice*)
Todd B. Sherman, Esquire (*of the bars of the
    State of New York and Southern and
    Eastern Districts of New York*)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................. i

I.     PRELIMINARY STATEMENT ...................................... 1

II.    STATEMENT OF FACTS ......................................... 4

III.   ARGUMENT .................................................. 15

       A.   The Issues Raised by VZW's Complaint are
            Governed by New York Law ................................ 15

       B.   VZW Commenced this Action in Violation of Pre-suit
            Notice Requirements, a Mandatory Condition Precedent
            Clearly Delineated in the Operative Agreement Governing
            the Business Relationship Between VZW and Zcom -
            Mandating Dismissal of VZW's Instant Lawsuit  .................. 16

       C.   Alternatively, VZW's Lawsuit Must be Dismissed
            Because (A) the District of New Jersey Does Not Have
            Personal Jurisdiction over Zcom; (B) this District Is Not a
            Proper Federal Venue for Adjudicating VZW's Complaint;
            and, (C) there Appears to Be a Lack of Complete Diversity,
            Divesting this Court of Subject Matter Jurisdiction  ................ 18

            I.    VZW's Pleadings Do Not Provide a Proper Basis
                  for this Court to Assume *in personam* Jurisdiction
                  over Zcom, or for Venue to be Placed in the
                  District of New Jersey  ................................. 18

            II.   This Court Ought Dismiss for Lack of Subject Matter
                  Jurisdiction as Complete Diversity is Apparently Lacking
                  Amongst the Parties  .................................. 24

IV.    CONCLUSION ................................................ 26

# TABLE OF AUTHORITIES

**Federal Cases**

Amberson Holdings LLC v. Westside Story Newspaper,
    110 F. Supp 2d 332, 334-335 (D.N.J. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) . . . . . . . . . . . . . . . . . . . . . 20

Burke v. Quarterly, 969 F. Supp. 921, 924 (D.N.J. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 20

Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.,
    177 F.3d 210, fn. 13 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24

Cottman Transmission Sys., Inc. v. Martino,
    36 F.3d 291, 294 (3rd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Frederico v. Home Depot, 507 F.3d 188 (3rd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 17

Gehling v. St. George's Sch. of Med., Ltd.,
    773 F.2d 539, 542-543 (3rd Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Gibbs v. Carnival Cruise Lines, 314 F.3d 125, 131 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . 15

Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567 (2004) . . . . . . . . . . . . . . 24, 25

Hanson v. Denckla, 357 U.S. 235, 253 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Helicopteros Nacionales de Colombia, S.A. v. Hall,
    466 U.S. 408, 416 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Henry Heide, Inc. v. WRH Prods. Co.,
    766 F.2d 105, 108 (3rd Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Homa v. Am. Express Co., 558 F.3d 225, 227 (3rd Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 15

Honeywell, Inc. v J.P. Maguire Co., Inc.,
    1999 WL 102762 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Joy v. City of St. Louis, 201 U.S. 332, 340-341 (1906) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Keeton v. Hustler, 465 U.S. 770 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941) . . . . . . . . . . . . . . . . . . . . . . 15

Lincoln Prop. Co. v. Roche, 546 U.S. 81, 89 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

McNutt v. General Motors Acceptance Corp.,
　　　298 U.S. 178, 182 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Mendez v. Law Offices of Cohen & Slamowitz, LLP,
　　　— F Supp 2d —, 2011 WL 5828573 (D.N.J. 2011) . . . . . . . . . . . . . . . . . . . . . . . 23

Mennen Co. v. Atl. Mut. Ins. Co., 147 F.3d 287 (3rd Cir. 1998) . . . . . . . . . . . . . . . . . . . . 25

Mesalic v. Fiberfloat Corp., 897 F.2d 696, 698 (3rd Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 19

Nelligan v. Zaio Corp., 2011 WL 1085525 (D.N.J. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 20

O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312 (3rd Cir. 2007) . . . . . . . . . . . . . . 20

Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 373-374 (1978) . . . . . . . . . . . . . . 25

Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n,
　　　819 F.2d 434, 437 (3rd Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Reliance Steel Prods. v. Watson, Ess, Marshall,
　　　675 F.2d 587, 589 (3rd Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Schultz v. Cally, 528 F.2d 470, 474 (3d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Smith v. Spina, 477 F.2d 1140 (3rd Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Sunbelt Corp v. Noble, Denton & Associates, Inc.,
　　　5 F.3d 28, 31 (3rd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Swiger v. Allegheny Energy, Inc.,
　　　540 F.3d 179, 182 (3rd Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Telcordia Tech., Inc. v. Telkom SA Ltd.,
　　　458 F.3d 172, 177 (3rd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

TMG Metal v. Okapi Consultants, LLC,
    2011 WL 4900014 (D.N.J. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

U.S. v. Morton, 467 U.S. 822, 828 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Weber v. Jolly Hotels, 977 F. Supp 327, 331 (D.N.J. 1997) . . . . . . . . . . . . . . . . . . . . . . . 21

World-Wide Volkswagen Corp. v. Woodson,
    444 U.S. 286, 297-298 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Zambelli Fireworks Mfg. Co., Inc. v. Wood,
    592 F.3d 412, 419 (3rd Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**New Jersey State Cases**

Avdel Corp. v. Mecure, 58 N.J. 264, 277A.2d 207 (1971) . . . . . . . . . . . . . . . . . . . . . . . . 20

**New York State Cases**

Diontech Consulting, Inc. v New York City Hous. Auth.,
    78 A.D.3d 527, 915 N.Y.S.2d 541 (1st Dept. 2010) . . . . . . . . . . . . . . . . . . . . . . . 17

Emfore Corp. v. Blimpie Assoc., Ltd., 51 A.D.3d 434,
    860 N.Y.S.2d 12 (1st Dept. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Southern Wine & Spirits of Am., Inc. v Impact Envtl. Eng'g, PLLC,
    80 A.D.3d 505 (1st Dept. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Yonkers Contr. Co., Inc. v. Port Auth. Trans-Hudson Corp.,
    93 N.Y.2d 375, 712 N.E.2d 678, 690 N.Y.S.2d 512 (1999) . . . . . . . . . . . . . . . . 16

Yonkers Contr. Co. v Port Auth. Trans-Hudson Corp.,
    208 A.D. 2d 63, 621 N.Y.S.2d 642 (2nd Dept. 1995) . . . . . . . . . . . . . . . . . . . . . . 17

**Federal Statutes**

28 U.S.C. § 1332(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28 U.S.C. § 1332(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

28 U.S.C.§ 1391(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Federal Rules**

F.R.C.P. Rule 4(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

F.R.C.P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

F.R.C.P. Rule 9(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

F.R.C.P. Rule 12(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

F.R.C.P. Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

F.R.C.P. Rule 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

F.R.C.P. Rule 12(h)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Local Rules**

Local Civil Rule 5.3(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**New Jersey Rules**

R. 4:4-4(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Treatises**

5 Wright & Miller § 1208, at 100 (2d ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Defendant In Touch Concepts d/b/a Zcom ("Zcom") respectfully submits this brief in support of its motion for an Order dismissing the complaint of Cellco Partnership d/b/a Verizon Wireless ("VZW") pursuant to F.R.C.P. Rules 12(b)(6) for failure to state a claim upon which relief can be granted; or alternatively, (a) pursuant to F.R.C.P. Rule 12(b)(3) for fixing an improper venue and/or pursuant to F.R.C.P. Rules 12(b)(1) and 12(h)(3) on the grounds that the Court lacks subject matter jurisdiction as complete diversity is apparently lacking.  Additionally, in an abundance of caution, to ensure that it remains in compliance with the terms and conditions of its Master Agreement with VZW, Zcom seeks an Order pursuant to Local Civil Rule 5.3(c) sealing materials which VZW claims are proprietary and confidential, which were exchanged with Zcom pursuant to the agreements which govern the business relationships between VZW and Zcom, or alternatively an Order determining that such materials are not confidential and thus do not necessitate sealing from public view; and, for such other and further relief as this Court may find just, proper and equitable.

I. PRELIMINARY STATEMENT

This action concerns a principal, VZW, who has acted in bad faith and unfairly towards its agent, Zcom, and when Zcom voiced its concerns VZW sought to muzzle it through a bogus "investigation" aimed at whitewashing its own wrongdoing, and terminating its agency relationship - and with it the livelihoods of not less than 400

people, nearly 60 different business entities and approximately 120 store locations in various states, though substantially in New York.

VZW now improperly seeks to avail itself of the federal courts without concern for pre-suit notice requirements that it drafted into its own contract of adhesion with Zcom, or proper venue in matters based upon diversity jurisdiction.

The operative agreement governing the relationship between VZW and Zcom (Ex. B) is governed under New York law (Ex. B, ¶ 10.1) and includes a provision mandating that any party seeking to commence a court action arising under the agreement must first provide written notice to the other party, and a fifteen (15) day window to negotiate (Ex. B, ¶ 14 - ¶ 14.2). Notwithstanding this mandate, drafted by VZW itself, the only writings provided by VZW to Zcom pertained to their bad faith putative termination of the agency agreement(*see* Ex. C) - which contained no notice of impending litigation. Moreover, VZW has in no way negotiated with Zcom regarding the termination, or the litigation. Accordingly, as VZW has failed to meet a condition precedent to seeking judicial intervention, their complaint must be dismissed pursuant to the very contract they drafted.

Additionally, beyond simply ignoring the terms of their own contract, in their tactical rush to the Courthouse VZW conveniently "forgot" that Zcom is a New York corporation, with a principal office in New York, who maintains no corporate presence in New Jersey. Accordingly, the grounds that VZW relied upon to support *in personam* jurisdiction over Zcom are wrong. Moreover, while VZW asserts that there were

2

"grounds" to support its bad faith termination of its agreement with Zcom, they use boilerplate language claiming that "a substantial number of the events giving rise to Verizon Wireless's claim occurred in this judicial district," - this too is incorrect. Rather, the entirety of VZW's allegations, notwithstanding that they are false and misleading, are rooted in the State of New York. Accordingly, venue in the District of New Jersey is improper.

Furthermore, VZW seeks federal jurisdiction based upon diversity of citizenship; however, based upon their own representations it appears that there may not be complete diversity - which would divest this Court of subject matter jurisdiction. Plaintiff VZW is a partnership and for diversity purposes is a citizen of each state in which its partners reside. VZW asserted in its Rule 7.1 statement [Ex. M] that Verizon Communications, Inc. ("Verizon") owns Bell Atlantic Mobile Systems ("BAM") and GTE Wireless ("GTE"), two of the partners in VZW, comprising 55% of its ownership. Verizon is a Delaware corporation with principal offices located in the City, County and State of New York, accordingly, for diversity purposes it is a resident of both New York and Delaware. As VZW asserts that Verizon, a New York resident, owns two partners in VZW, it appears that VZW, as a partnership, is also a resident of New York by virtue of such ownership. Under such circumstances, there would not be complete diversity.

## II. STATEMENT OF FACTS

For nearly twenty years Zcom has maintained an agency relationship with wireless communications behemoth VZW wherein Zcom is authorized to sell VZW branded products and services. Pursuant to the Master Agreement governing the relationship between Zcom and VZW, Zcom was for all relevant times constrained to only working with and on behalf of VZW.

Until September 2010, Zcom was jointly owned by its current President and Chief Executive Officer Vikas Dhall a/k/a I.P. Singh ("Vikas") on the one hand, and Alexandra Bershtein ("Alex"), on the other hand; each of whom owned 50% of Zcom's stock. Because Zcom, under the guidance of Vikas, was successful in the marketing and sale of VZW products and services, VZW expanded Zcom's authority under their agency agreement such that Zcom was permitted to enlist sub agents to also market and sell VZW branded products and services. Ultimately, Zcom had approximately 150 store locations around the United States, most of which were sub agents authorized to market and sell VZW branded products and services.

All of the Zcom sub agents were duly approved of by VZW, as were the locations they operated from. VZW was well aware of the existence of Zcom's agency agreements with its sub agents. Moreover, VZW was also aware that they were not parties to Zcom's agency agreements with its own sub agents.

In 2008, VZW again renewed their master agency agreement with Zcom for a five year term. Subsequently, when Vikas purchased Alex's shares of Zcom in September 2010, Patrick Devlin, President of the New York Metro Region at VZW, on behalf of VZW, informed Vikas that he anticipated that Vikas' children, on behalf of Zcom, would be doing business with Devlin's own children on behalf of VZW.

As the economy took a downward turn, beginning in or about the later parts of 2008, VZW began to promote the marketing and sale of VZW branded prepaid wireless service. Moreover, in the later part of 2009 VZW began heavily promoting the its own branded prepaid service was a means of quicky and easily increasing its reported new number activations in order to "steroid enhance"its reportable year-over-year activations to impress government regulators, investment analysts, existing and prospective shareholders, existing and prospective wireless customers, and creditors.

Based upon the compensation guidelines for Zcom, as unilaterally set by VZW, the marketing and sale of prepaid services was generally a loss for Zcom. Notably, when a prepaid account was legitimately activated by a Zcom sub agent, Zcom only retained a meager portion of the commission for itself, with the bulk going to the sub agent. Moreover, such activations did not provide for "residual payments" to Zcom or its sub agents. Furthermore, such activations were not considered by VZW as part of Zcom's "minimum performance" requirements that VZW unilaterally established and which Zcom had to meet. Thus, while VZW was directing Zcom to aggressively focus on the

5

marketing and sale of VZW branded prepaid products and services, it was simultaneously depriving Zcom of any performance credit or residual income.

VZW developed a scheme to artificially inflate the quantity of their own branded prepaid wireless accounts without the need for actually acquiring additional customers. The scheme, was multifaceted, involving misleading Zcom, its sub agents, and its end user customers on multiple fronts.  As designed and implemented by VZW, the scheme involved the activation of cellular telephones ostensibly for use with prepaid VZW branded wireless services.  However, in accordance with VZW's scheme, these cellular instruments were either: (a) owned by customers who had intended to discard them upon upgrading to newer equipment; (b) already discarded by customers who had upgraded to newer equipment; or, (c) provided by VZW, pre-loaded with an amount of "air time" "minutes" - with a short "shelf-life" before expiration, as determined by VZW.  These phones that customers intended to discard - or did discard - upon an upgrade were referred to by VZW as "Customer Provided Equipment" or "CPE."

Zcom, and its sub agents, were instructed by VZW that they must push the prepaid plans by telling the customers that: (a) they could have an "emergency" phone for pennies a day; (b) they would "credit" their "activation fee" of $25.00; (c) an existing phone would be activated as a "pre-pay" account where the customer does not have to sign any contract; and, (d) they were running a promotion wherein the agent would "give" the customer $45.00 worth of air time minutes to use.  These customers were not informed

6

that the prepaid air time minutes were at the most expensive rates charged, most commonly twenty-five cents per minute. Moreover, these customers were also not informed that the prepaid air time minutes that were supposedly being "given" to them would expire in 30 days.

VZW informed Zcom, and its sub agents directly, that they would be compensated via a $40.00 commission on each prepaid activation, along with an incentive, colloquially known as a "spiff" of $20.00 for each activation. VZW further informed Zcom, and its sub agents directly, that they were to activate the prepaid accounts by crediting them with $15.00 and that after the first thirty days the accounts were to be replenished by the activating agent with $30.00 on behalf of the customer. VZW's further instructed that the one-time replenishment was all that was required in order to ensure that the prepaid phone remained active for at least 180 days, thus avoiding "charge backs" of commissions.

What VZW did not inform Zcom, or its sub agents, was that they had designed their prepaid scam with a "self-destruct" mechanism designed to minimize the actual expenses incurred by VZW. Critically, Zcom, nor its sub agents, were informed by VZW that "test calls" had to be made from the prepaid phone at the time of activation to prevent premature deactivation by VZW. The scheme was such that if the prepaid phone was not used for "test calls" at the time of activation, the account would deactivate within 150 days, 30 days shy of the minimum activation period for commissions to be retained by Zcom, or its sub agents.

As devised by the defendants, yet unknown to Zcom and its sub agents, the prepaid phone activation scheme was designed to permit the defendants to obtain the benefits of a newly activated phone number, while depriving their agents, including Zcom, of their commissions on said activations. This worked to VZW's advantage because on the day that a new prepaid number was activated VZW, and its parents, subsidiaries and affiliates, including Verizon Communications, Inc. were able to report such activations as "new" to existing and prospective investors and financial analysts, as well as to government regulators, including the SEC and FCC, customers and creditors.

As devised by VZW, within a day after the initial activation of the prepaid phone, VZW would receive payment from Zcom of approximately $13.20 for each prepaid activation, which is a discounted rate charged to Master Agents for $15.00 worth of prepaid air time. Thereafter, within 45 days after the initial activation of the prepaid phone, VZW would receive another payment from their Zcom of approximately $26.40 for each prepaid activation, which is a discounted rate charged to Master Agents for $30.00 worth of prepaid air time. Accordingly, within 45 days, VZW would receive $39.60 from Zcom for each prepaid account activated.

Thereafter, the defendants would pay Zcom the $40.00 commission and $20.00 "spiff" incentive, which Zcom would then mostly distribute to its sub agents for the accounts they activated. However, any prepaid account that did not have "test calls" made and was not otherwise used by its end user customer was deactivated prior to 180

8

days elapsing.  Moreover, any prepaid account that did not stay active for at least 180 days was subject to a "charge back" of the full $40.00 commission back to VZW.

As Zcom and its sub agents were all instructed by VZW to market the prepaid phones as "emergency" phones - the intent of the phones, as marketed at VZW's direction, was clearly not to use them unless there was an urgency requiring same.  "Test calls" were frequently not made by Zcom and its sub agents, as there were no instructions from VZW requiring them to do so.  Rather, unless a customer asked for such calls to be made to ensure the newly activated prepaid instrument was operational, there was no use of the phone unless the end user customer ultimately used it.   Because no "test calls" were made, if the end user customer did not use the phone - as was to be expected as they were marketed as "emergency" phones - the phones would be deactivated by VZW during the 180 day "charge back" period - without notice to the customer, Zcom or the sub agent.  VZW would then "charge back" the $40.00 commission.  Notably, in or about April 2010 VZW began heavily "charging back" commissions paid out to Zcom  on prepaid activations done in December 2009, at VZW's direction,  because the accounts, as designed by VZW, did not remain active long enough - as it was VZW who deactivated them.

With wholesale fraudulent intent, VZW  also directed Zcom and its sub agents to activate cellular instruments which had been discarded by customers who had upgraded to newer equipment with prepaid services, in fictitious names.  Zcom as an entity would not

9

willfully or voluntarily participate in VZW's fraudulent scheme.  As a result, VZW violated the privity that Zcom maintained with its own sub-agents and initiated direct contact with such sub agents, directing them to participate in the prepaid activation promotion.  VZW threatened that sub agents of Zcom that did not increase their prepaid service activations would be punished, including, potential loss of:  their commissions for sale of data transmission plans plus 50% of their "Co-Op" advertising monies, and, *inter alia*, their continued ability to market and sell VZW branded products and services.  Accordingly, VZW threatened to take the livelihoods of Zcom and its sub agents if they did not comply with their demands.  Notably, at VZW's insistence, certain of Zcom's sub agents fraudulently reported sales of prepaid service to celebrities, including: Robin Williams, Julia Roberts, the late Steve Jobs, Warren Buffet and Russian leader Vladimir Putin.

Sub agents of Zcom participated with the fraudulent components of VZW's scheme because of the pressure to do so put on them by VZW, without any authority of Zcom.  For instance, on or about December 4, 2009, acting on behalf of VZW, account manager Jorge Velez conceded to a Zcom sub agent that the prepaid activation scheme was "shady," yet was approved by VZW and that if the activations weren't made that people would lose their jobs and that participation was "do or die" (*See* Exs. G-H and incorporated digital recording burned to CD-Rom).