# EXHIBIT D

THE LAW FIRM OF RAVI BATRA, P.C.
The Batra Building
142 Lexington Avenue
New York, NY 10016
Ravi Batra, Esquire (*pro hac vice*)
Michael W. Kennedy, Esquire
(212) 545-1993
(212) 545-0967 (fax)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, | CASE No. 11 Civ. 6493 (PGS)(TJB) |
| *Plaintiff,* | DECLARATION IN SUPPORT OF A MOTION TO DISMISS PURSUANT TO F.R.C.P. RULE 12(b) and 12(h) AND FOR AN ORDER PURSUANT TO LOCAL CIVIL RULE 5.3(c) SEALING PURPORTEDLY CONFIDENTIAL MATERIALS |
| v. | |
| IN TOUCH CONCEPTS, INC. d/b/a ZCOM WIRELESS, | |
| *Defendant.* | |

RAVI BATRA, hereby declares, certifies and affirms, under the penalties of perjury, pursuant to the laws of the United States of America:

1.      I am the principal of The Law Firm of Ravi Batra, P.C., 142 Lexington Avenue, New York, NY 10016, with whom Michael W. Kennedy, Esquire, a member of the bar of this Court and, *inter alia*, of the Courts of the State of New Jersey, is associated, attorneys of record for defendant In Touch Concepts, Inc. d/b/a Zcom ("Zcom").  I am an attorney admitted to appear before this Court *pro hac vice*.  I am

admitted to practice in all Courts of the State of New York, where Zcom is incorporated and maintains its principal place of business.  I am also admitted to practice before ths Supreme Court of the United States, as well as the federal District Courts in the Southern and Eastern Districts of New York.  I am lead counsel for Zcom in litigation involving it currently pending in New York State and federal courts, with issues related to the instant proceedings, and accordingly am the attorney most familiar with all litigation currently pending which involves Zcom.   I make this declaration upon information and belief based upon the annexed affidavit of Vikas Dhall, a/k/a I.P. Singh, President and Chief Executive Officer of Zcom, along with a review of prior papers and proceedings in the within action, and the files maintained by The Law Firm of Ravi Batra, P.C. pertaining to Zcom.

2.     I make this declaration in support of Zcom's motion (A) pursuant to F.R.C.P. Rules 12(b) and 12(h)(a) to dismiss the pending complaint seeking a declaratory judgment on behalf of plaintiff Cellco Partnership d/b/a Verizon Wireless ("VZW") [Exhibit A]:  (i) on the grounds that VZW has failed to state a claim upon which relief can be granted, pursuant to F.R.C.P. Rule 12(b)(6), as the contractual condition precedent of pre-suit protocol, inserted into the contract by VZW, was not met by VZW; (ii) in the alternative, (a) pursuant to F.R.C.P. Rule 12(b)(3) on the grounds that VZW fixed an improper venue, or alternatively, transferring venue to a federal District Court in New York, pursuant to 28 U.S.C. § § 1404(a) and 1406(a); (b) pursuant to F.R.C.P. Rule

12(b)(2) on the grounds that the District of New Jersey lacks personal jurisdiction over Zcom; (c) pursuant to F.R.C.P. Rules 12(b)(1) and 12(h)(3) on the grounds that the District of New Jersey lacks of subject matter jurisdiction as there is not complete diversity amongst the parties; and, (B) pursuant to Local Civil Rule 5.3(c) sealing materials which VZW claims are proprietary and confidential, which were exchanged with Zcom pursuant to the agreements which govern the business relationships between the VZW and Zcom, to wit Exhibits C, D, E, F, I, T and U appended to the instant Declaration and Exhibits A, B, C and D appended to the January 10, 2012 Declaration of Vikas Dhall, a/k/a I. P. Singh, or alternatively an Order determining and directing that such materials do not warrant a confidential designation and authorizing their public filing.

## I.   FACTUAL BACKGROUND

3.     Zcom has maintained a long standing agency relationship with VZW wherein Zcom is authorized to sell services on VZW's wireless network, and equipment that works on that network.   Pursuant to their agreement, Zcom may engage sub agents who, if approved by VZW, may perform the sale of services and equipment on Zcom's behalf.   In turn, Zcom maintains agency relationships with its sub agents, who are not parties to any agreement that Zcom has with VZW.  Rather, there is no business relationship between VZW and any sub agent of Zcom.

4.      A true copy of the Master Agreement which VZW maintains governing the relationship between itself and Zcom ("Master Agreement") is appended hereto and incorporated herein as <u>Exhibit B</u>. This Master Agreement is a contract of adhesion, drafted by VZW.

5.      In the worst of faith, by letter dated July 26, 2011, VZW has sought to terminate its agency relationship with Zcom effective January 31, 2012 ("Termination Letter") because:

a.      Zcom would not cooperate in a scheme instituted by VZW and its corporate parents and affiliates involving mass activations of prepaid cellular phone services, under false pretenses, to artificially inflate the quantity of new account activations that VZW, and, *inter alia*, its majority parent Verizon Communications, Inc., reported to government regulators, investment analysts, potential and existing shareholders, potential and existing customers, and, *inter alia*, creditors; and,

b.      after VZW's "steroid-enhanced" performance came into question, Zcom actively resisted being VZW's scapegoat, such that VZW fabricated false claims of "misconduct" by Zcom in an effort to steer attention and blame away from VZW's own wrongdoing.

A true copy of the Termination Letter is appended hereto and incorporated herein as <u>Exhibit C</u>.

4

6.      By the termination letter VZW alleges that the termination was generically

made, "without cause" and " for 'no cause';" however, VZW added that they had

"grounds for a 'with cause' termination." In "support" of their "grounds" for "cause,"

VZW refers to the very prepaid scheme that they implemented and forced upon Zcom and

its sub agents, under threats of business loss and financial ruin.

●      *VZW'S PREPAID ACTIVATION SCAM*

7.      As designed and implemented by VZW, the scheme involved the activation

of cellular telephones ostensibly for use with prepaid VZW branded wireless services.

However, in accordance with VZW's scheme, these cellular instruments were either: (a)

owned by customers who had intended to discard them upon upgrading to newer

equipment; (b) already discarded by customers who had upgraded to newer equipment; or,

(c) provided by VZW, pre-loaded with an amount of "air time" "minutes" - with a short

"shelf-life" before expiration, as determined by VZW. These phones that customers

intended to discard - or did discard - upon an upgrade were referred to by VZW as

"Customer Provided Equipment" or "CPE."

8.      That it was VZW who was the force behind the aggressive marketing and

sale of VZW branded prepaid products and services with CPE is evidenced by e-mails

that VZW designated as "confidential," emphasizing the push, to wit [Exhibit D]:

a.      June 25, 2009: highlights locations with an upgrade ratio

higher than 2.5 to 1. Wants these locations to aggressively go after the CPE opportunity;

        b.      July 06, 2009: location goal sheet for CPE sales.  Explains that stores not hitting their goals will lose data commissions plus 50% of their advertising monies, referred to as "Co-Op;"

        c.      July 23, 2009: directing Zcom to have its sub agents push, *inter alia*, CPE and Pre-Pay during every transaction; and,

        d.      November 12, 2009: directing Zcom to have its sub agents push CPE activations with customer's old devices.

The heavy promotion of prepaid products and services along with CPE activation began in or about November 2009, although there was promotion of same which predated that. Such promotion continued until in or about April - May 2010 when VZW began pushing VZW branded cellular phones "bundled" with prepaid air time minutes.

      9.      Zcom, and its sub agents, were instructed by VZW that they must push the prepaid plans by telling the customers that:

        a.      they could have an "emergency" phone for pennies a day;

        b.      they would "credit" their "activation fee" of $25.00;

        c.      an existing phone would be activated as a "pre-pay" account where the customer does not have to sign any contract; and,

        d.      they were running a promotion wherein the agent would "give" the customer $45.00 worth of air time minutes to use.

These customers were not informed that the prepaid air time minutes were at the most expensive rates charged, most commonly twenty-five cents per minute. Moreover, these customers were also not informed that the prepaid air time minutes that were supposedly being "given" to them would expire in 30 days.

10.    VZW informed Zcom, and its sub agents directly, that they would be compensated by receipt of a commission of $40.00 on each prepaid activation, along with an incentive, colloquially known as a "spiff" of $20.00 for each activation. VZW further informed Zcom, and its sub agents directly, that they were to start the prepaid accounts by crediting them with $15.00 upon activation and that after the first thirty days the accounts were to be replenished with $30.00 by the agent, on behalf of the customer. VZW's further instructed that the one-time replenishment was all that was required in order to ensure that the prepaid phone remained active for at least 180 days, thus avoiding "charge backs" of commissions.

11.    What VZW did not inform Zcom, or its sub agents, was that they had designed their prepaid scam with a "self-destruct" mechanism designed to minimize the actual expenses incurred by VZW. Critically, neither Zcom, nor its sub agents, were informed by VZW that "test calls" had to be made from the prepaid phone at the time of activation to prevent premature deactivation by VZW. The scheme was such that if the prepaid phone was not used for "test calls" at the time of activation, the account would

7

deactivate within 150 days, 30 days shy of the minimum activation period for commissions to be retained by a Master Agent, like Zcom, or its sub agents.

12.     As devised by VZW, yet unknown to Zcom and its sub agents, the prepaid phone activation scheme was designed to permit VZW to obtain the benefits of a newly activated phone number, while depriving their agents, including Zcom, of their commissions on said activations.  This worked to VZW's advantage because on the day that a new prepaid number was activated VZW, and its parents, subsidiaries and affiliates, including Verizon Communications, Inc. were able to report such activations as "new" to existing and prospective investors and financial analysts,  as well as to government regulators, including the SEC and FCC, as well as customers and creditors.

13.     As devised by VZW, within a day after the initial activation of the prepaid phone, VZW would receive payment from Zcom of approximately $13.20 for each prepaid activation, which is a discounted rate charged to Master Agents for $15.00 worth of prepaid air time.  Thereafter, within 45 days after the initial activation of the prepaid phone, VZW would receive another payment from their Zcom of approximately $26.40 for each prepaid activation, which is a discounted rate charged to Master Agents for $30.00 worth of prepaid air time.  Accordingly, within 45 days, VZW would receive $39.60 from Zcom for each prepaid account activated.

14.     Thereafter, VZW would pay Zcom the $40.00 commission and $20.00 "spiff" incentive, which Zcom would then mostly distribute to its sub agents for

8

the accounts they activated. However, any prepaid account that did not have "test calls" made and was not otherwise used by its end user customer was deactivated prior to 180 days elapsing. Moreover, any prepaid account that did not stay active for at least 180 days was subject to a "charge back" of the full $40.00 commission back to VZW.

15.     Zcom and its sub agents were all instructed by VZW to market the prepaid phones as "emergency" phones - thus the intent of the phones was not to use them unless there was an urgency requiring same. "Test calls" were frequently not made by Zcom and its sub agents, as there were no instructions from VZW requiring them to do so. Rather, unless a customer asked for such calls to be made to ensure the newly activated prepaid instrument was operational, there was no use of the phone unless the end user customer ultimately used it. Because no "test calls" were made, if the end user customer did not use the phone - as was expected as they were marketed as "emergency" phones - the phone would be deactivated by VZW during the 180 day "charge back" period - without notice to the customer, Zcom or the sub agent and VZW would then "charge back" the $40.00 commission. Notably, in or about April 2010 VZW began heavily "charging back" commissions paid out to Zcom on prepaid activations done in December 2009, at VZW's direction, because the accounts, as designed by VZW, did not remain active long enough - as it was VZW who deactivated them.

16.     VZW profits a "net" $19.60 per pre-paid # scam: Under these circumstances, VZW would receive $79.60 from Zcom ($39.60 in air time minutes +

9

$40.00 "charged back" = $79.60). Notwithstanding that VZW initially paid out $60.00 in commission and "spiff," after the payment for air time minutes which usually expired before they were ever used, and the "charge back" of the $40.00 commission, VZW realized not less than $19.60 per each prepaid activation done by Zcom.

17. **VZW's revised plan "nets" VZW $6.40 per pre-paid # scam**: Beginning in or about January 2010, VZW slightly amended the instructions to Zcom and its sub agents. Under the revised plan, VZW required that the initial activation of the prepaid instrument by the selling agent be done with $30.00 worth of air time minutes rather than $15.00 worth of minutes - at a cost of $26.40. Under these revised instructions, VZW still realized not less than a net $6.40 per each prepaid

activation done by Zcom and its sub agents - as the $40.00 "charge back' would still occur ($26.40 + $40.00 charge back vs. $60.00 paid out in "spiff" and commission).

- *VZW THREATENED AND PRESSURED ZCOM AND ITS SUB AGENTS*

18. VZW directed Zcom and its sub agents to heavily promote prepaid VZW branded services to their customers, notwithstanding that Zcom did not really benefit from the sale of prepaid services - and neither did the customers - who got stuck with a "flat" "spare tire:" the phone would be deactivated by VZW unless the customer loaded it up with price-gouging, rapidly expiring, non-"roll-over" minutes sold by VZW.

19. VZW's also directed Zcom and its sub agents to activate cellular instruments which had been discarded by customers who had upgraded to newer

10

equipment with prepaid services, even in fictitious names.  Notably, at VZW's insistence, certain of Zcom's sub agents fraudulently reported sales of prepaid service to celebrities, including: Robin Williams, Julia Roberts, the late Steve Jobs, Warren Buffet and Russian leader Vladimir Putin.

20.     Zcom as an entity would not willfully or voluntarily participate in VZW's fraudulent scheme.  As a result, VZW violated the privity that Zcom had with its own sub-agents and initiated <u>direct</u> contact with Zcom's sub agents, directing them to participate in the prepaid activation promotion - which was really a bold nationwide fraudulent scam to artificially inflate reported numbers of new account activations to shareholders, customers, creditors, the SEC and, *inter alia*, the FCC.

21.     VZW threatened that sub agents of Zcom that did not increase their prepaid service activations would be punished, including, potential loss of:  their commissions for sale of data transmission plans plus 50% of their "Co-Op" advertising monies, and, *inter alia*, their ability to market and sell VZW branded products and services.  Accordingly, VZW threatened to take the livelihoods of Zcom and its sub agents if they did not comply with their demands.  That VZW actively sought to punish Zcom, via its sub agents, is revealed in an e-mail from John Coyle, then a District Manager for VZW - who lost his job with VZW ostensibly because of his involvement with the prepaid scheme - to Zcom on May 19, 2009, wherein Coyle indicates that VZW sought to implement a plan to financially hurt stores that are underperforming [Exhibit E].   Moreover, other e-mails,

11

including ones from VZW to Zcom on June 8, 2009 indicated that stores not meeting

goals set by VZW and conveyed through Zcom would be penalized [Exhibit F].

22.     VZW told Zcom and its sub agents that participation was "do or die" - as

proved by an audio recording:  Sub agents of Zcom participated with VZW's scheme

because of the pressure to do so put on them by VZW, without any authority of Zcom.

For instance, on or about December 4, 2009, acting on behalf of VZW, account manager

Jorge Velez informed a Zcom sub agent that the prepaid activation scheme, albeit

"shady," was approved and that if the activations weren't made that people would lose

their jobs and that participation was "do or die."  Moreover, Velez further reported that

his "general" was VZW New York Metro Director of Indirect sales, Tom Verghese, and

that Vergese, and higher ups, which includes Patrick Devlin, VZW's President of its New

York Metro region, were demanding more prepaid numbers.  This communication was

recorded by the sub agent and a digital recording of same on CD-Rom is being provided

along with the courtesy copy forwarded to Chambers, and is incorporated herein by

reference.  An affidavit from the sub agent who recorded same is appended hereto as

Exhibit G.  As is included at ¶ 143 of Zcom's pending lawsuit sounding in tort against,

*inter alia*, Verizon Communications, Inc. ("Verizon") and VZW, described in greater

detail herein, infra, (*see also* Ex. P, *infra*), a transcript of the December 4, 2009

communication follows with the letters "JV" representing the statements of defendant

Velez, and "SA" representing the Zcom sub agent representative:

12

JV:     [unintelligible] my big stores are not doing absolutely
        nothing, and, and, of course, obviously I'm not
        blaming the stores, I'm blaming the economy, the
        traffic.

SA:     Right.  Right, right.  So that means Tom Verghese,
        John Coyle. . .

JV:     [unintelligible]

SA:     are okay with that.  Like, they know it.  It will be like,
        it will be shady, a little bit shady, not 100% shady but a
        little bit shady.

JV:     Yes it is sir.  And, listen, I don't sugarcoat shit
        because, you know,  I'm an honest person, I like to do
        things honest myself.  But, right now, Tom is asking
        for numbers.

SA:     Gotcha.

JV:     How we get the numbers, he doesn't want to know.
        All he wants to see numbers.  And the only way we can
        do things like this is by promoting C, customer
        provided equipment, we call it C P E and tacking on
        that $15.00 that way our [unintelligible].

SA:     So

JV:     So listen, if you, if you do, if you do five, say here in
        Bohemia for the whole fuckin' month [unintelligible]
        ten numbers [unintelligible] well then of course you
        guys are gonna do business.  You guys are also gonna
        sell prepay the right way also but, it's just the way we
        got, we're trying to do something for the next couple
        of days to show some kind of growth, because right
        now we're not.  We had a horrible October, horrific
        November, and December's not doing so well.  And,

13

and, and honestly it's everybody's job is on the line if we don't perform well in December. You know my job is on the line, Coyle's job is on the line, and obviously, obviously our big general Tom is on the line as well.

SA:   Gotcha, gotcha.

JV:   But, it's do or die sir, so you know [unintelligible].

SA:   No, no, no, definitely, for $15.00, let's say we like, for argument sake, just talking to you, let's say we do like 25 new lines with the prepay

JV:   Yeah.

SA:   In my store. Argument sake only five people continue to carry the prepaid and twenty people does not even increase the minutes. . .

JV:   Right.

SA:   So we get, we get, five commissions for sure, like [unintelligible] if the money [unintelligible]   Just like advertising I can say, oh you know I can say my [beeping in background - unintelligible speaking] saving your  jobs [unintelligible] I can say.

JV:   Absolutely sir.

SA:   I can stand about 2 - 3 hundred dollars extra a month you know.

JV:   And before, and before I talk to Ahmed, before I speak to Tina, I first talk to you, because I want to get your feedback, your, your suggestions.

14

SA:   No, no, I was there with Tina and, and Andy and everybody, and I did mention then, you know you told me that In Touch was getting a very good deal for their Samsung Smooth.

JV:   Yeah [unintelligible] they sent e-mail on it [unintelligible] I asked her to send information to you guys but she hasn't sent shit.   It's, it's already the 4th of the month.

SA:   Yeah, they have not sent anything.  Thank you to you because we are ready now. I spoke to Dan and we already are, like, um, you know, basically, I discuss with [inaudible/ unintelligible - background voice] basically I, I discuss [unintelligible] with either you or Dan, how to sell those $25.00 prepaid, you know how to put like a new sign, free phone on the counter, and you know, even by giving them the free phone, if we charge them just the $30.00 for the minutes

JV:   Right, absolutely.

SA:   we can cover, because you said that the phone will be $25.00 and it comes with a $30.00 card

JV:   Right.  That's correct.

SA:   If it comes with a $30.00 card and I sell the phone for just $30.00 it means I'm covering the cost of, um, my phone and increasing the gross ad.

JV:   [unintelligible] right.

SA:   Simple as that.  So, I'm definitely on it, you know, I'm just waiting for them to get the phone, but this is a good idea.  Now, now you give me green signal.

JV:   Right.  Listen, even, even, even my idea is costing you nothing because remember we're using, we're using the same customer's phone.

15

SG:    Customer's own phone. Right.

JV:    Just we're doing a lot of upgrades why not take advantage of the upgrade that's already coming in instead of waiting for [unintelligible] or whatever. What happened to [unintelligible]. It's not Tuesday. We can't wait till Tuesday. We got Friday, today, Saturday, weekend, Sunday, we can, honestly, it's a do or die, it's a do or die situation for us. My ass is on the line. Coyle's ass is on the line. Tom's ass is on the line. We, my bosses' bosses want to see numbers. How we get it they don't care at this point.

SA:    Gotcha sir.

JV:    Alright, buddy, so. . .

SA:    No problem. I'll go again on the weekend, or Monday maybe to my stores and I'll again continue [unintelligible].

JV:    No problem sir. Listen, I appreciate your time.

SA:    No problem. Thank you. Thank you Jorge. Bye.

Notably, on December 8, 2009 that same sub agent contacted Zcom via e-mail expressing concern about the prepaid activation plan endorsed by VZW because the prepaid phone would become inactive during the charge back period [Exhibit H].

> ● *ZCOM SOUGHT TO ROOT OUT FRAUD*

23.    Zcom internally detected what appeared to be fictitious prepaid account activations and expeditiously reported same to VZW, who ironically was the root cause of the problem. Moreover, by e-mail dated November 29, 2009, Zcom informed VZW that they were implementing a comprehensive anti-prepaid fraud program with a protocol for

16

identifying and preventing such fraud and with repercussions for participating in same [Exhibit I]. VZW outwardly commended Zcom for its detection and instructed them to continue to deter prepaid activation fraud; however, at the same time VZW personnel were surreptitiously in direct contact with Zcom's sub agents coercing them to commit the very prepaid activation fraud that Zcom was trying to thwart!

## II.   RELATED LITIGATION

A.   *Reachout Wireless, Inc., et. al., v. In Touch Concepts, et. al.*, Index # 652587/2011 (Ramos, J.): Sub agents sue Zcom as a result of VZW's prepaid activation scam;

B.   *Cellco Partnership d/b/a Verizon Wireless v. In Touch Concepts, Inc. d/b/a Zcom*, Case No. 11 CV 6493 (PGS) (TJB): VZW, unsure of its wrongful termination of Zcom, commences the instant action wherein they sue Zcom seeking Declaratory Judgment;

C.   *In Touch Concepts, Inc. v. Verizon Communications, Inc., et. al.*, Case # 12-cv-00025 (PKC) (JCF): Class Action by Zcom against, *inter alia*, Verizon and VZW, commenced in New York County Supreme Court, and removed to the Southern District of New York by, *inter alia*, Verizon and VZW.

24.   A.   Zcom sub agents Reachout Wireless and American Candy sue Zcom: Based upon VZW's false representations that the architecture and orchestration of their prepaid scheme was performed by Zcom, Zcom has been named as a defendant in a civil class action commenced on or about September 20, 2011 in the Supreme Court of the State of New York, New York County: *Reachout Wireless, Inc., et. al., v. In Touch Concepts, et. al.*, Index # 652587/2011 (Ramos, J.), which seeks damages for, *inter alia*, commissions associated with prepaid activations which were "charged back" by VZW.

Attached hereto as <u>Exhibit J</u> are portions of the First Amended Complaint filed by Zcom

sub agents Reachout and American Candy, on or about September 27, 2011, making

direct reference to allegations of misconduct by former VZW District Manager Tom

Verghese.  Instigated by Reachout and American Candy's counsel, the *New York Post*

initially ran a story about the filing of that frivolous lawsuit, entitled "*Verizon - pre-paid*

*tangle*," by business reporter Josh Kosman on or about September 28, 2011 [<u>Exhibit K</u>].

     25.     That litigation has been rather contentious, with Reachout/American Candy

and Zcom simultaneously seeking Orders to Show Cause with Temporary Restraining

Orders on October 17, 2011.  Notably, after oral argument on October 17, 2011 [<u>Exhibit</u>

<u>L</u>], injunctive relief sought by Zcom was granted [<u>Exhibit M</u>], while that sought by sub

agents Reachout and American Candy was denied.  Furthermore, once the motion was

ultimately returnable, after further oral argument on November 30, 2011 [<u>Exhibit N</u>],

relief sought by Zcom was granted, while it was again denied to sub agents Reachout and

American Candy.

     26.     <u>B.   VZW inequitably seeks relief against Zcom in New Jersey Federal</u>

<u>Court</u>: Thereafter, on or about November 4, 2011, VZW commenced the instant

action, seeking a Declaratory Judgment that VZW was entitled to terminate its business

relationship with Zcom [Ex. A].  By Consent Order dated November 17, 2011, and

entered on November 21, 2011, Hon. Tonianne J. Bongiovanni, United States Magistrate

18

Judge, *inter alia*, enlarged Zcom's time to make the instant motion until January 10, 2012 [Exhibit O].

27.    C.   Zcom commences a class action lawsuit against 25 defendants:

Because, *inter alia*, VZW coerced Zcom's sub agents, whom Zcom is in privity with, to breach their contractual arrangements with Zcom, and it is believed that VZW did the same thing with other Master Agents, on December 28, 2011, Zcom commenced a civil class action in the Supreme Court of the State of New York, New York County, against VZW, its parents and affiliates, as well as certain of its employees, seeking, *inter alia*, compensatory and punitive damages. That lawsuit also seeks over $12 billion dollars in non-class action compensatory and punitive relief against VZW, its parents and affiliates, certain of their employees, and the principals of certain Zcom sub agents who willfully participated in VZW's prepaid scam. On or about January 3, 2012, VZW, its parents and affiliates and certain of their employees removed this action to the Southern District of New York, ostensibly pursuant to the Class Action Fairness Act: *In Touch Concepts, Inc. v. Verizon Communications, Inc., et. al.*, Case # 12-CV-00025 (PKC) (JCF).

28.    True copies of the Summons and Verified Complaint that Zcom filed in New York County Supreme Court, as was then removed to the Southern District of New York by, *inter alia*, VZW, is appended hereto as Exhibit P. Moreover, under New York law, as this complaint is personally verified by Vikas Dhall a/k/a I.P. Singh, the President

and Chief Executive Officer of Zcom, it serves as an affidavit for all purposes pursuant to

N.Y. C.P.L.R. § 105(u).

29.     Referral letter to Federal Prosecutors, the SEC and FCC, and United

States Senators:  Because the issues raised by Zcom's lawsuit are so significant, and

because the actions of VZW and its parents, affiliates, subsidiaries, and certain of its

employees was intended to mislead and defraud such a broad range of people and entities,

by letter sent December 29, 2011, Zcom duly reported the allegations contained within its

Class Action complaint to federal regulators (the SEC and FCC), federal prosecutors in

both the Southern and Eastern District of New York, and United States Senators Hon.

Charles E. Schumer, of the Judiciary Committee and Hon. Mark R. Warner of the

Committee on Commerce, Science and Transportation and its subcommittee on

Communications, Technology, and the Internet, as Judge Greene's breakup of "Ma Bell"

seems to have been thwarted by corporate feudal lords [Exhibit Q].  Notably, the *New

York Post* also found significant interest in Zcom's mistreatment, running a story about

Zcom's lawsuit, entitled "*Verizon gamed cell phones, suit says,*" by business reporter Josh

Kosman on or about December 29, 2011 [Exhibit R], and another article entitled

"*Verizon 'coerce' charge,*" also by Mr. Kosman, was published by the *New York Post* on

January 1, 2012, following Zcom's referral to federal authorities [Exhibit S].

### III.   PERTINENT PORTIONS OF THE MASTER AGREEMENT - INCLUDING THE UNMET *CONDITION PRECEDENT* TO VZW COMMENCING THIS ACTION

30.    The Master Agreement [Ex. B] contains certain terms that are of critical importance to VZW's pending action, and Zcom's instant motion, to wit:

a.    VZW commenced this action in wholesale breach of ¶ 14 - ¶ 14.2 of the Master Agreement, which  provides, in pertinent part, that

> (¶ 14) [n]either party may commence any court case against the other party without first providing written notice and an opportunity to negotiate with the other party.  (¶ 14.1) The written notice required by this subsection shall specify the alleged claim or controversy, summarizing the factual basis for the claim or controversy and the contractual provisions, if any, at issue.  (¶ 14.2) Within fifteen (15) days of such written notice, the parties shall meet in person or by telephone and in good faith attempt to settle the alleged claim or controversy. IF THE PARTY RECEIVING THE NOTICE REFUSES TO MEET, THIS PERIOD WILL BE DEEMED TO HAVE EXPIRED UPON THE SOONER OF FIFTEEN (15) DAYS OR THE DATE OF SUCH REFUSAL

(EMPHASIS IN ORIGINAL).  VZW did not comply with ¶ 14 - ¶ 14.2;

b.    ¶ 10.1 provides, in pertinent part, that "the interpretation and enforcement of this Agreement and all matters arising out of or relating to it shall be governed by the law of New York;

c.    notwithstanding that it is settled New York law that all contracts are governed by the implied covenant of good faith and fair dealing, as evidence of VZW's bad faith, they included language in the Master Agreement seeking to escape from their

21

mandatory obligation to act fairly and in good faith with Zcom, such that ¶ 10.2

unlawfully provides that "[it] is understood and agreed that this Agreement is not subject

to any implied duties of good faith or fair dealing;"

        d.     critically, however, the Master Agreement also contains a

severability clause at ¶ 10.3 which provides, in pertinent part that if portions of the

agreement are invalid or unenforceable, the remainder of the agreement continues so long

as the material intent of the agreement is not changed;

        e.     Furthermore, ¶ ¶ 10.7.3 - 10.7.3.1 of the Master Agreement mandates

that

> VZW shall defend, indemnify and hold harmless [Zcom], its
> Affiliates, and their respective directors, officers, employees,
> contractors, agents, shareholders, and/or any successors
> and/or assignees thereof, and their respective heirs and legal
> representatives (collectively, "Agent Indemnitees"), from and
> against any and all Losses, and reasonable attorney's fees and
> expenses incurred in the enforcement of this indemnification,
> resulting from Claims brought against the Agent Indemnitees
> to the extent such Losses result from: gross negligence or
> willful misconduct of VZW and/or its Affiliates, personnel,
> employees, contractors, subcontractors or subagents;

however, further evidencing their bad faith, and notwithstanding that they were provided

by Zcom with written notice of, *inter alia*, claims made against Zcom, pursuant to ¶

10.7.4.1, which are based upon willful misconduct of VZW personnel [Exhibit T], VZW

outright refused to provide a defense or indemnification [Exhibit U], and is thus not

cooperating, in violation of ¶ 10.7.4.3.

## IV.   RELIEF SOUGHT

31.     A business entity cannot be permitted to act in bad faith and unfairly with its agents.  Accordingly, Zcom vehemently disputes the putative termination of its longstanding agency with VZW as the termination of same by VZW is rooted in bad faith and unfair dealing.  Notwithstanding that it is VZW's own bad faith and unfair "double dealing" which has generated the controversy between VZW and Zcom, it is VZW who disingenuously comes to this Court, with nothing but unclean hands, incapable of being "washed," incredulously, and frivolously,[1] praying for equitable relief in the form of a declaration that its wrongdoing is right - which is the entire substance of their pending complaint [Ex. A].

32.     The Master Agreement, drafted by VZW, mandates that VZW was not permitted to commence any "court case" arising out of the agreement, and thus, this action is barred, *ab initio*, without VZW "first providing written notice and an opportunity to negotiate with" Zcom. [Ex. B, ¶ 14 - ¶ 14.2].  No such notice was provided - and there was absolutely no negotiation.  Accordingly, VZW failed to meet a condition precedent to commencing suit as drafted by them in their own contract of adhesion.  Therefore, under New York law, which the Master Agreement is governed by [Ex. B, ¶ 10.1], VZW may not maintain the instant action - mandating its dismissal.

---

[1]Rule 11 is exactly intended to chill or prevent a party from filing the kind of lawsuit VZW has filed against Zcom.  To be clear, we aim our Rule 11 displeasure at VZW, not its attorneys.

33.     Furthermore, VZW improperly seeks to fix venue in this diversity action to determine issues pertaining to controversy of its own making in its home District. Pursuant to 28 U.S.C. § 1391(a)(1), this action, if properly brought, would have to have been commenced in federal court in New York.  In an effort to escape from this procedural reality, VZW simply made boilerplate representations that "a substantial number of the events giving rise to Verizon Wireless's claim occurred in this judicial district" and that ZCom is subject to *in personam* jurisdiction in this judicial district." However, all of the allegations that VZW has made about Zcom are centralized in New York, and Zcom is a New York corporation with its principal offices located in New York.  Moreover, apart from 3 sub agents, who are independent contractors, with independent corporations that Zcom does not exercise control over, Zcom does not maintain a corporate presence in New Jersey and has not "transacted business in the State of New Jersey in connection with the matters at issue" as alleged by VZW in their complaint.  Rather, other than an occasional meeting held in New Jersey at VZW's insistence, there is no link between Zcom and New Jersey.[2]  Accordingly, none of the alleged, albeit false "events giving rise to Verizon Wireless's claim occurred in this

---

[2]In a putative affidavit submitted in support of a motion to quash subpoenas that Zcom issued to Verizon Communications, Inc. executives Ivan Seidenberg and Lowell McAdam, in furtherance of Zcom's defense of the claims made by Reachout Wireless and American Candy pending in New York County Supreme Court [Exhibit X], Patrick Devlin, President of VZW's New York Metro Region represented that Zcom's President Vikas Dhall has only once visited with Devlin at his New Jersey offices (Ex. X, ¶ 12).

24

judicial district" and, Zcom is <u>not</u>, it is respectfully urged, "subject to *in personam* jurisdiction in this judicial district" for the reasons relied upon by VZW - therefore this Honorable Court is an improper forum, and lacks personal jurisdiction over Zcom.

34.   <u>Subject Matter Jurisdiction is lacking as there is an absence of complete diversity</u>: Alternatively, a valid question exists as to whether this Court has subject matter jurisdiction, as based upon VZW's Rule 7.1 statement [<u>Exhibit V</u>] and the putative affidavit of Patrick Devlin, VZW's President for the New York Metro Region, submitted in the pending New York County action against Zcom, there may not be complete diversity.

35.   As affirmatively represented by VZW in their Rule 7.1 statement and in Mr. Devlin's putative affidavit, Bell Atlantic Mobile Systems ("BAM") and GTE Wireless ("GTE") are "two of the partners representing 55% of the interest in Verizon Wireless, are ultimately owned by Verizon Communications, Inc. ("Verizon"). For diversity purposes, a partnership is a resident of all of its partners. Moreover, a corporation is a resident of its state of incorporation and where it has its principal place of business.

36.   Accordingly, as the records of the New York Department of State confirm that Verizon is a Delaware corporation with a principal place of business in New York [<u>Exhibit W</u>], it is a resident of both New York and Delaware. Moreover, if BAM and GTE are owned by Verizon, then they too are residents of New York. Furthermore, as

BAM and GTE are thus residents of New York, as partners in VZW they make VZW a resident of New York as well.  Accordingly, both Zcom and VZW are apparently residents of New York, destroying complete diversity!

37.    Local Civil Rule 5.3(c) protection of potentially confidential materials: During the course of their business dealings VZW transmitted documents and materials to Zcom which VZW represented were confidential.  Moreover, the Master Agreement provides for the protection of "Confidential Information disclosed by VZW" to Zcom [Ex. B, ¶¶ 3.10 - 3.10.4].

38.    While Zcom may not agree with VZW's self-designations, in an abundance of caution, we seek an Order either sealing such allegedly confidential material which are appended to Zcom's motion papers from public inspection, to wit: Exhibits C, D, E, F, I, T and U to the instant Declaration and Exhibits A, B, C and D to the January 10, 2012 Declaration of Vikas Dhall, a/k/a I. P. Singh, or, alternatively an Order finding and directing that such materials are not confidential and do not warrant sealing - thus authorizing their public filing.

WHEREFORE, as it is respectfully requested that Zcom's motion be granted in its entirety, and that the instant action be dismissed pursuant to F.R.C.P. Rules 12(b) and 12(h).

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed at: New York, New York
Executed on: January 10, 2012

Respectfully submitted,
THE LAW FIRM OF RAVI BATRA, P.C.
*Attorneys for Defendant In Touch Concepts, Inc.*

Ravi Batra, Esquire (*pro hac vice*)
The Batra Building
142 Lexington Avenue
New York, New York 10016
(212) 545-1993

27